```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------------------X
                                         :
 4   ADIAHA A. RUANE,                    :
                                         :   17-CV-03704 (PKC)
 5                    Plaintiff.         :
                                         :
 6              v.                       :
                                         :   225 Cadman Plaza East
 7   BANK OF AMERICA, NA, et al.,        :   Brooklyn, New York
                                         :
 8                    Defendants.        :   January 9, 2018
     ------------------------------------X
 9
            TRANSCRIPT OF CIVIL CAUSE FOR INITIAL CONFERENCE
10              BEFORE THE HONORABLE PEGGY KUO
              UNITED STATES CHIEF MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiff:        EVE WEISSMAN, ESQ.
                               New Economy Project
14                             121 West 27th Street, #804
                               New York, New York  10001
15
                               BRIAN L. BROMBERG, ESQ.
16                             Bromberg Law Office, PC
                               26 Broadway, 21st Floor
17                             New York, New York 10004

18   For Defendant Bank        CONSTANTINE A. DESPOTAKIS, ESQ.
      of America:              Wilson Elser Moskowitz Edelman
19                              & Dicker
                               1133 Westchester Avenue
20                             White Plains, New York 10604

21   For Defendant Chex:       JOHN A. WAIT, ESQ.
                               ALEXANDRA L. SOBOL, ESQ.
22                             Fox Rothschild LLP
                               100 Park Avenue, 15th Floor
23                             New York, New York 10017

24
     Court Transcriber:        MARY GRECO
25                             TypeWrite Word Processing Service
                               211 N. Milton Road
                               Saratoga Springs, New York 12866

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

1   (Proceedings began at 10:07 a.m.)

2          THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3   presiding.  Civil Cause for Initial Conference, docket number

4   17-CV-3704, Ruane v. Bank of America, NA, et al.  Counsel,

5   please state your name for the record starting with the

6   plaintiff.

7          MS. WEISSMAN:  Eve Weissman with New Economy

8   Project.

9          MR. BROMBERG:  Brian Bromberg, Bromberg Law Office,

10  PC for the plaintiff.  Good morning, Your Honor.

11         MR. DESPOTAKIS:  Constantine Despotakis; Wilson

12  Elser, counsel for defendant Bank of America, NA.  Good

13  morning, Judge.

14         MR. WAIT:  Good morning, Your Honor.  John Wait here

15  with my colleague Alexandra Sobol; Fox Rothschild.  We

16  represent Chex Systems.

17         THE COURT:  All right.  Good morning, everyone.  So

18  we're here for an initial conference but there's also been a

19  motion to strike the jury demand filed, and so I'll be asking

20  counsel some questions on that as we proceed.  But I'd like to

21  hear what counsel have to say about the case since this is an

22  initial conference.

23         MS. WEISSMAN:  Sure.  Good morning, Your Honor.

24  This case is brought, plaintiff brings claims under two

25  federal laws, the Electronic Fund Transfer Act and the Fair

1    Credit Reporting Act, along with attendant state laws, the New

2    York Fair Credit Reporting Act, the New York General Business

3    Law Section 349 banning deceptive acts and practices and other

4    common law state law claims as well.

5              Your Honor, the plaintiff in this case is a low

6    income single mother who realized back in September 27, 2017 -

7    - I'm sorry, 2016, that there were funds in her Bank of

8    America checking account that she did not recognize.  That

9    same day she promptly called the bank, informed them that

10   there were funds that were not hers and asked them to remove

11   the funds from her account.  Instead, Bank of America called

12   her just a few hours later, informed her that they were

13   actually going to blame her for the fraud, close her account,

14   and also reported report suspected fraud activity to Chex

15   Systems, the other defendant in this case.  It turns out that

16   the fraudulent funds or the unauthorized funds in her bank

17   account consisted of five checks.  Those checks were some very

18   obvious signs of fraud including the fact that they were from

19   a Bank of America payroll account of a Cheesecake Factory

20   restaurant located Casabalas [sic] Hills, California, a

21   location that our client had never lived in, worked at, or

22   even visited.  The signature on the back of the check bears no

23   resemblance to her actual signature.  And on the front of the

24   checks there is a signature that is actually a direct replica

25   of the signature of President Barack Obama.

4

1          After her account was closed she was unable to open

2    up an account at another bank.  She tried and was unable to.

3    This prevented her from accessing her widow's pension which

4    comes from Ireland.  And as a result of that, she was forced

5    to relocate from San Francisco where she had recently moved to

6    pursue a career opportunity to New York City at the age of 45

7    to move in with her mother and get back on her feet.

8          Your Honor, we're concerned that this has happened

9    to other Bank of America customers as well where the bank has

10   failed to conduct a reasonable investigation of their fraud

11   claims.  We brought a case last year with some similar facts

12   against Bank of America where a low income consumer here in

13   New York City also had fraudulent checks deposited into his

14   bank account also bearing a fake Obama signature.  So that's a

15   summary of our claims in our case.

16          THE COURT:  All right.  Can I just ask you a couple

17   of questions?

18          MS. WEISSMAN:  Yes.

19          THE COURT:  Your client opened a Bank of America

20   account in 2005 or when was that?

21          MS. WEISSMAN:  Yeah, she doesn't remember the exact

22   date but based on the signature card, she does recognize her

23   signature and that date.  She does not dispute that that was

24   around the time that she would have opened up the account here

25   in New York.

5

1          THE COURT:  Okay.  So is the signature card

2   something that she would have signed at the time that she

3   opened the account or is something that could have happened

4   later?

5          MS. WEISSMAN:  Your Honor, I can't answer that

6   really because that might be a question for the bank.  She

7   does recognize her signature since it did happen many years

8   ago.  She doesn't disputed it is her signature but I don't

9   know that she recalls exactly whether she signed it in the

10  moment that she was opening the account.

11         THE COURT:  Okay.  All right.  Thank you.

12         MS. WEISSMAN:  Sure.

13         THE COURT:  So let me hear -- can I hear first from

14  I guess Mr. Despotakis.

15         MR. DESPOTAKIS:  Despotakis.

16         THE COURT:  Yes.  Despotakis, okay.

17         MR. DESPOTAKIS:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MR. DESPOTAKIS:  The facts are, as you might

20  imagine, somewhat different from our point of view.  There

21  were indeed five checks deposited into the plaintiff's

22  account.  She protests that she knows nothing about it, was

23  not involved, and is positioning and presenting herself as a

24  victimized consumer presumably as part of some unknown hack of

25  her account with no evidence to back that up.

6

1          These checks were deposited and very quickly

2    bounced.  The method of deposit was online banking.  Well,

3    remote.  Electronically imaged and deposited.  So they were

4    not deposited with any teller or bank official who would have

5    seen it or inspected them.  The reference to the signature of

6    the maker on the face of the check is really a scribble.  They

7    are just initials.  And this is an isolated event involving a

8    deposit into a particular customer's account.  There's no

9    interconnection with anything.  Once the check --

10          THE COURT:  I'm sorry, when you say interconnection

11   with anything, what do you mean?

12          MR. DESPOTAKIS:  With anything else.  It's just a

13   single act arising out of an imaged remote deposit

14   electronically.  No human eye at the bank saw these deposits

15   going into the account.  They just were there.

16          THE COURT:  Okay.  Just so I understand, somebody

17   takes a picture and then it deposits or is it going through an

18   ATM machine?

19          MR. DESPOTAKIS:  No, this is a remote, a picture and

20   we understand it was electronically deposited.  I will verify

21   that, but it was electronic and that's how the checks wound

22   their way into the account.

23          THE COURT:  Okay.

24          MR. DESPOTAKIS:  They were very quickly upon

25   presentation, because the checks purport to be drawn on Bank

7

1   of America, it's an accelerated process.  They find out that

2   these checks are not legitimate.  So in wearing their hat now

3   as the payor bank of these checks in a different side of the

4   bank, they say no, these checks are no good, they're bounced

5   as counterfeits.  That's counterfeit.  And that's the way they

6   come back.  These are spurious items that found their way into

7   this lady's account.

8           The most interesting thing, and I think you heard

9   counsel say, is it's rather odd that she's sitting on her

10  computer and online banking watching her balance just before

11  the day that all five checks appear.  These checks are

12  bounced.  The bank then, as allowed under the deposit

13  agreement, because the bank's deposit agreement governing the

14  terms of this account, contain a lot of provisions that might

15  certainly be used common sense but are there to prevent risk

16  of loss to the bank.  In this case, the bank suffered no loss.

17  The plaintiff protests that these checks were not hers and she

18  has no claim to the money.  The account was closed in a slight

19  overdrawn position but I don't think the bank pursued that.

20  At least I don't know that they did sitting here today.  And

21  everything is even.  They did report her because counterfeit

22  spurious items are coming out of the fraud world whether with

23  her involvement or knowledge, that remains to be seen, were

24  run through this account.  So the bank didn't report it to say

25  look, you know, we're accusing this woman necessarily but

8

1   checks that are counterfeit found their way into this account.

2   How would anybody know what her account number was?  How would

3   they know what to do?  How would they know the timing to put

4   all five checks through together into her account?  Now, there

5   are a lot of things that are going to be reserved for

6   discovery, but if you look at the signature on these checks,

7   it's a scribble, and the fact that no human eye saw them on

8   the intake side kind of makes some of the arguments on her

9   complaint rather red herrings.  It doesn't matter.  No human

10  eye saw these to inspect these checks.  They weren't put in

11  over the counter.  They just found their way by image.

12          So the bank did report it as it must and every

13  financial institution has an interest in knowing whether a

14  customer has allowed their account to be used for fraud

15  knowingly or unknowingly.  That's the reason that Chex Systems

16  exists.  It's basically a place where banks report look, we

17  had a customer, this customer and this account was used to

18  perpetrate a fraud by the deposit of counterfeit items or

19  spurious items and it's fair that the bank reported it and

20  it's fair that other institutions know about it because if

21  this customer goes and opens up an account at Bank B, they too

22  would like to know that perhaps she's not watching her

23  account, she's being negligent, or any customer.  Or maybe

24  she's part of a fraud ring.  We just don't know.  But the

25  reporting was fair, it was reasonable, it's part of the risk

9

1  abatement and the risk loss prevention.  And it's in the

2  deposit agreement.  A customer knows what can happen.

3  Likewise, her account was not only frozen, it was also closed

4  out also as the agreement provides as a matter of contract.

5  But in New York law, as far as I know, there's no shotgun

6  marriage.  The customer is not entitled to be able to bank

7  with Bank A and that bank is not entitled to have -- as long

8  as it's non-discriminatory, they don't have to have a business

9  relationship.  It's still a deposit agreement.  It's still a

10 relationship based on contract between a customer and their

11 financial institution.  And each has rights.  Each has rights.

12 And those rights are spelled out in the deposit agreement.

13        THE COURT:  How long is that deposit agreement?  How

14 many pages is it?

15        MR. DESPOTAKIS:  You know, Your Honor, I brought an

16 extra copy which is a better copy, a better image.  It's 30,

17 40 pages.  It has a clear index in the front with the

18 categories bolded.  Perhaps it's not when the exhibits came

19 through but it's bolded and it has a series of provisions in

20 here that relate to the deposit account relationship

21 including, as the Court is aware, the jury strike waiver

22 provision which is a mutual provision.  Both the bank and the

23 depositor waive a right to trial by jury.  It runs both ways.

24        THE COURT:  All right.  So let me ask you a couple

25 of questions.  You said how would someone know how this

1  fraudulent -- I mean I don't think there's a dispute that this

2  is a fraudulent check.

3           MR. DESPOTAKIS:  Oh, the checks are fraudulent.

4           THE COURT:  It's clearly counterfeit, right?  And so

5  you said how would anyone know how the checks got into the

6  system, right?  What kind of investigation was done to find

7  that out?

8           MR. DESPOTAKIS:  As I sit here today, Judge it was

9  reviewed by the bank's risk, fraud kind of risk unit.  I don't

10  know what their formal title is.  They looked at the checks.

11  They verified the spurious nature of those items and they

12  determined that the bank could not accept the risk of this

13  account continuing to be open, that a fraud had been

14  perpetrated by the mere fact that these checks ran through.

15  There were other aspects to that review.  And again, as I sit

16  here today, I don't know all of those aspects but they are

17  there and there's a discrete file which we will be producing

18  in discovery and that's certainly not an issue.  But just

19  Googling and going on the internet myself and talking to

20  people in general, there are frauds out there, as many as you

21  can shake a stick at.

22           THE COURT:  Right.  And I think everybody can -- I

23  guess I could take judicial notice that frauds occur, right?

24  But the question is who suffers the consequences.  And I think

25  that's probably the issue here which is whether you did –

1   whether the bank did enough investigation to determine whether

2   the bank, the account holder was the one who should suffer

3   according to them by having the frozen account and the closing

4   of the account.

5            MR. DESPOTAKIS:  Correct.

6            THE COURT:  And granted, she has no right to it but

7   there are certain things that, you know, certain expectations,

8   whether you guys were out to really catch the bad guys if

9   they're not the plaintiff herself.  So that's I guess the crux

10  of it.

11           MR. DESPOTAKIS:  That's a great unknown if it's done

12  through --

13           THE COURT:  Yes, I know, but I guess the question is

14  what is the burden on the bank to figure that out before

15  taking the action that it did?  Right?  I mean reporting that

16  it's fraud is clearly, yes, if somebody has an account where

17  fraudulent activity has occurred, figuring that out and

18  letting them know that in fact it is fraud is important.  But

19  it sounds like here she, according to the plaintiff, reported

20  it herself.  Are you saying that that's not true?

21           MR. DESPOTAKIS:  She reported it but as I mentioned,

22  this will be part of the discovery.

23           THE COURT:  Okay.

24           MR. DESPOTAKIS:  It's kind of odd that by her own

25  version of events she was magically on the computer and

1  looking at her online banking.

2        THE COURT:  I don't know that it's magical.  People

3  check their accounts.

4        MR. DESPOTAKIS:  Not all the time.  Not the day

5  before these checks get --

6        THE COURT:  Right.  So that's -- I'm not --

7        MR. DESPOTAKIS:  As far as --

8        THE COURT:  Yes.  I just want to figure out if you

9  have enough facts here for me to understand what happened.

10        MR. DESPOTAKIS:  But if I may, Your Honor, as well,

11  two quick things in terms of the things that I've seen and the

12  scams I'm aware of.  For example, there are fraudsters out

13  there who will reach out to people who are of modest means and

14  may need money and they'll say you're going to find some

15  checks and some money being deposited into your account.  You

16  keep it.  You keep 10 percent.  Just don't say anything when

17  we withdraw it.  And then you go and make a claim to the bank.

18  So these frauds and these kinds of frauds do exist out there.

19  And we'll find out in discovery, you know, who she

20  communicated with prior to these events, who she contacted,

21  who contacted her.  I'm not saying she did or she didn't.  But

22  these types of frauds also are out there.

23        THE COURT:  Right.  But the question here sounds

24  like is what the bank did at the time, whether they did an

25  adequate investigation.

13

1      MR. DESPOTAKIS:  And again, Your Honor, we must keep

2 two things separate, if I may.  The reporting to Chex Systems

3 about fraud events in this account.  That's what it is, it's a

4 reporting of a fraud.  The second piece of it is the bank's

5 absolute right to close an account because it doesn't have to

6 assume a risk of loss.

7      THE COURT:  Okay.  So --

8      MR. DESPOTAKIS:  That's an absolute right.

9      THE COURT:  Yes, I understand.

10      MR. DESPOTAKIS:  That's our position.

11      THE COURT:  Okay.  But there are some let's say

12 contractual and perhaps statutory protections, right?

13      MR. DESPOTAKIS:  And both ways too.

14      THE COURT:  Okay.  So let me find out -- I have a

15 few questions about your motion to strike the jury demand.

16 The first is the question that I posed to plaintiff's counsel

17 about the signature card.  Can we assume that the date on the

18 signature card, May 31, 2005, is the date that she opened the

19 account with Bank of America?

20      MR. DESPOTAKIS:  Yes, Your Honor.  And that's also

21 stated in the accompanying supported affidavit.

22      THE COURT:  All right.  And so the account number

23 there ends in 52?

24      MR. DESPOTAKIS:  Yes.  We redacted that obviously

25 for confidentiality.

1          THE COURT:  Yes.  I appreciate that.  But the letter

2   that you attached with regard to the account information and

3   the letter that was purportedly sent to her, that was dated

4   May 10, 2005 has an account number ending in 3211.

5          MR. DESPOTAKIS:  I can take you through that, Your

6   Honor.

7          THE COURT:  Okay.

8          MR. DESPOTAKIS:  And that's explained in the reply

9   in more detail to our motion.

10          THE COURT:  I didn't understand it.

11          MR. DESPOTAKIS:  What happened when this account was

12   opened it was on the cusp in the transition period of the

13   acquisition of the former Fleet Bank by Bank of America.  That

14   occurred in 2005 exactly in this time period.

15          THE COURT:  Well, there was an effective date in

16   June 2005.

17          MR. DESPOTAKIS:  That's correct.

18          THE COURT:  Okay.

19          MR. DESPOTAKIS:  That's correct.

20          THE COURT:  So if she opened her account at the last

21   day of May and the acquisition was not effective until the

22   middle of June, are you saying that even though she opened an

23   account that ended in 52 it was changed to an account that

24   entered in 211?

25          MR. DESPOTAKIS:  I know from my own account, Your

15

1    Honor, there was a renumbering done.

2              THE COURT:  So it was renumbered?

3              MR. DESPOTAKIS:  Yeah.

4              THE COURT:  And do we have proof that that was

5    happened?  Do we know that that's the same account because you

6    didn't --

7              MR. DESPOTAKIS:  You know, I'm comfortable in saying

8    yes but I need to verify that.  But from my own general

9    knowledge, I believe that is the case but I can't be 100

10   percent certain.

11             THE COURT:  All right.  And then the other problem

12   or the other thing that puzzled me is that the letter that was

13   purportedly sent to you said it was Bank of America letter

14   sent to Fleet customers was dated May 10, 2005 which would

15   have been before the plaintiff opened her account.

16             MR. DESPOTAKIS:  Here's what -- that's correct, Your

17   Honor.  However --

18             THE COURT:  How does that work?

19             MR. DESPOTAKIS:  -- this is [inaudible] of the

20   transition.  So she eventually does open her account

21   admittedly at the later part of that month.  So you have that

22   first letter.  Here's what --

23             THE COURT:  Who would the letter have gone to if --

24             MR. DESPOTAKIS:  It would not have gone to her at

25   that point because she's not part of --

1          THE COURT:  So when did it get to her?

2          MR. DESPOTAKIS:  -- the Fleet customers.  But by

3     being part of the Fleet customer base, our point in our papers

4     has clarified in the reply takes us down a certain --

5          THE COURT:  I still don't understand.  If she opened

6     her account with Bank of America, what does that have to do

7     with Fleet?

8          MR. DESPOTAKIS:  Here's what I'm saying --

9          THE COURT:  Right?  If you're a -- if she's a bank -

10    - if she opened her account with Bank of America and Bank of

11    America acquired Fleet, why does her account change?  She was

12    never with Fleet.

13         MR. DESPOTAKIS:  It does not change, Your Honor.

14         THE COURT:  Okay.

15         MR. DESPOTAKIS:  It's an acquisition and merger.

16         THE COURT:  Okay.

17         MR. DESPOTAKIS:  Her account exists and carries

18    over.  It's a handoff.  It's an acquisition.

19         THE COURT:  It's handed off from whom to whom?

20         MR. DESPOTAKIS:  From Fleet to Bank of America.

21         THE COURT:  But she was never with Fleet because she

22    never opened her account with Fleet.

23         MR. DESPOTAKIS:  She had a Fleet account.

24         THE COURT:  She had a Fleet account?

25         MR. DESPOTAKIS:  I think she did.

1          THE COURT:  When was that opened?

2          MR. DESPOTAKIS:  Again, did she?  I just want to

3   remember.  But here's the analysis.

4          THE COURT:  But why would she have a signature card

5   with Bank of America on May 31st?

6          MR. DESPOTAKIS:  Then she may not have had a Fleet

7   account.  But let me start -- if I may, Your Honor --

8          THE COURT:  Well, but then I don't -- then if that's

9   not the case -- so this is why I'm puzzled because she either

10  was or wasn't a Fleet account.

11         MR. DESPOTAKIS:  Let me think --

12         THE COURT:  Let me ask you -- let me tell you why

13  I'm puzzled.  Okay.  If she was a Fleet customer, okay, then

14  she would have had -- then she may have gotten the letter that

15  was sent to Fleet customers in advance of this acquisition.

16         MR. DESPOTAKIS:  If she was, if she was.

17         THE COURT:  If she was.

18         MR. DESPOTAKIS:  If she was.

19         THE COURT:  And if she wasn't, then she wouldn't

20  have.

21         MR. DESPOTAKIS:  Correct.

22         THE COURT:  So it's important whether she was or

23  not.  So the fact that you're having this conversation without

24  knowing that --

25         MR. DESPOTAKIS:  No, because -- well, I understand

1   what Your Honor is saying but allow me a minute to take you

2   through the timeline in our argument.

3            THE COURT:  Okay.

4            MR. DESPOTAKIS:  Let's assume that that is correct

5   because I believe that you are correct.  May 31 or so was when

6   she opens her account with Bank of America.  Okay?  That

7   signature card clearly references a deposit agreement and that

8   it's subject to an account rule, that there is a contract

9   between her and the bank.  That's encapsulated in the deposit

10  agreement.  And as time progresses, that's why the reply lays

11  this out, as time progresses each and every month she got a

12  monthly statement and in the monthly statement it directs her

13  attention again each and every month in boldface language of

14  the existence of a deposit agreement.

15           THE COURT:  Can we stop there?  Because I don't

16  really care about the deposit agreement at this point.

17           MR. DESPOTAKIS:  Okay.

18           THE COURT:  I care about the notifications in terms

19  of the jury, the jury demand strike.

20           MR. DESPOTAKIS:  Well, that's what I'm saying, Your

21  Honor.  That --

22           THE COURT:  So no, because what you've relied on is

23  this letter that's dated May 10, 2005 that has an account

24  number that's different from the signature card and the

25  signature card is dated after the date of the letter that was

1  purportedly sent to her.  So I don't understand whether she

2  got the letter because you told me she wouldn't have gotten

3  the letter if she wasn't a Fleet customer.  And if she did get

4  the letter, why she was getting the letter with a different

5  account number.  So I don't -- because that's sort of Exhibit

6  A of your argument because you're saying that there's an

7  argument there about settling disputes which says may elect to

8  have a jury or not.  And then that's where the booklet is

9  enclosed.  And let me see if the booklet is -- what is the

10  name of that booklet?  Is that the deposit agreement?

11           MR. DESPOTAKIS:  That's the deposit agreement.

12           THE COURT:  Okay.  So that's where the booklet is

13  enclosed.  So I'm still having trouble with the timing as to

14  whether that May 10th mailing or that May 10th letter is

15  relevant at all because I don't know whether she got it.

16           MR. DESPOTAKIS:  It may not be, Your Honor, but

17  we're saying --

18           THE COURT:  If it's not relevant --

19           MR. DESPOTAKIS:  Irrespective of that letter she was

20  --

21           THE COURT:  Okay.  But I want to talk about the

22  letter.  So it's either --

23           MR. DESPOTAKIS:  The letter would not have applied.

24  I will concede --

25           THE COURT:  It's either -- in considering this

1  motion to strike the jury demand, I'm either considering that

2  letter or I'm not.  And if you want me to consider the letter,

3  you --

4          MR. DESPOTAKIS:  [Inaudible] --

5          THE COURT:  You want me to throw the letter out?

6          MR. DESPOTAKIS:  That letter we're prepared to say

7  she was not a Fleet customer, she opened her account.  Then I

8  don't know of any other accounts except for that Fleet

9  account, Your Honor.  Now if that account was 1132 -- here's

10 our point.  And let me try to word it carefully because I know

11 what Your Honor is asking, I know what the issue.  If she's a

12 Fleet customer, she knows that there is in existence an

13 account agreement, whatever that agreement might be.  Putting

14 aside the May 10th letter that would not have given her an

15 actual copy of.  What we're saying by signing that signature

16 card she's aware that an agreement between the bank and her

17 exists, right?  For the prior account.

18         THE COURT:  Okay.  So --

19         MR. DESPOTAKIS:  Now you transition to her opening

20 up the Bank of America account in the end of May.  So again,

21 putting that May 10th letter on the shelf for purposes of the

22 analysis, the question becomes how is it that we, Bank of

23 America, are saying she is now contractually bound by that

24 jury strike provision.

25         THE COURT:  Okay.

1          MR. DESPOTAKIS:  And we're saying that binding

2    effect comes with cost in a couple of ways.  Her ongoing

3    knowledge that there is a deposit agreement that's applicable.

4    The signature card of 2005 that she did sign at the end of May

5    refers to the deposit agreement and any amendments to it from

6    time to time.

7          THE COURT:  Okay.  So let me turn --

8          MR. DESPOTAKIS:  Then you layer on the monthly

9    statements that again give her notice of that deposit

10   agreement.  It's easy access and availability to look at, to

11   ask for, to review year in and year out since that 2005 till

12   the date of this series of events in 2016.

13         THE COURT:  Okay.  So let me look at this signature

14   card.  And it says by signing this application I agree that

15   everything is true, agree to notify you any time if anything

16   changes.  I agree to be bound by the terms and conditions in

17   deposit accounts and services for which I've applied.  Okay.

18   So where does it show that she received the deposit agreement?

19         MR. DESPOTAKIS:  Are you looking at the May 31 card,

20   Your Honor?

21         THE COURT:  Yes.

22         MR. DESPOTAKIS:  Okay.

23         THE COURT:  And this is your attachment.

24         MR. DESPOTAKIS:  Right, but the --

25         THE COURT:  Exhibit A.

1          MR. DESPOTAKIS:  The deposit agreement as it exists

2    from time to time --

3          THE COURT:  I know, but where does it say that she

4    received it?

5          MR. DESPOTAKIS:  It would not say that she received

6    it.  Just an acknowledgment that she knows it exists.  She

7    agrees to it.

8          THE COURT:  She knows it exists?

9          MR. DESPOTAKIS:  She agrees to it.

10          THE COURT:  Agrees to what?  This doesn't make

11    reference to a deposit agreement document.

12          MR. DESPOTAKIS:  But then that notice is given again

13    and again.

14          THE COURT:  No, no, but I'm trying to figure out at

15    the moment she signs it -- I'm just trying to figure out at

16    what point she's on notice of that document, that 40 page

17    document you showed me.  So at what point is she on notice of

18    that?

19          MR. DESPOTAKIS:  I would argue --

20          THE COURT:  Because this document, the signature

21    card, does not make reference to that document.

22          MR. DESPOTAKIS:  Not by name, not by the title of

23    the deposit agreement.

24          THE COURT:  Right.  So how is somebody supposed to

25    know that that's the document that they've agreed to?

23

1        MR. DESPOTAKIS:  By the notice she then gets each

2   and every month.  And our legal position is she knows there's

3   an agreement --

4        THE COURT:  And so what proof do you have that she's

5   receiving that every month?

6        MR. DESPOTAKIS:  The monthly statements are

7   addressed to her.

8        THE COURT:  The monthly --

9        MR. DESPOTAKIS:  There's no debate that she didn't

10  get her monthly bank statements.

11       THE COURT:  Yes, but the monthly statement doesn't

12  show that she received the deposit agreement.

13       MR. DESPOTAKIS:  It notifies her again and again --

14       THE COURT:  That there -- of what?

15       MR. DESPOTAKIS:  -- of the deposit agreement and

16  [inaudible] --

17       THE COURT:  Where is the deposit agreement?

18       MR. DESPOTAKIS:  It's for the asking.

19       THE COURT:  Where can she find it?

20       MR. DESPOTAKIS:  Online on the bank's website, from

21  any branch, from any bank --

22       THE COURT:  But does the document say you must look

23  at this document because this document waives one of your

24  constitutional rights?  Does it say --

25       MR. DESPOTAKIS:  With all due respect, Your Honor,

24

1    we don't believe that is the law.

2              THE COURT:  Okay.  But I'm just trying to figure out

3    where there's notification of the document that states that

4    think that you're -- the jury waiver.  What document?  Because

5    this document you've told me doesn't make reference to the

6    deposit agreement.  It makes reference generally to documents

7    and agreements.

8              MR. DESPOTAKIS:  To an agreement with the bank that

9    she could have gone and asked for and gotten.

10             THE COURT:  So she has to ask for it.  It's not

11   being given to her.

12             MR. DESPOTAKIS:  She would have been given something

13   --

14             THE COURT:  But it doesn't say that.

15             MR. DESPOTAKIS:  -- presumably when she opened the

16   account.

17             THE COURT:  It doesn't -- that's what I'm trying to

18   figure out.  Where does it say that she received it?

19             MR. DESPOTAKIS:  And again, that would have been the

20   signature card signed at the time.  Again, it was a transition

21   from Fleet to Bank of America.

22             THE COURT:  Okay.  So but this --

23             MR. DESPOTAKIS:  Those signature cards were changed

24   later, you know, as new accounts --

25             THE COURT:  Just to be clear because the print is

 1  small, so there's nothing here that makes reference to the

 2  deposit agreement that you are referencing, is that right?

 3          MR. DESPOTAKIS:  Not by title of the document.

 4          THE COURT:  Not by title.  But tell me where you're

 5  saying.

 6          MR. DESPOTAKIS:  If you're looking at Exhibit A,

 7  Judge --

 8          THE COURT:  Exhibit A.

 9          MR. DESPOTAKIS:  And again, I apologize, it's a poor

10  copy --

11          THE COURT:  Yes.

12          MR. DESPOTAKIS:  -- when it was reproduced but it's

13  --

14          THE COURT:  And my eyesight is not what it used to

15  be, so please tell me where I should be looking.

16          MR. DESPOTAKIS:  It would be that line, "I agree to

17  be bound by the --" it looks like "terms and conditions for

18  this deposit account and services and credit accounts."  I'm

19  just trying to read some of the language myself.  It talks

20  about her agreeing to be bound to the agreements for deposit

21  accounts.  But I agree with Your Honor it does not

22  specifically refer to this document as titled.

23          THE COURT:  Okay.  But it says -- so you're saying

24  this statement which I'm assuming is what it is because it's

25  not very legible and I don't have the original so I don't know

1  whether her version was legible, it says, "I agree to be bound

2  by the terms and conditions governing the deposition accounts

3  and services and credit accounts for which I have applied."

4          MR. DESPOTAKIS:  Right.

5          THE COURT:  That's what you're relying on.

6          MR. DESPOTAKIS:  Right.

7          THE COURT:  Okay.

8          MR. DESPOTAKIS:  And our point is that that tells

9  her there's an agreement.

10          THE COURT:  Okay.

11          MR. DESPOTAKIS:  Something she should be asking for.

12  This was a pamphlet form if I remember correctly.  Again, I'm

13  going back now, Your Honor, from my own memory.  I was in-

14  house counsel for Nat West for some 20 years before the

15  acquisition.  These used to be pamphlets which is a strange

16  way to copy you can see.  But this was a --

17          THE COURT:  So there's a document that you attached

18  in your document Exhibit B, and it was the May 10th letter

19  which are now telling me I should not rely on.

20          MR. DESPOTAKIS:  Right, since she was not an account

21  party --

22          THE COURT:  Okay.  But --

23          MR. DESPOTAKIS:  -- she would not have gotten that

24  letter.

25          THE COURT:  So the document that is attached to that

27

 1  which is Document 15-2 as docketed, it says deposit agreements

 2  and disclosures, and it says effective June 17, 2005.  Is that

 3  the deposit agreement that you're talking about?

 4          MR. DESPOTAKIS:  Beginning with that date, Your

 5  Honor.  And also as referred to on each and every monthly

 6  statement.

 7          THE COURT:  Each and every month.  Okay.  So --

 8          MR. DESPOTAKIS:  Under the heading important notice.

 9          THE COURT:  This document which says effective June

10  17, 2005, has a table of contents as you mentioned.  It does

11  not seem to be a complete table of contents because it stops

12  at Page 70 and the purported jury waiver that's in the section

13  called resolving disputes --

14          MR. DESPOTAKIS:  It's resolving --

15          THE COURT:  -- doesn't even show up on that table of

16  contents as you've given the Court.  I assume it's there but

17  you haven't given it to me.  And then it doesn't tell me how

18  long the pamphlet actually is because it stops at Page 81 but

19  there's nothing that tells me that that is in fact the last

20  page.  So --

21          MR. DESPOTAKIS:  Yeah, that --

22          THE COURT:  Can you tell me how many pages that

23  document was in 2005?

24          MR. DESPOTAKIS:  In 2005?

25          THE COURT:  Because you've asked the --

1          MR. DESPOTAKIS:  Beyond what we were able to get

2    from the bank that --

3          THE COURT:  Yes, because you've asked me to rely on

4    this document so I'm --

5          MR. DESPOTAKIS:  But that --

6          THE COURT:  I'd like to know how long the document

7    was.

8          MR. DESPOTAKIS:  That document, Your Honor, remember

9    this is 2005.

10          THE COURT:  Yes.

11          MR. DESPOTAKIS:  This event happens in 2016.

12          THE COURT:  I know, but you're relying on it.

13    You're relying on the deposit agreement.

14          MR. DESPOTAKIS:  We're relying on that deposit

15    agreement and each successive year's deposit agreement.

16          THE COURT:  Okay.  So do you have copies of those?

17          MR. DESPOTAKIS:  They were added.  They're on the

18    reply papers, Your Honor.  They were Exhibit B, Part 1 of 4.

19    There were four parts to B.  And those are deposit agreements

20    down through the years.

21          THE COURT:  This is --

22          MR. DESPOTAKIS:  Which I believe was part of our

23    reply.  And the purpose -- not to burden the Court, but the

24    purpose for attaching all of the deposit --

25          THE COURT:  How many pages were those documents?

1          MR. DESPOTAKIS:  Let me pull one out as a

2    representative sample.  I'll just randomly go to Part 3 of 4.

3    This too was in a paper form, looking at Part 3 of 4 and

4    looking at the table of contents it has the same thing

5    resolving claims.  Let me go to the end of this.  It may very

6    well be, Your Honor, not seeing an actual copy of it and I

7    can't tell from this, the resolving claims provision is I

8    believe pretty much towards the end of the agreement, but not

9    having the actual exemplar that I could look through I can't

10   make a representation to the Court one way or the other.

11         THE COURT:  Okay.  So I'm pulling it up on the

12   docket so I can take a look because you've had -- Exhibit B

13   appears to be several pages.  Okay.  That's why my law clerk

14   didn't print it up for me because it's so many pages.

15         MR. DESPOTAKIS:  On the representative sample, yeah,

16   then we go -- it ends with jurisdiction and venue, Page 48.

17         THE COURT:  And how many versions did you attach

18   there?  There's one now that's 2008.

19         MR. DESPOTAKIS:  We tried to give the Court

20   everything since 2005 to date.  And the Court will note that -

21   -

22         THE COURT:  Well, to date?  Because the document

23   that you gave in your initial pleadings was 2017 which clearly

24   the plaintiff would not have received.

25         MR. DESPOTAKIS:  That would have been the current

1   one to show the Court the provision.

2           THE COURT:  Right.  But the current doesn't matter

3   because we're talking about her agreement.

4           MR. DESPOTAKIS:  Right.

5           THE COURT:  All right.  So --

6           MR. DESPOTAKIS:  The account was not there, so --

7           THE COURT:  How many versions would she have gotten?

8           MR. DESPOTAKIS:  She would have -- these would have

9   been in place.  If the Court looks to the effective date on

10  the lower left front page --

11          THE COURT:  Of what document?

12          MR. DESPOTAKIS:  Of each one of these agreements

13  over time.  For example, this one says November -- here's one

14  2016, another one would say effective -- just bear with me.

15  And they're identified, Your Honor, in a little bit more

16  detail in the reply affidavit.

17          THE COURT:  Yes.  But having all of this here like

18  this in hundreds of pages for the Court is not useful because

19  I can't go through every page and figure out how many versions

20  there were.  It would have been useful if you told me how many

21  versions and what the effective dates were.

22          MR. DESPOTAKIS:  This provision would have been

23  unchanged through the years.

24          THE COURT:  But you're telling me that there were

25  different iterations of the, what is it called, deposit

1    agreement.

2          MR. DESPOTAKIS:  Deposit agreement.  But not in this

3    provision, Judge.  It's just that --

4          THE COURT:  Well, but still in order to find out if

5    it was kept the same an individual would have to read it.  Are

6    you saying that --

7          MR. DESPOTAKIS:  I'm saying once they read it the

8    first time, and then they'd be notified --

9          THE COURT:  Well, but it's changed.

10         MR. DESPOTAKIS:  -- once it changes --

11         THE COURT:  But it's been changed.  The document

12   which you're saying was the customer's obligation to read

13   would have changed several times between 2005 and 2016.

14         MR. DESPOTAKIS:  But this provision would not have

15   changed.

16         THE COURT:  I know, but you don't know that unless

17   you read the whole document.  And if you're saying the

18   customer would have to read the whole document, I'm trying to

19   figure out how many pages the customer would have had to read

20   to figure this out.

21         MR. DESPOTAKIS:  What we're saying is it was legally

22   incumbent on the customer to look and --

23         THE COURT:  Yes, that's right.  That's why I'm going

24   through this exercise.

25         MR. DESPOTAKIS:  Each time it was --

32

1          THE COURT:  So I'm trying to figure out how many

2  pages you're saying this customer would have had to read

3  throughout the years between 2005 and 2016.

4          MR. DESPOTAKIS:  I would suggest two, the table of

5  contents and going to that section about resolving disputes

6  and the waiver of the jury trial.

7          THE COURT:  Oh.

8          MR. DESPOTAKIS:  Which is mutual.

9          THE COURT:  That's interesting.  Okay.  That's fine.

10 That's --

11         MR. DESPOTAKIS:  Because there are many provisions

12 in this agreement.

13         THE COURT:  Yes.  I know that.  But I'm just trying

14 to get a sense of what you're saying.  So do you have at hand

15 all those agreements and can you tell me how many there were

16 between 2005 and 2016?  This would save my law clerk some time

17 in having to go through all the pages that are on the docket.

18 Because they would just be pamphlets, right?  So tell me how

19 many pamphlets there are.

20         MR. DESPOTAKIS:  We printed them out, so let me see

21 what I can make of this.

22         THE COURT:  And how many pages each one is.

23         MR. DESPOTAKIS:  What's been marked as Exhibit B,

24 Part 1 of 4 should have -- here we go.  It says Part 1 of 4.

25 This one would have 48 pages promulgated in 2005, effective

1  date of it appears to be 11/05.  I'm looking at the very

2  bottom.  I go to the next one.  These may be out of order.

3  There was one effective June 17, 2005.  This one likewise

4  based on the table of contents was 70 pages.

5       THE COURT:  Well hold on.  If that was 70 pages,

6  then the portion that you attached in your pleadings reference

7  shows the resolving disputes on Pages 80 and 81.

8       MR. DESPOTAKIS:  The positioning of this may have

9  changed over the years.

10      THE COURT:  No, no, that's the actual document.

11  That's the one that's effective June 17th, '05.

12      MR. DESPOTAKIS:  Yeah, but this one is 48.  I'm

13  sorry, the one for [inaudible] --

14      THE COURT:  Can I --

15      MR. DESPOTAKIS:  And it talks about resolving

16  claims.

17      THE COURT:  No.  I see resolving disputes.  Can you

18  just look at your pleadings, Document 15-2, Page 10 of 11, the

19  portion you gave me which purports to be a page from the

20  deposit agreement effective June 17, 2005.  Even though the

21  table of contents ends at 70, the pages talking about

22  resolving disputes are actually Pages 80 and 81.

23      MR. DESPOTAKIS:  You're talking about the motion in

24  chief, Your Honor?

25      THE COURT:  Yes.

34

1          MR. DESPOTAKIS:  In that early version, yes, you are

2     correct.

3          THE COURT:  So how can that document only have 70

4     pages?

5          MR. DESPOTAKIS:  No, this is 80 and 81.  And I

6     apologize, Your Honor.  It's possible some of these are

7     incomplete.  But again, the relevant provisions are here in

8     the copies you have before you.

9          THE COURT:  Yes, but I can't -- I don't -- now I

10    don't know whether I can say that this provision that you've

11    attached to your pleading in chief was actually part of the

12    deposit agreement if the deposit agreement ends at Page 70 and

13    you've given me Pages 80 and 81.

14         MR. DESPOTAKIS:  If you look at -- let's see.  The

15    first one.  Then you've got this -- let me go to the June 2005

16    agreement, and I'm going to look at that one.

17         THE COURT:  That's the one I'm looking at.

18         MR. DESPOTAKIS:  That's Exhibit B, correct?  This is

19    the one we were discussing a moment ago, and it has resolving

20    disputes.  And this is a 70-page agreement.  We have -- if I

21    go to the next exhibit --

22         THE COURT:  Is resolving disputes on Page 80?

23         MR. DESPOTAKIS:  I'm looking at the table of

24    contents.  Page 80, correct.

25         THE COURT:  Okay.  So how can it be a 70-page

1   document if you're giving me Page 80?

2           MR. DESPOTAKIS:  It changes over time, Your Honor.

3           THE COURT:  No, we're talking about the one

4   document, the document that's effective June 17, 2005.  It

5   should be a static document.  And you've told me it's a 70-

6   page document and yet the part you want me to look at is on

7   Page 80.

8           MR. DESPOTAKIS:  This one, this particular year,

9   that particular iteration, that's where it appears, Page 80,

10   correct.

11           THE COURT:  Right.  But you said the documents ends

12   at 70.

13           MR. DESPOTAKIS:  I'm looking at incomplete copies of

14   it.

15           THE COURT:  Then what you've given me as exhibits

16   are not reliable.

17           MR. DESPOTAKIS:  But not as to the relevant

18   provision.

19           THE COURT:  But the relevant provision, if it's on

20   Page 80 and it's a 70-page document isn't part of the

21   document.  It's outside of the document.  That's the part that

22   I don't understand.

23           MR. DESPOTAKIS:  But these are the documents that

24   are attached in our reply papers.

25           THE COURT:  I know.  But you've told me -- I've

36

1   given you the opportunity because I was looking at what you

2   gave in your affidavit -- not your affidavit, but the

3   affidavit from the initial pleading.  Okay?  And I had a

4   question about it.  And so now you're going to the reply

5   affidavit and you're still giving me the same information

6   which is that it's a 70-page document and yet the provision

7   you want me to look at is on Page 80.  So I don't understand

8   that.  I'm just trying to understand it.

9            MR. DESPOTAKIS:  Because the document itself would

10  have been reprinted over time.  Different issues were inserted

11  into the deposit agreement having nothing to do with jury

12  waiver.

13           THE COURT:  No, but the jury waiver provision is on

14  Page 80.  Can I give this to you?  You know what I'm talking

15  about, right?

16           MR. DESPOTAKIS:  I understand, Your Honor.  Yes.

17           THE COURT:  So how can it be on Page 80 if the

18  document ends at 70?  That just seems weird.

19           MR. DESPOTAKIS:  It might be an incomplete document

20  or an earlier iteration.  But we gave you --

21           THE COURT:  But how am I supposed to rely on it if

22  it's incomplete and changing?  I don't understand how I can do

23  that from a logical perspective.

24           MR. DESPOTAKIS:  Because as you go through from 2005

25  --

37

1          THE COURT: No, no, I'm just looking at the one

2     document. I'm just -- I know things change over time and I

3     appreciate that argument. So that's why I wanted to start

4     from the very beginning. Right? That's a very good place to

5     start.

6          MR. DESPOTAKIS: Always is.

7          THE COURT: Right. And so the first document,

8     because it was when Bank of America took over Fleet, and you

9     made reference to it in both your initial papers and your

10    reply papers, is the document that says effective June 17,

11    2005 and it's called deposit agreements and disclosures.

12    Okay. So that's great. And I'm looking at it because you

13    want me to rely on it. And the table of contents that I have

14    ends at 70. And so my question was maybe that's incomplete.

15    That's okay. But I'm giving you the opportunity to tell me

16    what, since you do have the complete version there, what this

17    document is like because you've only given me excerpts and the

18    excerpt you draw my attention to called resolving disputes is

19    in Page 80 and 81. So is that or is that not a part of the

20    document?

21          MR. DESPOTAKIS: If Your Honor --

22          THE COURT: And what you're telling me doesn't give

23    me any comfort.

24          MR. DESPOTAKIS: If Your Honor is referencing the

25    document I was referring to as a sample -- this is a March 16

1  -- I'm sorry, March 2016 --

2          THE COURT:  No, no, no.

3          MR. DESPOTAKIS:  You're talking about --

4          THE COURT:  I'm still talking about 2005 because

5  like I said, we start at the very beginning.  We haven't

6  progressed from there, so that's why I'm still stuck on that

7  because somehow you want me to look at Page 80 but the

8  document ends at 70 and that's kind of an Alice in Wonderland

9  situation because I'm like what Page 80?  Is that even part of

10 the document you want me to look at?  I'm not saying you're

11 wrong.  I'm looking for an explanation.  If you have the

12 document and you want to hand it up and I can look at it, I

13 will certainly look at it, but I'm not hearing anything that

14 helps.

15         MR. DESPOTAKIS:  Other than the documents that are

16 in the reply that are a sequence of deposit agreements

17 [inaudible], the best way I can respond to Your Honor is

18 simply that this provision is there.  It's there in all of

19 these exhibits over the many years.

20         THE COURT:  Okay.  And --

21         MR. DESPOTAKIS:  As is the notice on the monthly

22 statement.

23         THE COURT:  Okay.  And the notice on the monthly

24 statement says you are bound by the agreement.

25         MR. DESPOTAKIS:  Yes.

1          THE COURT:  Okay.  But it doesn't --

2          MR. DESPOTAKIS:  It says important --

3          THE COURT:  Because -- and the reason I ask is

4   because I live in the real world.  When the credit card

5   companies change their agreements they often enclose a

6   pamphlet and I know that I've gotten it and I'm sure that they

7   have a record that they sent it to me.  So I was just curious

8   whether Bank of America sent a copy of the agreement every

9   time there was a revision so that the customer knows here's a

10  new version if you want to read it because you're bound by it

11  and continue to be bound by it notwithstanding there may have

12  been changes.  Here's a copy of it.  Now, if they didn't do

13  that, that's the practice.  But I need to understand what

14  you're relying on in your argument that this plaintiff was on

15  notice and what that meant.

16          MR. DESPOTAKIS:  I think once having been given

17  notice that there was an agreement and --

18          THE COURT:  Somewhere.

19          MR. DESPOTAKIS:  -- it's going to be from time to

20  time --

21          THE COURT:  An agreement somewhere.  It's not that

22  she was given the agreement.  You're saying she wasn't given

23  the agreement at the signature card time.  There's no record

24  that she was.

25          MR. DESPOTAKIS:  Going back to 2005 I have nothing

40

1   in front of me and nothing that the bank could verify whether

2   the practice then was to give people the pamphlet.  So I can't

3   tell you, Your Honor, that that was the practice.

4               THE COURT:  Okay.

5               MR. DESPOTAKIS:  I can tell you my own experience

6   because I was a customer too -- well, that's neither here nor

7   there for your purposes and I won't go there for purposes of t

8   his argument.  But what we're saying is under the applicable

9   law she's on notice that there's an agreement.  That notice

10  appears seriatum over and over on each and every one of the

11  monthly statements, important notice, big uppercase letters.

12  It appears in each of these iterations.

13              THE COURT:  Important notice shows up under

14  statement that says --

15              MR. DESPOTAKIS:  On the statement as well.

16              THE COURT:  Do you have an example of the statement

17  --

18              MR. DESPOTAKIS:  That is --

19              THE COURT:  -- that shows me what that looks like?

20              MR. DESPOTAKIS:  Yes, I do indeed.  Here's a sample.

21  It's actually the statement leading up to the month of these

22  transactions.

23              THE COURT:  And was that submitted previously so I

24  can look at it or is it something you --

25              MR. DESPOTAKIS:  I don't know that we submitted --

1   no, we would not have had -- maybe it's part of the reply but

2   I don't think so.  It was discussed in the reply affidavit so

3   it may very well be there.

4           THE COURT:  Okay.

5           MR. DESPOTAKIS:  Let me try to find that.  In his

6   reply he mentions it specifically.  And you can read the

7   notice in the record while I search for the affidavit, Your

8   Honor.  Important information all boldfaced upper case bank

9   deposit accounts.  Deposit agreement.  When you opened your

10  account you received a deposit agreement and fee schedule and

11  agreed that your account would be governed by the terms of

12  these documents as we may amend them from time to time.  These

13  documents are part of a contract to your deposit account and

14  govern all transactions relating to your account including all

15  deposits and withdrawals.  Copies of both the deposit

16  agreement and fee schedule which contain the current version

17  of the terms and conditions of your account relationship may

18  be obtained at our financial centers.  And this is Page 2

19  important information.  And this is discussed in the reply

20  affidavit, Your Honor.

21          THE COURT:  All right.  But a copy was not attached?

22          MR. DESPOTAKIS:  I have to see if there is one.

23          THE COURT:  All right.  But you've read it into the

24  record so that's fine.  But you're saying that it says you

25  received a copy of the deposit agreement --

42

1          MR. DESPOTAKIS:  At the time you opened --

2          THE COURT:  -- at the time you opened the account

3     but actually we have no record of that, right?  Because if she

4     opened the account at the time of the signature card, there's

5     nothing that's attached to the opening documents that show

6     that she did get it.

7          MR. DESPOTAKIS:  This would be a fair inference of

8     this reading.  This will be that that was the bank's practice.

9          THE COURT:  That was the practice but there's no

10    record that this person actually received it.

11         MR. DESPOTAKIS:  On personal experience, but --

12         THE COURT:  Right.  But you know, usually if you get

13    documents you can say I signed for it and I received it but

14    that purports to say you did receive it but in fact we have no

15    record on this record.

16         MR. DESPOTAKIS:  And it invites them to look at it.

17    And this appears, this prominent notice appears on each and

18    every copy of the statement.  And here it is on a simple

19    couple of page monthly statement [inaudible].

20         THE COURT:  Saying that you have to go to this

21    document.  You have to go to the bank and ask because it

22    doesn't even say that you can get it on a website.  You have

23    to go to the bank and ask for it.

24         MR. DESPOTAKIS:  For those that I think had online

25    banking there's also all kinds of facilities.  She had online

43

1    banking so she could navigate and get it.

2            THE COURT:  But you don't have a screenshot of what

3    an online bank customer would see.  But that piece of paper

4    says you must go to the bank and ask for it.

5            MR. DESPOTAKIS:  This piece of paper says it.  It

6    says it's available.  And that's really what we're saying as a

7    matter of law.  It's available, you're bound by it, here it

8    is.  And this notice appeared over and over and over and over

9    each monthly statement she got over the years.

10           THE COURT:  All right.  Okay.  So thank you.  Now is

11   there anything else you want to say?

12           MR. DESPOTAKIS:  No.

13           THE COURT:  Thanks.  So let me turn to counsel for

14   Chex.  Tell me what you want to say.

15           MR. WAIT:  Good morning, Your Honor.  John Wait on

16   behalf of Chex.

17           The allegations -- as Your Honor knows, Chex is a

18   reporting agency.  We receive information from banks such as

19   Bank of America in the event that the consumer later disputes

20   the accuracy of the information.  We typically go back to Bank

21   of America and conduct an investigation.  We ask for a

22   verification of the underlying information, et cetera.  The

23   allegation against Chex primarily, according to the plaintiff,

24   is that Chex reinvestigation was not adequate or reasonable.

25   In essence, that Chex should have done more than it did to

1  determine the veracity of the underlying allegations.

2          We will need to -- we have currently an

3  investigative file which we have gone through which we will be

4  producing in discovery but we are going to need to conduct

5  interviews and dive deeper into what actually happened here

6  before we can really get to the heart of some of these issues

7  here whether or not in fact this was an innocent plaintiff,

8  whether or not all the allegations were false, et cetera.  And

9  other than that, I have nothing further to add.

10          THE COURT:  So you have the investigative file but

11  you don't know yet what the extent of the investigation was?

12          MR. WAIT:  It's notes and we're going to need to

13  actually sit down and interview those people to find out more

14  about --

15          THE COURT:  Find out what happened.

16          MR. WAIT:  -- what exactly they did.  I mean

17  certainly you can glean some of that from the notes themselves

18  which I think is your point, but I don't think that is

19  comprehensive enough.  I think we're going to need to do some

20  discovery.

21          THE COURT:  Well, yes.  I understand discovery needs

22  to proceed but I guess my question is from the time this case

23  was filed and then in preparation for your answer and

24  everything else until today, are you saying you still don't

25  know the extent of the investigation?  Because you're not

1  going to find out more from discovery propounded on the

2  plaintiffs, the extent of your investigation.  So I'm just

3  trying to find out what you mean by that.

4        MR. WAIT:  No.  I mean our investigation is

5  certainly detailed in the investigative notes and that's the

6  whole point of having investigative notes.  So you are

7  correct.  All I'm saying is that as we've heard this morning,

8  you know, there are two different possible scenarios here in

9  terms of what happened.  You know, again, in terms of whether

10 or not this plaintiff was completely innocent or not in terms

11 of whether or not the investigations were adequate or not.  We

12 certainly have some of information.  We have certainly

13 reviewed the file carefully but we're far from the point where

14 we can definitively say what happened here.

15        THE COURT:  Okay.

16        MR. DESPOTAKIS:  If I may, Your Honor, may I

17 supplement?

18        THE COURT:  Yes.  Okay.

19        MR. DESPOTAKIS:  It's going to be very quickly.

20        THE COURT:  Go ahead.

21        MR. DESPOTAKIS:  Just for the record, the

22 notification that I read coming from the monthly statements

23 are indeed discussed in the reply affidavit and they are

24 exhibits that were also submitted to the Court.  All the

25 monthly statements are Exhibit D for David.  The jury waiver

46

1   provisions are again repeated as Exhibit C.  So that reply

2   affidavit of Tom R. Jordan does take the Court exactly through

3   the sequence of monthly statements and they are attached to

4   the motion.

5            THE COURT:  So Exhibit D is a monthly statement.

6   I'm just looking at the first one that you attached and that

7   is Page 1 of 11 for the period July 14th, '05 to August 15th,

8   '05.  I'm scrolling through the statement which for privacy

9   reasons I see you've blacked out the details.

10           MR. DESPOTAKIS:  If I may, Your Honor, also Mr.

11  Jordan's affidavit parses out the timelines for the Court.  He

12  says from at least the August 15, 2005 statement, the monthly

13  statement for the period May 15, 2013 through June '13, this

14  notice was printed on the last page of the monthly statements

15  under a heading that reads, quote, uppercase, "Important

16  information for bank deposit accounts."

17           THE COURT:  Okay.  So let me -- I'm just looking at

18  this page because I want to see that.

19           MR. DESPOTAKIS:  Well then he says, Your Honor, my

20  point being beginning with the monthly statement for the

21  period of June 13, 2013, this notice was moved from that year

22  going forward for the second page of the monthly statements.

23  So from mid-2013 statement rendering --

24           THE COURT:  Right.  So --

25           MR. DESPOTAKIS:  -- that logo now appeared on the

1   second page.

2          THE COURT:  I'm looking at your Exhibit D and this

3   is, like I said, a statement from July 14, 2005 through August

4   15, 2005 to the plaintiff.  Can you direct me to the page

5   where this notice appears because I'm not seeing it?

6          MR. DESPOTAKIS:  July '05?  July '05, Your Honor?

7   Beginning with the monthly statements for the period -- let me

8   find --

9          THE COURT:  Yes, this is in 2005.  So it's your

10  first Exhibit D, Page 1.

11         MR. DESPOTAKIS:  It would be -- I don't have Exhibit

12  D with me but looking at the timelines he describes, it should

13  be the second page after the cover page that has the

14  customer's address.  Then you just go to the next page.

15         THE COURT:  I don't see it.  I see Page 2 of 11,

16  sign up for direct deposit, more rewards, more choices, more

17  for you.  Get your statement online through online banking.

18  Moving.  And risk free CD/IRA.

19         MS. WEISSMAN:  Your Honor, the statement appears to

20  be on Page 11 of that first deposit agreement.

21         THE COURT:  Okay.

22         MR. DESPOTAKIS:  The first one.  And then it was

23  moved up in positioning --

24         THE COURT:  Okay.  But I'm just not seeing it, so

25  let me see.  Page 11 of 11, how to balance your Bank of

48

1   America account.  Important information.  I see it.

2           MR. DESPOTAKIS:  And the positioning of that notice

3   was moved up to the second page.

4           THE COURT:  Right because wow, that's -- unlike the

5   boxes on Page 2, this one is at the bottom of the piece of

6   paper that says how to balance your bank account, the

7   important information is at the end.  Okay.  So now you're

8   saying in 2013 it's moved up.

9           MR. DESPOTAKIS:  It moved up to the second page.

10          THE COURT:  Okay.  So let me see that.

11          MR. DESPOTAKIS:  Such as the statement that I read

12  from, Your Honor, which was, for example, the statement from

13  September of 2016.

14          THE COURT:  So I'm looking at -- you said 2016 it

15  was moved up or 2013.

16          MR. DESPOTAKIS:  September, '16 is the one I read --

17          THE COURT:  '16.  Okay.  All right.

18          MR. DESPOTAKIS:  -- before but it's the same notice.

19          THE COURT:  So '13 is still at the end and '16 when

20  it's moved up in the copy that you've given me now has it in

21  red letters.

22          MR. DESPOTAKIS:  Looking at the March 16th to April

23  13th statement, once again it's on the second page.  It moved

24  up.

25          THE COURT:  Yes.  I actually see it moved up as of

1  this one which is dated July 15, or July 2013.  It's already

2  on the second page.

3        MR. DESPOTAKIS:  It's already up, yes.

4        THE COURT:  Okay.  Thank you.

5        MR. DESPOTAKIS:  Thank you.

6        THE COURT:  So let's turn to --

7        MS. WEISSMAN:  Your Honor, may I just add something

8  --

9        THE COURT:  Go ahead, please.

10        MS. WEISSMAN:  -- about the deposit agreements.  I

11  just wanted to point out that in addition to the issues you've

12  raised, there's no evidence that any of the exhibits attached

13  to the affidavit of Tom Jordan were ever sent to or presented

14  to our client.

15        THE COURT:  Well, I think that's been conceded.  I

16  think the point is that the argument is she had the

17  opportunity to get those documents.  I don't think anyone is

18  saying that she was actually sent those documents.

19        MS. WEISSMAN:  And I just wanted to add as well then

20  that our position is that certainly even if the bank statement

21  was sent to her with one line referencing a deposit agreement,

22  surely that's not enough to bind her to a contract and wipe

23  away her constitutional right to a jury.

24        THE COURT:  And I think that is the crux of the

25  argument.

1          MR. DESPOTAKIS:  Well, mutually.

2          THE COURT:  I'm sorry?

3          MR. DESPOTAKIS:  The bank also waives it.  It's a

4    mutual right that was waived.  The bank -- it says both the

5    bank and she waive the right to a jury.

6          THE COURT:  But we're not contesting -- they're not

7    contesting the bank's waiver, so the only issue we're talking

8    about is her waiver.  So let's look at discovery.  So the

9    issue of the jury strike shouldn't affect discovery, so I

10   think everybody should move forward with that even while the

11   decision on that issue is pending.  So the Rule 26(a)

12   disclosures will be amended and complete by January 23rd.

13   We'll have initial requests February 8th and discovery closing

14   November 9th.  So that's a long time on a case that since

15   everybody's got their arms around what the issues are and

16   where the documents may be.  Can you tell me why you need that

17   much time to be followed by expert discovery that will take us

18   into 2019?  Let's focus first on November 9th.  What needs to

19   happen?  We are not -- let me just find out from each side

20   what discovery do you need to have done, fact discovery?

21         MR. BROMBERG:  Well, Your Honor, the key here really

22   is going to be the degree of the investigation.  The

23   interesting quirk here is that we are going to be seeking to

24   look into what Bank of America and Chex Systems have done with

25   this particular type of fraud because as we said before, we

1    had another case involving the same fraud pattern, involving

2    the Barack Obama signatures on the checks.  So presumably

3    there's going to be some kind of internal file that's been

4    developed about what the bank has actually done with respect

5    to that particular fraud.  But you're absolutely right.  Much

6    of the case is going to revolve around what they did with

7    respect to the reinvestigation of our client.  But informing

8    them as well is probably the larger fraud file that we presume

9    they have.  They haven't told us one way or the other whether

10   they have it, involving what they did with this overall fraud.

11   And now the reason I'm saying this is because my office has

12   had a number of cases involving similar fraud patterns and

13   will settle the case and then six months later there'll be a

14   front page article in the New York Times saying oh wow, the

15   specific fraud pattern that they were trying to blame on our

16   client was actually part of a bigger fraud being engineered

17   from overseas or being engineered by insiders.  So presumably,

18   they're doing some kind of investigation into this Barack

19   Obama fraud and how this is going on.  We don't know what

20   they're doing.  They haven't told us.  We want to delve into

21   that and find out what's going here.

22          THE COURT:  Okay.  So what I'm hearing is that

23   figuring out whether this investigation was reasonable and

24   adequate you're looking to what was done in this case as well

25   as cases like it?

1        MR. BROMBERG:  Exactly.  Which is part of the reason

2   why we put down so much time because we figured that there

3   would be push back on getting into the larger investigation

4   that's taking place here with respect to this particular

5   Barack Obama facsimile fraud that's going on at Bank of

6   America.

7        THE COURT:  Okay.  So then let me hear from the

8   defendants what you're intending to do during the time between

9   now and November.

10        MR. DESPOTAKIS:  So from the bank's point of view

11   from the discovery [inaudible] we may want to get at her

12   records on her communications or email communications for

13   several months leading up to this and for perhaps the month

14   afterwards.  In terms of -- unless something happens or

15   something comes to light in the course of that discovery

16   involving some other party or some other theoretically cohort

17   or co-conspirator if she's involved in it.  If not, it is

18   clear that she may very well have given her information,

19   account information to a third party.  So I think that will

20   all be generated out of discovery.  There will be push back

21   because this is discrete event with this particular customer.

22   Other cases that Mr. Bromberg may have are not on these facts

23   and they certainly have nothing to do with this case,

24   understanding that discovery is not really the issue of

25   relevancy or not.  It's useful.  That's fine.  But there will

1   come a point in time when we'll have a dispute over the

2   discovery and the scope of what we try to get.

3             I learned the other day that one of the two

4   investigators or claim analysts that handled this particular

5   claim is out on maternity leave. I'm waiting for the bank to

6   tell me when she will be back and I will share that

7   information with you when I have it. And it's my

8   understanding also that they may not be physically located in

9   New York at this time so they may have gone for different

10   duties or they may be with the fraud unit in a different

11   physical location in the bank. So I will [inaudible]. We can

12   work out the arrangements for their depositions when they're

13   ready for that.

14             But from the bank's point of view, I don't foresee

15   an extensive amount of discovery of the plaintiff.

16             THE COURT: Okay. And from Chex's perspective?

17             MR. WAIT: I would simply agree with co-counsel.

18             THE COURT: All right. So then let me turn to the

19   expert discovery. What experts do you anticipate?

20             MR. BROMBERG: Well, Your Honor, it would probably

21   be -- we haven't sat down with an expert yet. It would

22   probably be one of the experts who typically testifies in Fair

23   Credit Reporting Act cases to prove up the best practices for

24   an investigation, to prove up causation possibly as to

25   damages. So we may -- we have not yet decided whether or not

54

1    to bring in an expert.  Expert discovery tends to be very

2    expensive.  Our preference is really to try and sit down with

3    Your Honor after we've done at least the initial paper

4    discovery and possibly even some of the initial depositions

5    and then sit down for a settlement conference rather than

6    start spending a lot of money on experts which can really

7    drive up the cost of a case.  But it would be some of the

8    experts that typically testify in Fair Credit Reporting Act

9    cases.  And much of the discovery here is going to be similar

10   to Fair Credit Reporting Act cases except for the fact that

11   we've had this prior pattern and practice and the scope of

12   discovery as to what their investigation file says about this

13   Barack Obama signature scam for want of a better term.

14          THE COURT:  All right.  And from the defendant's

15   perspective?  Experts on your side?  Or only rebuttal?

16          MR. DESPOTAKIS:  We haven't really approached that

17   issue with our client.  It's a little open ended for the

18   moment.  I heard what Mr. Bromberg said but this is not a

19   credit case.  This is a passing of counterfeit check case.

20   But that's the dispute we probably will have.  We'll deal with

21   that.  I don't know at this moment.  We probably will sit down

22   with our client in the coming month or two to figure out what

23   their intentions are because again, it's expensive.  And mind

24   you, Your Honor, this is all over some under -- what is it,

25   not $5,000 worth of checks.

1      THE COURT:  I think that the issue here isn't about

2  the value of the checks but the impact that the plaintiff

3  alleges this had on her life.

4      MR. DESPOTAKIS:  I realize that, Your Honor.

5      THE COURT:  So that's why it's an important case to

6  her.

7      MR. DESPOTAKIS:  And again, I would point out the

8  consequential damages are precluded under the deposit

9  agreement.  There are other issues but in the spirit of

10 cooperation, no door is shut here.  You know, it will take us

11 a little time to get there.  I don't for the moment foresee an

12 expert witness but I do need to talk to my client.  We don't

13 want to run down that expense because that would make no sense

14 if this matter can be resolved at some point.

15     THE COURT:  Okay.  And Chex?

16     MR. WAIT:  Chex agrees that after we complete fact

17 discovery it makes sense to engage in some sort of settlement

18 dialogue before we turn to bringing in potential experts.

19     THE COURT:  Okay.  All right then.  So this is what

20 I'll do since it sounds like people are anticipating discovery

21 disputes and not hearing otherwise.  I think we should get

22 moving on discovery quickly.  It sounds like everybody kind of

23 knows where they're headed, so I think you should start

24 propounding your document requests and interrogatories.

25 You've given yourselves a deadline of February 8th but I would

1  say don't wait.  All right?  I'm not going to move that

2  deadline up because it's only a month away but I think the

3  faster you can get things done the faster we'll move and the

4  more quickly we can resolve any disputes.  So if the document

5  requests are as Mr. Bromberg has represented, I anticipate

6  that there will be push back.  And so let's get moving on

7  them, okay, so that you can propound your requests, get your

8  objections in, and then try to work it out.  And if you can't

9  work it out, bring it to my attention so that I can resolve it

10  and you can keep going.  It sounds like there's room for some

11  discussions and I'm happy to help you out if you need it.  And

12  people have all said after the close of fact discovery but I

13  wonder whether there's a point before November when the

14  parties can sit down and try to talk.  Yes?

15       MR. BROMBERG:  Your Honor, I think maybe after we

16  get through the paper discovery it might make more sense

17  before we start with the depositions because that's really

18  when the when the cost of the case starts skyrocketing is when

19  you start doing the depositions.

20       THE COURT:  So let me just look at my calendar and

21  see.  Do the parties want a settlement conference?  Or I can

22  make a referral to mediation or you can try to work it out on

23  your own.

24       MR. DESPOTAKIS:  We would be amenable to a

25  settlement conference.

1          THE COURT:  All right.  Yes?

2          MR. BROMBERG:  We would be amenable to it.

3          MR. WAIT:  We're not opposed to a settlement

4    conference.  At the same point, it might make sense for the

5    parties to try to -- or for counsel to get together and try to

6    resolve it on their own as a first step.

7          THE COURT:  Okay.  So here's what I'll do then.  I

8    will set a settlement conference for some time in April.  All

9    right?  Toward the end of April or beginning of May.  And that

10   will give the parties a date to work toward so that you can

11   get all the discovery that are really important to you done

12   before that date.  And with the eye toward if we can resolve

13   it then you won't have to do the rest of it.  And if it's not

14   possible to resolve it at that point, then you can keep going

15   with the next phase and maybe at the end of fact discovery in

16   November we can try again and see where we are.  All right?

17   But I think it's useful to have a marker so that you can focus

18   on the discovery you absolutely need before you can sit down

19   and have a reasonable discussion on settlement and then keep

20   the others for later.  All right?  So and certainly before

21   that date the parties are free to talk amongst yourselves and

22   try to work things out.  The Court always appreciates it

23   because I don't have to do anything, I don't have to spend my

24   resources.  I'm happy to.  But if you can solve it without --

25   resolve the case without my help then that's great.  Let me

58

1   look then at my calendar and see what dates are good.  So

2   April I can do -- why don't we go into May.  May 1st, May 2nd,

3   May 3rd.  Are those dates available?

4             MR. BROMBERG:  Are they available to you?

5             MS. WEISSMAN:  Fine for me.

6             MR. BROMBERG:  They're fine for plaintiffs.

7             MR. DESPOTAKIS:  What day of the week are --

8             THE COURT:  They're Tuesday, Wednesday, and

9   Thursday.

10            MR. DESPOTAKIS:  Any of that is fine, Your Honor.

11  If possible, maybe Tuesday if that's agreeable to everybody?

12            THE COURT:  I generally schedule them in the

13  afternoon, so it would be from 2 to 5.

14            MR. DESPOTAKIS:  Okay.

15            MR. BROMBERG:  That's fine.

16            THE COURT:  2 to 5 on May 1st?

17            MR. BROMBERG:  John, is that fine with you?

18            THE COURT:  Tuesday is May 1st.

19            MR. WAIT:  May 1st?

20            THE COURT:  Yes.

21            MR. WAIT:  Certainly, Your Honor.

22            THE COURT:  Okay.

23            MR. DESPOTAKIS:  May 1st, 2 p.m.?

24            THE COURT:  Yes.

25            MR. DESPOTAKIS:  That's fine, Your Honor.

59

1           THE COURT:  And I would like to get then

2   confidential settlement statements from the parties by April

3   24th.

4           MR. BROMBERG:  Ex parte, right?

5           THE COURT:  Ex parte.  You should email those to

6   chambers.  Those will be ex parte and confidential.  And after

7   I review them I may give you each a call to discuss them.  All

8   right.  So for the settlement conference on May 1st I would

9   like the plaintiff obviously to be there and somebody who has

10  settlement authority from each of the defendants.  All right?

11          MR. DESPOTAKIS:  For the May 1.

12          THE COURT:  For May 1st.  And if they are not

13  available in person, I would entertain a request that they

14  participate by telephone but you need to tell me why.

15          MR. DESPOTAKIS:  In the bank's case, Your Honor, and

16  I'm glad you mentioned that, the decision maker on this on all

17  such settlement conferences is in-house counsel who physically

18  sits in the bank in Rhode Island.  He's up in Providence.

19          THE COURT:  All right.

20          MR. DESPOTAKIS:  That is his role.  He supervises

21  in-house counsel on this case for me.  So if he can --

22          THE COURT:  All right.  So he --

23          MR. DESPOTAKIS:  -- appear telephonically, that

24  would be --

25          THE COURT:  Yes.  But he needs to be available for

1    the entire time.

2              MR. DESPOTAKIS:  Yes.

3              THE COURT:  From 2 to 5.

4              MR. DESPOTAKIS:  I'll make that clear to him.

5              THE COURT:  All right.  Okay.  So that's scheduled

6    and I will approve the schedule that you've proposed with the

7    idea that I'm giving you the generous time till November

8    because we're taking a pause in the middle for settlement

9    discussions.  And then we'll revisit the expert discovery

10   issue at the end of fact discovery because if you don't need

11   it, then I'll move up that pre-motion date for the dispositive

12   motion.  Okay?

13             MR. DESPOTAKIS:  Thank you.

14             THE COURT:  Great.  So I will see everybody on May

15   1st.  I will look forward to -- not look forward, but I will

16   anticipate your discovery dispute papers.

17             So let me just tell you little bit about how I want

18   that to go.  The request will be propounded.  If there are any

19   objections, I mean you should respond.  And then if there are

20   issues where there's a motion to compel, first try to talk it

21   through to see if there are things you can work out, narrow

22   the issue, clarify.  And if you can't, then file something

23   with the Court telling me what the issues are.  So tell me

24   where the point of contention is.  Attach the documents as

25   necessary if you think it's important for me to look at it.

1   But you don't need to -- and if there's case law that's

2   relevant, whatever, you can send that to me in a letter motion

3   or letter brief.

4            MR. DESPOTAKIS:  Could be letter form?

5            THE COURT:  But I don't really need to have a lot of

6   full briefing on the issue because I'm just going to have a

7   telephone conference and I'll discuss it by telephone.  If I

8   have questions or I need more research, then I'll give you an

9   opportunity to supplement and give me more.  So in the first

10  instance, in other words, I don't need a full blown motion and

11  response.  I just need a clear delineation of what you're

12  talking about and any important case law.  And then after we

13  talk if I think I need more then I'll ask for more.  Okay?  So

14  I find that's the easiest way and the fastest way to deal with

15  this.

16           MR. BROMBERG:  So basically a letter motion?

17           THE COURT:  So a letter motion, but again, as --

18           MR. BROMBERG:  Keep it concise.

19           THE COURT:  Take the word brief to mean brief, not

20  large.

21           MR. BROMBERG:  All right.

22           THE COURT:  Okay?  So understood?

23           MR. BROMBERG:  Mm hm [positive inflection].

24           MR. DESPOTAKIS:  Yes, Your Honor.

25           MR. WAIT:  Yes, Your Honor.

62

1           THE COURT:  All right.  Thank you very much.

2           MR. DESPOTAKIS:  Thank you, Your Honor.

3           MR. BROMBERG:  Thank you.

4   (Proceedings concluded at 11:21 a.m.)

5                         *  *  *  *  *  *

63

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                    _Mary Greco_____

6                                         Mary Greco

7   Dated:   January 15, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25