1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    -----------------------------------X
                                        :
4    ADIAHA A. RUANE,                   :
                                        :   17-CV-3704 (PKC)
5                   Plaintiff,          :
                                        :
6              v.                       :   225 Cadman Plaza East
                                        :   Brooklyn, New York
7    BANK OF AMERICA, N.A., *et al.*,   :
                                        :   September 26, 2018
8                   Defendants.         :
     -----------------------------------X
9

10         TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
                BEFORE THE HONORABLE PEGGY KUO
11              UNITED STATES MAGISTRATE JUDGE

12   APPEARANCES:

13   For the Plaintiff:       BRIAN L. BROMBERG, ESQ.
                              Bromberg Law Office, P.C.
14                            26 Broadway
                              21st Floor
15                            New York, New York 10004

16                            EVE WEISSMAN, ESQ.
                              SUSAN SHIN, ESQ.
17                            New Economy Project
                              121 West 27th Street, #804
18                            New York, New York 10001

19   For Bank of America,     CONSTANTINE DESPOTAKIS, ESQ.
     N.A.:                    AARON WEISSBERG, ESQ.
20                            Wilson Elser Moskowitz Edelman &
                              Dicker, LLP
21                            1133 Westchester Avenue
                              White Plains, New York 10604
22
     For Chex Systems, Inc.:  JOHN A. WAIT, ESQ.
23                            Fox Rothschild, LLP
                              101 Park Avenue
24                            17th Floor
                              New York, New York 10178
25


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.

```
1                                                               2

2

3   APPEARANCES (Continued):

4   For Early Warning          CINDY D. HANSON, ESQ.
    Services:                  Troutman Sanders, LLP
5   (Via Telephone)            600 Peachtree Street NE
                               Atlanta, Georgia 30308
6
    Court Transcriber:         RUTH ANN HAGER, C.E.T.**D-641
7                              Typewrite Word Processing Service
                               211 N. Milton Road
8                              Saratoga Springs, New York 12866

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   (Proceedings began at 10:07 a.m.)

2           THE CLERK:  The Honorable Magistrate Judge Peggy Kuo

3   presiding.  Civil cause for motion hearing, docket

4   number 17-CV-3704, Ruane v. Bank of America, N.A., et al.

5           Counsel, please state your name for the record,

6   starting with the plaintiffs.

7           MS. WEISSMAN:  Good morning, Your Honor.  Eve

8   Weissman, New Economy Project, for plaintiff.

9           MR. BROMBERG:  Brian Bromberg, Bromberg Law

10  Office, P.C., for the plaintiff.  Good morning, Your Honor.

11          MS. SHIN:  Good morning, Your Honor.  Susan Shin,

12  New Economy Project, for the plaintiff.

13          MR. DESPOTAKIS:  Good morning, Your Honor.

14  Constantine Despotakis, counsel for defendant Bank of America.

15          MR. WEISSBERG:  Good morning, Your Honor.  Aaron

16  Weissberg with Bank of America.  Thank you.

17          MR. WAIT:  And John Wait of Fox Rothschild on behalf

18  of Chex Systems, Inc.

19          MS. HANSON:  And on the phone is Cindy Hanson from

20  Troutman Sanders for Early Warning Services.

21          THE COURT:  All right.  Good morning, everyone.  So

22  we're here to consider two discovery motions.  One was filed

23  by Bank of America seeking documents and discovery from the

24  plaintiff, and the other is from the plaintiff seeking

25  additional -- seeking to compel discovery from Bank of America

4

1   as well as Chex Systems.  So I'd like to start first with the

2   Bank of America motion to compel.  I recall that I had

3   considered something similar earlier and so I guess I'm a

4   little more familiar with those particular issues.  So let me

5   hear from Mr. Despotakis how this is different from what we

6   discussed earlier.

7          MR. DESPOTAKIS:  Yes, Your Honor.  As you may

8   recall, in the last round we had a telephone conference where

9   we addressed the issues, and the conclusion of that conference

10  was that we would basically be briefing it again more fully

11  with case citations and applicable law, which we have done,

12  and that brings us back full circle today.

13         From Bank of America's point of view we are seeking

14  three distinct types of items and information.  The first is

15  the identification by the plaintiff of all her servers, all

16  her internet suppliers, all her cell phone providers for a

17  period of time, and we've backed off a little bit on that

18  period of time.  We pulled it back to --

19         MR. WEISSBERG:  One year before and three months

20  after.

21         MR. DESPOTAKIS:  -- to one year before the deposit

22  of the checks and to three months afterwards, for that

23  shortened period of time.  The second category --

24         THE COURT:  You're also seeking to identify her

25  devices.

5

1              MR. DESPOTAKIS:  And her devices.

2              THE COURT:  Right.  Okay.

3              MR. DESPOTAKIS:  All her internet providers, her

4    devices, her cell phones, all her means of communications for

5    that limited time period.

6              THE COURT:  Okay.

7              MR. DESPOTAKIS:  The second category of information

8    we're seeking relates to her prior banking relationships,

9    again for a somewhat reduced period of time --

10             MR. WEISSBERG:  Two years prior and one year

11   subsequent.

12             MR. DESPOTAKIS:  -- two years prior and one year

13   subsequent to the deposit of the checks in question.  The

14   third category we are seeking is her tax returns, and that too

15   is limited --

16             MR. WEISSBERG:  Five years.

17             MR. DESPOTAKIS:  -- to five years prior to the date

18   of the deposit of the checks.  Each of these categories, for

19   the reason that we've expressed in our motion papers, are

20   critical before we can proceed to the deposition stage of the

21   plaintiff, and each, as we have requested and for the reasons

22   we briefed, represent a distinct line of inquiry to which we

23   believe we are entitled in defending this case and defending

24   it effectively for our client.

25             The plaintiff's complaint is -- especially the

6

1   amended complaint as filed, really is a shotgun approach

2   melding not only federal causes of action, but state causes of

3   action, including I think under California, was the last time

4   I looked, as well as New York.  There are issues alleging not

5   only to violations -- alleged violations of the Fair Credit

6   Reporting Act, but the plaintiff raises issues as to damages,

7   as to state law causes of action for defamation.  And each of

8   these, again for the reasons we've briefed to the Court, are

9   legitimate and a source of concern before we can have an

10  effective deposition of the plaintiff.

11          The communication devices -- I'll just lump them in

12  one category as communication devices, whether they were

13  internet, cells, whatever -- it is critical that we find out

14  with whom the plaintiff was communicating.  The bank reached,

15  from its point of view, a reasonable decision based on the

16  facts it had before it and as presented by the plaintiff, but

17  from its own records, that she was or may have been involved

18  in the actual process and fraud that led to the deposit of

19  those five checks.  Therefore, it is important, based on those

20  facts, that we get to the bottom of with whom she was

21  communicating.

22          The bank is familiar with the ring of fraudsters

23  that are out there.  When I say "the bank," I'm talking about

24  the bank's security officers and the folks who investigated

25  this.  This has become, you know, somewhat common knowledge.

7

1    They know what's out there.  And we need to identify, who was

2    she talking to leading up to this; who was she talking to

3    shortly after this happened?

4           The facts upon which the bank based its decision to

5    report Ms. Ruane to Chex Systems and EWS at the time are the

6    same facts that are driving her complaint, and the only thing

7    that she has presented is just her protestation that, "I

8    didn't do it.  I wasn't involved.  I don't know what

9    happened."  Yet the deposits were effected through an Android

10   device linked to her -- or I'm sorry, to a cell phone --

11          MR. WEISSBERG:  A cell phone; Android cell phone.

12          MR. DESPOTAKIS:  -- an Android cell phone device

13   linked to her, including very specific identifying features to

14   it that the bank was able to determine it was she at the other

15   end of that.  All those facts come into play, and whether you

16   look at it from the point of view of the federal causes of

17   action or from the state causes of action that she's

18   asserting, certainly when you bring in defamation you bring

19   issues of damages.  You bring in all those other -- or the

20   panoply of other alleged wrongs and repercussions that the

21   plaintiff has allegedly suffered.

22          What we are asking for is both reasonable, it's

23   rational, and it certainly is part of the liberal discovery

24   that the Federal Rules provide, and we think we're entitled to

25   that.

8

1          THE COURT:  Even under the 2015 amendments that you

2   failed to cite?

3          MR. DESPOTAKIS:  Yes, we do think that, Your Honor.

4   The second category, if I may move on just to give you a

5   little thumbnail sketch, the second category of the prior

6   banking arrangements that she had with whatever financial

7   institution, that too is critical because we need to know, did

8   she file similar claims with those other institutions?  Were

9   there similar circumstances where she was alleging the same

10  kinds of things that she's alleging here regarding her

11  checking account, the funneling of any counterfeit or spurious

12  checks through that account?  That too we think is certainly

13  something that we have the right to delve into if we are to

14  properly defend the bank and to defend its conclusions, based

15  on the same set of facts that the plaintiff is alleging.

16         It's important that we see that there's a pattern to

17  this.  It's important that we see what the plaintiff has done

18  with these other institutions.  Has she been paid off on prior

19  claims like this, similar to this?  Has there been any taint

20  with her in these other prior institutions?  For the same

21  reasons that I've expressed, it certainly seems to me relevant

22  and directly on point for us to have the ability to delve into

23  those raw facts and then proceed to deposition.

24         Finally, the tax returns.  Given the damages that

25  she is alleging, given the state causes of action that she's

9

1   asserting, given the very nature of the fraud that took place

2   here, when you juxtapose it against the bank's conclusion that

3   this was a sold account scenario --

4            THE COURT:  I'm sorry, a sold?

5            MR. DESPOTAKIS:  A sold count scenario.

6            THE COURT:  Okay.

7            MR. DESPOTAKIS:  She sold the information to her

8   account so that these checks could be funneled through her

9   account.

10           THE COURT:  She sold somebody the information?

11           MR. DESPOTAKIS:  Correct.

12           THE COURT:  Okay.

13           MR. DESPOTAKIS:  Right.  You know, it's important to

14   find out, as to that piece of it, what was her financial

15   picture like?  Did she report any losses on her tax returns,

16   for example, relating to what happened in prior events

17   regarding similar transactions or not?  We're not trying to

18   delve into the entirety of her financial picture, but we want

19   to see, what was her income?  We want to see, did she declare

20   any losses arising out of maybe similar incidents at prior

21   banks?  I'm not a tax expert, but we want to see what's there.

22   And tax returns are not magical.  There is a confidentiality

23   order in place.  We can possibly discuss some suitable

24   redaction that would make sense, but we're really eager to see

25   what is in there.  There may be nothing at the end of the day,

1  but we shouldn't be precluded from getting at that

2  information, is my point.

3          I think the entirety of plaintiff's opposition to

4  our motion really doesn't point to the Court's denying, you

5  know, a party the right to get that discovery.  It simply

6  points to the fact that in various cases they were deemed

7  relevant, and relevancy and direct impact on our ability to

8  defend and take an effective deposition of the plaintiff is

9  really our point.  That's our guiding principle in this

10  motion.  That's the relief we're seeking.

11          THE COURT:  Okay.  So I have a couple of questions.

12          MR. DESPOTAKIS:  Yes.

13          THE COURT:  With regard to the servers, the cell

14  phone providers and devices, I assume it's -- you're getting

15  that info -- you're seeking that information so that you can

16  do further discovery, right, with third-party subpoenas?

17          MR. DESPOTAKIS:  Correct, Your Honor.

18          THE COURT:  Right.  And you will be seeking, I

19  presume, records of phone calls that she made?

20          MR. DESPOTAKIS:  Correct.

21          THE COURT:  And you will be seeking -- as far as the

22  internet --

23          MR. DESPOTAKIS:  And emails.

24          THE COURT:  -- and emails, and the internet

25  providers would be for what?

1          MR. DESPOTAKIS:  The internet providers would be to

2  give us copies of communications, of the emails, perhaps --

3          THE COURT:  Oh, it's for emails?  I mean --

4          MR. DESPOTAKIS:  For emails.

5          THE COURT:  -- when you say "internet providers," I

6  wasn't sure if those would then be like search engines, right?

7          MR. DESPOTAKIS:  Yeah.  We're saying --

8          THE COURT:  So if somebody searches -- you know, the

9  search history doesn't seem like that would be relevant,

10  right?

11          MR. DESPOTAKIS:  No, we're looking for really text,

12  emails, telephone calls.

13          THE COURT:  Okay.

14          MR. DESPOTAKIS:  Those are the --

15          THE COURT:  And --

16          MR. DESPOTAKIS:  -- three sets of items.

17          THE COURT:  Okay.  So --

18          MR. DESPOTAKIS:  And if you recall, Your Honor,

19  based on what happened at the last telephonic conference

20  leading to today, you had instructed us -- obviously, this is

21  an issue in play and we of course refrained from serving any

22  subpoenas pending --

23          THE COURT:  Yes.

24          MR. DESPOTAKIS:  -- your decision.

25          THE COURT:  Yes, right, so I appreciate that.  But

12

1   the issue there is, you think that there -- plaintiff -- or

2   your investigation concluded that the plaintiff did engage in

3   wrongdoing and you want to see if she communicated with the

4   wrongdo -- with the ring of criminals, as you call them?

5           MR. DESPOTAKIS:  Correct.

6           THE COURT:  Okay.

7           MR. DESPOTAKIS:  And --

8           THE COURT:  So who are you seeking -- do you have

9   specific phone numbers or identities of people that you're

10  looking to see if she had communications?

11          MR. DESPOTAKIS:  The bank would -- here's the

12  Catch-22.  The bank's investigators would know certain numbers

13  that they already have --

14          THE COURT:  Right.

15          MR. DESPOTAKIS:  -- information on that definitely

16  are fraudsters --

17          THE COURT:  So why can't you --

18          MR. DESPOTAKIS:  -- but they wouldn't be able to

19  identify -- they might be able to identify others that are in

20  these records once they go through them.

21          THE COURT:  Right, but then you're just -- they

22  might iden -- so there are some phone numbers that you already

23  know --

24          MR. DESPOTAKIS:  Right --

25          THE COURT:  -- that you're looking for?

13

1          MR. DESPOTAKIS:  -- and there are some that might

2     come to light based on --

3          THE COURT:  And come to light in what way?

4          MR. DESPOTAKIS:  In reviewing the numbers that

5     appear or the addressees of the emails or the addressees of

6     the texts.  I'll lump them all together again for one

7     discussion.  The bank will go through those and if those --

8     any of those once reviewed lead to information as to a known

9     ring that uses that information that has that email address,

10    that has that text number or that telephone number, the bank

11    will be able to determine that, but --

12         THE COURT:  So does the bank have --

13         MR. DESPOTAKIS:  -- it's entitled to --

14         THE COURT:  Does the bank have an algorithm or a

15    list of known rings?

16         MR. DESPOTAKIS:  My understanding is that its

17    security department I think does have, the extent to which

18    they've dealt with fraud cases in whole -- you know, of all

19    types involving the bank.  There's a distinct fraud and

20    corporate security unit that would certainly be able to make

21    sense of the information that might be contained in these

22    documents.

23         THE COURT:  And I presume that that information will

24    be turned over in the course of discovery --

25         MR. DESPOTAKIS:  Yes.

14

1          THE COURT:  -- to the plaintiffs?

2          MR. DESPOTAKIS:  Oh, absolutely.  We're not --

3          THE COURT:  To the plaintiff, rather?

4          MR. DESPOTAKIS:  Yeah, yeah.

5          THE COURT:  Okay.  So if they seek to get the phone

6    numbers of the known ring people, you will turn those over?

7          MR. DESPOTAKIS:  Absolutely.

8          THE COURT:  Okay.

9          MR. DESPOTAKIS:  Yeah.

10         THE COURT:  So --

11         MR. DESPOTAKIS:  We're simply saying that it's a

12   point of discovery that we are entitled to.

13         THE COURT:  Right.  So you want to get the phone

14   records and the texts and the email first so you can run it

15   against what the bank has --

16         MR. DESPOTAKIS:  Right.

17         THE COURT:  -- and if the bank has any hits --

18         MR. DESPOTAKIS:  That's right.

19         THE COURT:  -- then you will turn that over to

20   plaintiff to let her and her lawyers know that you found some

21   hits and that it supports your theory of the case.

22         MR. DESPOTAKIS:  Absolutely, Your Honor.  And this

23   was never meant to suggest we would withhold that information

24   from plaintiff.

25         THE COURT:  Okay.  No, I just wanted to know.

1          MR. DESPOTAKIS:  Yeah.

2          THE COURT:  And do you have -- since the bank did an

3     investigation, are you in a position to turn over the known

4     numbers now?

5          MR. DESPOTAKIS:  To my recollection, Your Honor, I

6     think we can produce -- there's at least one number that the

7     bank knows, but I would point out that the only phone records

8     that plaintiff produced to us was a heavily redacted, I think

9     one month or two months of her Sprint bill --

10         MR. WEISSBERG:  Yes.

11         MR. DESPOTAKIS:  -- heavily redacted as to other

12    information, so --

13         THE COURT:  Yes, I appreciate that, but I just

14    wanted to make sure that you're sharing -- that you have

15    knowledge of at least a phone number that you're looking for

16    and that you --

17         MR. DESPOTAKIS:  Yes, yeah.

18         THE COURT:  -- have shared that or will share that.

19         MR. DESPOTAKIS:  That's one, subject to whatever

20    else might be located there that would click or that would be

21    a hit for the bank once it investigates it.  And again, within

22    the context of the confidentiality order that's in place, I

23    have no problem with turning that over to the plaintiff.

24         THE COURT:  Okay.  So -- and then you've made the

25    other argument that because there's a defamation suit, you're

1  entitled to find out whether in fact the plaintiff was engaged

2  in fraud, even if that wasn't the subject of the investigation

3  initially, right?  I mean, there are two parts of it; one is

4  whether the bank did a reasonable investigation.  The bank --

5  the bank's investigation is done so you can't now add on to it

6  to say it's reasonable, right?

7          MR. DESPOTAKIS:  I would answer that two ways, Your

8  Honor --

9          THE COURT:  Okay.

10          MR. DESPOTAKIS:  -- if I may?  Okay.  The first part

11  of it, if I understood you correctly -- look, the bank did its

12  investigation, it had certain facts before it, and we say it

13  came to a reasonable conclusion that she was or may have been

14  involved, and therefore met the requirements of the statute in

15  so doing.  The state causes of action that she's asserted, you

16  know, truth is a defense.  She --

17          THE COURT:  Right, that's what I meant.

18          MR. DESPOTAKIS:  Yeah.

19          THE COURT:  So there are two parts of it; one is the

20  reasonableness, and the reasonableness is looked at at the

21  time that the investigation happened, not today.

22          MR. DESPOTAKIS:  That's correct.

23          THE COURT:  So you can't add things now to say that

24  this is reasonable, right?

25          MR. DESPOTAKIS:  No, I --

1          THE COURT:  That's the first part.

2          MR. DESPOTAKIS:  Yeah.

3          THE COURT:  The second part is the defamation, so

4    you're saying with defamation, because truth is a defense,

5    you're entitled to get to the truth to say no matter what you

6    were thinking or what you knew back then, in fact she engaged

7    in this conduct that was the --

8          MR. DESPOTAKIS:  Well --

9          THE COURT:  -- topic of the defamation statement,

10   defamatory statement.

11         MR. DESPOTAKIS:  Right.  Yeah, but I would add a

12   little bit to it.

13         THE COURT:  Okay.

14         MR. DESPOTAKIS:  One point that Mr. Weissberg said

15   to me, we do have the principle of unjust enrichment.  She

16   certainly should not be allowed to make out a case under the

17   state causes of action, and even under the federal cause of

18   action.

19         THE COURT:  So the unjust enrichment is your

20   defense, right --

21         MR. DESPOTAKIS:  It's our defense.

22         THE COURT:  -- and you're saying, "What's the

23   enrichment and what's the unjustness?"

24         MR. DESPOTAKIS:  That -- well, it would go -- unjust

25   enrichment is one piece of it; damages that she's claiming

18

1    would be a second --

2              THE COURT:  Yeah, I understand the damages.

3              MR. DESPOTAKIS:  -- but on the unjust --

4              THE COURT:  Tell me about the unjust enrichment.

5              MR. DESPOTAKIS:  On the unjust enrichment, if she

6    had a hand in this fraud and it's demonstrated and it's

7    concluded that the bank had a reasonable investigation, so you

8    put that in one column, and then you go to the rest of it, if

9    it's demonstrated that she really did have something to do

10   with this one way or another, to reward her by a recovery in

11   this case would certainly be her unjust enrichment.  At that

12   point she would have committed in essence a fraud on the

13   court, a fraud on the parties.  She's taking the position she

14   had nothing to do with it.

15             THE COURT:  Right, I understand.  And so I'm not

16   sure that's unjust enrichment, because she hasn't yet been

17   enriched --

18             MR. DESPOTAKIS:  Not yet.

19             THE COURT:  -- so it's more of a clean hands

20   argument that she shouldn't recover here, because --

21             MR. DESPOTAKIS:  She should not recover, Your Honor.

22   She shouldn't be --

23             THE COURT:  Right, but it's not really unjust

24   enrichment, technically.

25

1              MR. DESPOTAKIS:  Whatever theory we wind up going

2  under.

3              THE COURT:  Okay.

4              MR. DESPOTAKIS:  We've said unjust enrichment.

5              THE COURT:  So -- okay.

6              MR. DESPOTAKIS:  You're right, Your Honor.

7              THE COURT:  That's why I was confused as to what she

8  was enriched with.

9              MR. DESPOTAKIS:  Yeah, she --

10             THE COURT:  She hasn't been --

11             MR. DESPOTAKIS:  Right.  She should not --

12             THE COURT:  -- you just don't think she should

13  recover.

14             MR. DESPOTAKIS:  -- be rewarded --

15             THE COURT:  Okay.  I get that.

16             MR. DESPOTAKIS:  -- at the end of the day.

17             THE COURT:  All right.  So let me turn to the prior

18  banking issue.  So you want to know whether she has made

19  similar claims because you're saying that she's part of this

20  ring of criminals, and so whether she did it in the past would

21  be important.  You want to know what banks she has had

22  relationships with and then you would again do a third-party

23  subpoena to find out if she's made claims.

24             MR. DESPOTAKIS:  Right.

25             THE COURT:  Is that right?

1          MR. DESPOTAKIS:  If I may, Your Honor, just back to

2     the last point for half a second?  Under 15

3     U.S.C. 1693(a)(12), the statute does not include any

4     electronic funds transfers that were made with a fraudulent

5     intent by the consumer --

6          THE COURT:  Yes, I understand that.

7          MR. DESPOTAKIS:  -- so that also harks back to that

8     issue that we talked about a moment ago.  In terms of the

9     banking records -- I'm sorry, we're up to the banking records

10     or to the --

11          THE COURT:  The prior relationships.

12          MR. DESPOTAKIS:  The prior relationships --

13          THE COURT:  My question was, I assume that you'll be

14     seeking bank records.  Once you identify the banks, you'll be

15     seeking records from them as to whether she made prior

16     complaints?

17          MR. DESPOTAKIS:  Yeah.  And in terms of the records

18     we'll be seeking, it would be a two-step process.  We would

19     first get the information as to what banks she did business

20     with.  And our intention is to simply focus on, not

21     necessarily each and every transaction, but we would like to

22     know whether she made any claims similar to the type of claim

23     alleged here or any claims that involved alleged wrongdoing or

24     issues of dishonesty involving her account, because that too

25     would bespeak to a mindset on the part of the plaintiff and

21

1  perhaps add some added picture to the issue of motive and what

2  this plaintiff is all about, or not -- or not, but that's

3  important.  We need to know what she did --

4          THE COURT:  So you won't be seeking, you know, her

5  monthly statements, you'll just be asking the banks to turn

6  over information as to whether she made prior complaints?

7          MR. DESPOTAKIS:  Right, and then particularly

8  whether she made any complaints regarding spurious check

9  deposits.

10          THE COURT:  Yes, that's what I mean --

11          MR. DESPOTAKIS:  Correct.

12          THE COURT:  -- but that's all you're looking for.

13  You're not looking at her bank -- her monthly statements to

14  see her individual transactions?

15          MR. DESPOTAKIS:  We may need to know not so much

16  individual transactions, but we would need to know monthly

17  account balances, because one of the things she's claiming in

18  this litigation is that, you know, she was receiving a pension

19  from Ireland.  She did some work, she had a job, and she's

20  claiming damages by what Bank of America allegedly caused her

21  to suffer by reason of the reports of EWS and Chex.  So it

22  seems to me, if she's alleging damages, we need to know that

23  she had funds or what kind of funds that she's typically had

24  over the years that would allow us --

25          THE COURT:  Typically?

1          MR. DESPOTAKIS:  Well, yeah, if she's got --

2          THE COURT:  Well --

3          MR. DESPOTAKIS:  -- all kinds of money in this other

4   bank or banks and all of a sudden she's not showing it, and

5   she's saying, "I had no money because Bank of America, I

6   couldn't negotiate my Irish pension that was due to me," in

7   the meantime she's got $6,000, $10,000 sitting here or there,

8   we'd like to know that, because that puts --

9          THE COURT:  Okay.  So this would counteract -- this

10  will counter her claim that she ran out of money and was

11  forced to do certain things.

12         MR. DESPOTAKIS:  Right.

13         THE COURT:  So if the bank account -- these other

14  bank accounts show that there was money, then the damages

15  would be lower because she didn't suffer the harm she's

16  alleged --

17         MR. DESPOTAKIS:  And if we see money there that

18  rapidly disappeared around the time of this incident, that

19  leads to yet other issues.

20         THE COURT:  Well, I mean, what --

21         MR. DESPOTAKIS:  Yeah, that's why it's important.

22         THE COURT:  I suppose you could argue it one way or

23  the other, because that would certainly also then support the

24  plaintiff's claim that she had expenses that she had to pay,

25  and that's why the money was being drained.

1          MR. DESPOTAKIS:  Yeah.  The point is, we need to

2  see.

3          THE COURT:  Okay.  So you're looking for monthly

4  account balances --

5          MR. DESPOTAKIS:  Right.

6          THE COURT:  -- as well as similar claims?

7          MR. DESPOTAKIS:  Right.

8          THE COURT:  All right.  So then the third one is

9  about the tax returns.  So the tax returns you said you'd be

10  willing to limit, so tell me how you -- what specific items

11  you're looking for.  You said you wanted to see if there were

12  reported losses, right?

13          MR. DESPOTAKIS:  Right.  We'd like to see her income

14  reported and any reported losses.

15          THE COURT:  So income and losses?

16          MR. DESPOTAKIS:  Right.

17          THE COURT:  That's it?

18          MR. DESPOTAKIS:  Yeah.

19          THE COURT:  Okay.

20          MR. DESPOTAKIS:  That's it, Your Honor, that's all

21  we would need.  And again, all of this will go into the mix

22  for the eventual deposition of the plaintiff.

23          THE COURT:  Right.  Okay, great.  Thank you.

24          MR. DESPOTAKIS:  Thank you.

25          THE COURT:  So then let me hear --

1          MR. DESPOTAKIS:  Thank you, Your Honor.

2          THE COURT:  -- from Ms. Weissman.

3          MS. WEISSMAN:  Thank you, Your Honor.  Your Honor,

4    the information that defendant Bank of America is seeking is

5    highly intrusive and invasive --

6          THE COURT:  Well, if you brought the suit, you --

7    there are certain risks that you take --

8          MS. WEISSMAN:  That's --

9          THE COURT:  -- so the question isn't about whether

10   it's intrusive; the question is whether it's relevant.

11         MS. WEISSMAN:  And also whether it's proportional,

12   so --

13         THE COURT:  Well, we're not at proportionality yet.

14   I think first is you've argued that it's not relevant, so let

15   me hear your argument there.

16         MS. WEISSMAN:  Bank of America, there seems to be

17   two broad categories of why this information is needed.  One

18   is to prove that she was somehow involved in this fraud.  Bank

19   of America, through the course of this litigation, has

20   routinely said that the reason that the bank believed she was

21   involved was because she was a person who was of modest

22   means --

23         THE COURT:  Well, no, let's put that aside.  They

24   said they did an investigation, okay, so they said --

25         MS. WEISSMAN:  Their --

1          THE COURT:  Hold on.  They said they've done an

2    investigation and so they have certain information and they

3    want to cross-check it against your client's information.  Why

4    shouldn't they be allowed to do that?

5          MS. WEISSMAN:  Judge, this is information that they

6    have not turned over through the course of discovery.  We have

7    certainly requested any information related to the

8    investigation that was performed.  Today for the first time I

9    heard that they have some reason to believe that the Android

10   phone that deposited these fraudulent checks was somehow

11   connected to our client.  I've never heard that alleged before

12   in this litigation and I have no idea what basis they have for

13   this.  They certainly haven't turned anything over to this

14   effect.

15         Similarly, counsel alluded to a "sold" account scam

16   fraud.  They did produce some documentation in discovery about

17   a sold account fraud, although it specifically has to do with

18   recent college graduates.  Nothing about the information that

19   they turned over in discovery reports regarding this sold

20   account fraud or sold account scam connects in any clear way

21   to our client.  And again, they just -- they seem to be basing

22   their request for this information on some secret knowledge

23   they have to connect her to what happened here, but they

24   haven't turned it over to us.

25         THE COURT:  Okay.  So if they turn that over, then

1  this is then relevant, right?

2          MS. WEISSMAN:  Well, if they have some basis to

3  connect our client to this fraud, other than to say that she's

4  a low-income person and the logical conclusion of that seems

5  to be that any time a low-income person --

6          THE COURT:  Yes, I know -- I've heard and that is

7  not an argument that should be the main point here, but what

8  I've heard from Mr. Despotakis is that the bank did an

9  investigation and that they came to the conclusion that your

10 client was involved somehow, and that -- and therefore they

11 should be entitled to -- and you've made a defamation claim,

12 so they're entitled to in fact -- to find out what in fact is

13 the truth, because truth is a defense.

14         MS. WEISSMAN:  Truth is certainly a defense, Your

15 Honor, but again, I mean, they're basing this not on anything

16 as far as we can tell.  So I think the main question, as you

17 pointed out, the first question certainly is whether it's

18 relevant, and we would strongly argue that none of this is

19 relevant until they have provided some reasonable basis beyond

20 just these sort of broad far-fetched allegations supported by

21 nothing to say that she was not involved.  We, it's true, have

22 said and alleged that she was not involved, but we've

23 certainly provided facts to support that, one of the key facts

24 being the fact that she reported this fraud --

25         THE COURT:  Right.

1          MS. WEISSMAN:  -- to Bank of America --

2          THE COURT:  Okay.

3          MS. WEISSMAN:  -- before anything was withdrawn.  So

4   just to answer your question about, if it was shown, if

5   they -- if the bank did turn over some information that

6   perhaps connected her or at least provided some reasonable

7   basis why they think she was connected to this, then I would

8   say that, okay, the question of relevance has now been

9   addressed.  So the next question though would be turn to

10   proportionality and whether or not these are in fact documents

11   that are needed to discover the information that the bank is

12   requesting or if other information is available.

13          THE COURT:  What other information are you

14   proposing?

15          MS. WEISSMAN:  Sure.  So for example, information

16   about her phone records to see who she's communicated with and

17   what her location was at the time of the incident.  I mean,

18   that's something Bank of America specifically brings up, is

19   they want to isolate her location.  Well, certainly

20   information that's already in Bank of America's possession,

21   including both the online log-in history that was produced as

22   part of discovery so far, and also her bank statements, show

23   purchases being made during the time -- during the -- and

24   around the relevant time period and show where she was, just

25   as one example, and that's --

28

1          THE COURT:  Well, but what about who she's
2   communicating with?  So if their theory is that she's in on
3   this and they have some targets of who was in this ring, if
4   she was communicating with them, then that would tend to show
5   that she was involved.
6          MS. WEISSMAN:  And Judge, as you brought up, if Bank
7   of America has a phone number or something that they are
8   interest -- they haven't turned that over to us, first of all,
9   but you would be glad we have her phone records.  If we are
10  officers of the court, if they have a phone number or multiple
11  phone numbers and they want to know whether or not those phone
12  records -- those phone numbers, excuse me, appear on the phone
13  records, that's something that we could certainly look at and
14  attest to.  If they do appear, we're happy to unredact the
15  information regarding those particular phone numbers that Bank
16  of America is interested in.  I'm not sure what Mr. Despotakis
17  means when he says that, "Well, we also just need to look at
18  all of the phone records to see whether or not," -- I'm not
19  even sure whether or not there's other phone numbers that
20  they're not currently aware of that would somehow --
21          THE COURT:  Well, it sounds --
22          MS. WEISSMAN:  -- come to the fore --
23          THE COURT:  -- like there are some other numbers
24  that are on the bank's radar, but they -- it might be a long
25  list, and so it doesn't make sense for them to turn that over

1   to you, but if they get your client's phone records and run it

2   against their known list, they might get some hits.  And once

3   they get those hits, again, that would tend to show that she's

4   communicating with -- I'll just call them for sake of brevity,

5   known criminals.  All right.  I'm not making any judgment as

6   to whether there's criminal behavior, but just a shorthand,

7   right, so -- and then once they have those hits, if there are

8   any, then they'll share it with you and then you'll have that

9   information.

10          So the question is whether they should be entitled

11  to do that.  Again, since you've charged defamation, they are

12  allowed to find out the truth.  It's not limited to the

13  investigation they did in real time in the past.  They are now

14  entitled to go forward and find out whether she was in fact

15  linked to this criminal ring.

16          MS. WEISSMAN:  That's true, although it would seem

17  that they have to have some basis beyond pure conjecture --

18          THE COURT:  Well, it doesn't sound like it's pure

19  conjecture.  They may not have shared it with you and so this

20  will be the issue for Mr. Despotakis.  Since you were

21  requested to turn over information about the investigation,

22  why have you not turned it over yet?

23          MR. DESPOTAKIS:  You may recall, Your Honor, we kind

24  of touched on this issue in the conference call we had

25  previous to today on this.  It's a bit of a conundrum, but it

1  may be solvable.  Each side had submitted to Your Honor

2  confidential settlement statements, which I won't go into in

3  terms of contents or whatever.  But the issue became how do we

4  move forward to deal with any information that might have been

5  there that we can disclose to plaintiffs counsel?  I'm not

6  adverse to providing that information to them, especially

7  since one of the comments that Ms. Weissman made once again

8  repeats a refrain that has been well known from the plaintiff.

9  I'll leave it at that.  There is a confidentiality order in

10 place.  If Your Honor will -- and it's been repeated in your

11 papers, that particular refrain, but --

12             THE COURT:  Well, I don't understand what you're

13 talking about.

14             MR. DESPOTAKIS:  It doesn't matter.  If Your Honor

15 would order it, I have no problem --

16             THE COURT:  Well --

17             MR. DESPOTAKIS:  -- it's subject to a

18 confidentiality order.

19             THE COURT:  Oh, okay.  So the subs -- the

20 confidentiality order is in place.

21             MR. DESPOTAKIS:  Correct.

22             THE COURT:  Okay.  So I know you have concerns about

23 tipping your hand --

24             MR. DESPOTAKIS:  Right.

25             THE COURT:  -- in terms of the security measures

1   that the bank takes, but you can't engage in a litigation by

2   withholding information, right, so it is a conundrum for you.

3   And a choice for your client is, you know, if you're engaging

4   in this litigation, you have to turn over information --

5              MR. DESPOTAKIS:  I will --

6              THE COURT:  -- and if you don't want to turn over

7   the information, you might have to figure out some other way

8   to resolve this.

9              MR. DESPOTAKIS:  My initial reaction to Your Honor

10  and your statements is, I would be prepared to have a

11  discussion at the end of the day with our client.  I would

12  strongly urge it, and I would need to get the client's

13  authority, and I would be happy to give Eve or Brian a call by

14  tomorrow.

15             THE COURT:  Because I'm not going to grant your

16  request in the absence of your turning information over to the

17  plaintiff --

18             MR. DESPOTAKIS:  I would hope I can --

19             THE COURT:  -- because I don't think it's fair for

20  you to just ask for their information and you not turn over

21  your information.

22             MR. DESPOTAKIS:  Well, we have given them

23  substantial discovery responses.

24             THE COURT:  No, but you haven't given them the basic

25  core of the investigation that your client performed, and that

32

1   is the core of this case, whether it was reasonable, and they

2   cannot assess whether it was reasonable --

3              MR. DESPOTAKIS:  Well --

4              THE COURT:  -- and they can't refute your defense

5   that it was reasonable unless they can see it.

6              MR. DESPOTAKIS:  -- we have given responses,

7   including I think internal communications, commit notes, and

8   certain other transactional information we have.  There is one

9   piece that created the conundrum.

10             THE COURT:  Well --

11             MR. DESPOTAKIS:  And I can commit to recommend it to

12  the client and we can resolve this by Friday and report back

13  to Your Honor once I speak to the client tomorrow --

14             THE COURT:  So --

15             MR. DESPOTAKIS:  -- but be prepared to recommend it,

16  but it doesn't impact on I think some of the issues that we

17  discussed --

18             THE COURT:  But your known phone numbers, for

19  example, you haven't turned over.

20             MR. DESPOTAKIS:  Well, again, that was not part of

21  any discovery demand that I'm aware of.

22             THE COURT:  Well --

23             MR. DESPOTAKIS:  The bank has its standard security

24  procedures.

25             THE COURT:  But if they had a hit, right, if they

33

```
 1   figured out that a phone number on this case --
 2           MR. DESPOTAKIS:  No, no, no, you're
 3   misunderstanding, Your Honor --
 4           THE COURT:  Okay.
 5           MR. DESPOTAKIS:  -- if I may?  Okay.  They don't
 6   have a hit.  They have the numbers, but for them to determine
 7   whether those numbers match up to any communications made by
 8   plaintiff, we need that information.  We're not suggesting --
 9           THE COURT:  Okay.  So that wasn't part of the
10   investigation?
11           MR. DESPOTAKIS:  Yeah, that was not revealed by the
12   limited phone records for a month or so, redacted, that was
13   provided to us.  That's -- the bank knows from its dealings in
14   other matters and whatever it's doing, but it needs to match
15   its knowledge institutionally to what might be revealed in
16   these phone records.  That's my point.
17           THE COURT:  So it's possible for your -- from your
18   perspective that you get the full phone records and there's no
19   hit at all?
20           MR. DESPOTAKIS:  Correct, but we won't know that
21   until we get them.  And on the issue of the Android phone, if
22   I may briefly, to use that Android device the user would have
23   had to have the raw password and online banking data that
24   belongs to Ms. Ruane, so it comes full circle back to her.
25   The issue about -- I respect what you said, you're officers of
```

34

1  the court, but there's nothing that obligates me, with all due

2  respect to counsel, to take their word for anything --

3          THE COURT:  Well --

4          MR. DESPOTAKIS:  -- just as they are not taking my

5  word for a lot of stuff.

6          THE COURT:  -- right, I appreciate that, but I think

7  part of it is what the bank knew.  And so what it sounds like

8  to me, since I don't know what the investigation entailed, it

9  sounds to me like the bank knows where the transaction on the

10 bank website occurred or the -- through the phone app, the

11 bank app, or somehow you know that there's this Android

12 device --

13         MR. DESPOTAKIS:  Yes, yes,

14         THE COURT:  -- that engaged in this transaction.

15         MR. DESPOTAKIS:  And that's in the records, yes.

16         THE COURT:  And your understanding is in order to --

17 and that Android device -- do you know whether it belongs to

18 the plaintiff?  You don't know?

19         MR. DESPOTAKIS:  We only know that for that device

20 to have been used in the manner it was used, the plaintiff's

21 password, online banking credentials, they all would have had

22 to been known to that user.

23         THE COURT:  Okay.  So then it would be important to

24 you to know whether the plaintiff -- whether that's her phone

25 or someone else's phone --

1          MR. DESPOTAKIS:  Right, and --

2          THE COURT:  -- because if it's someone else's phone,

3   then you could -- you know, maybe there's some information --

4   that they stole her information and used their own phone.

5          MR. DESPOTAKIS:  Well, we'll be able to identify, or

6   the bank would be able to identify what that phone matches to,

7   what part of the world --

8          THE COURT:  Yeah.

9          MR. DESPOTAKIS:  -- and there are known hotbeds of

10  fraud where these things emanate from.

11         THE COURT:  Okay.

12         MR. DESPOTAKIS:  On the issue of location of the

13  plaintiff when these transactions occurred, these are image

14  deposits.  They could be done anywhere, from anywhere.  These

15  were not deposits that were walked into the bank.  They were

16  just on the internet through the Android --

17         THE COURT:  You take a picture of it --

18         MR. DESPOTAKIS:  -- electronically --

19         THE COURT:  -- on the bank -- on the --

20         MR. DESPOTAKIS:  -- in they went.  Right.

21         THE COURT:  But when you take a picture of the

22  bank -- of the check, the picture presumably has a location

23  stamp on it?

24         MR. DESPOTAKIS:  It may, but the point I'm making is

25  these could be done from anywhere.

1          THE COURT:  But you -- do you have a location stamp?

2    Has that --

3          MR. DESPOTAKIS:  I do not know.  I do not know if

4    there was one on there.  Whatever the checks have on them,

5    they have copies of the checks.

6          THE COURT:  No, no, not the checks.

7          MR. DESPOTAKIS:  We have copies of the checks.

8          THE COURT:  Not the checks themselves.

9          MR. DESPOTAKIS:  The images themselves.

10         THE COURT:  The images themselves that were then

11   sent to the bank so the bank could credit the account.

12         MR. DESPOTAKIS:  I think that's what we've provided.

13   We provided the actual images.

14         THE COURT:  It has a location on it?

15         MR. DESPOTAKIS:  I don't recall what they have, but

16   whatever information they have on them, they do.

17         THE COURT:  Because it sounds to me like it would.

18   That's why I'm asking.

19         MR. DESPOTAKIS:  Yeah.  They may very well have

20   that, yeah.

21         THE COURT:  If I take a picture with my phone, it

22   usually says where it was, roughly.

23         MR. DESPOTAKIS:  Yeah, it may.  I just don't know

24   standing here now whether it does.

25         THE COURT:  Okay.

1          MR. DESPOTAKIS:  But whatever format those copies --

2     plaintiff had those copies so --

3          THE COURT:  All right.  So you -- so there's

4     still -- you called it one piece of information, as far as the

5     investigation, that has not been turned over and you need to

6     talk to your client about turning it over.

7          MR. DESPOTAKIS:  Yes, I will do that.

8          MS. WEISSMAN:  Your Honor, may I just respond to a

9     couple things?  I'm honestly just a little bit perplexed.  The

10    question of the location was -- I only brought that up because

11    it was something that Bank of America raised, that they needed

12    to know her location.  It sounds like maybe they don't need to

13    know her location.  That was one of the reasons they gave in

14    their motion as to why they needed her phone records.

15         The Android device and the information that Bank of

16    America has turned over regarding the Android device, nothing

17    about that suggests on its face that she was connected or

18    involved.  Yes, the Android device used her online log-in

19    information to access her account and commit the fraud, but we

20    know there's all kinds of fraud that takes place.  I think

21    Your Honor took judicial notice of that during our first

22    conference.  So the mere fact that a phone, which seems to

23    have an IP address in Chicago, when she was in California, was

24    used to deposit these checks -- and I'm just having trouble

25    understanding how Bank of America can use that fact to say

1    that this sort of supports their theory that she was involved

2    and connected somehow to what happened.

3              THE COURT:  Well, I think they're entitled, because

4    they're now entitled to discover the truth.  Okay?  And so

5    they're entitled to find out whether your client was involved,

6    and this is a logical place to go, you know.  You may not

7    think it's connected, but I think the bar is pretty low,

8    because you have put the truth of the matter in issue here.

9    If you were talking just about the reasonableness of the

10   investigation, you know, we would be focused on the

11   investigation they did in the past, but because you've pled

12   defamation, they are allowed now to get to the bottom of what

13   happened and they're -- one way that they have suspected this

14   may be -- may have transpired is that your client used her

15   phone, and if not, then fine, but if so, they're entitled to

16   look at it and they're entitled to see if that's the

17   situation.

18             So unfortunately for you, I think they are entitled

19   to get the devices and the information so they can look to see

20   if it matches, first of all, in the Android, or any other

21   transactions that they've had related to this account because

22   of the fraud that you've alleged.  Because if they can piece

23   these things together and present to the jury that in fact

24   Ms. Ruane was involved with a ring of criminals, then they get

25   to win on the defamation.  Now, they may not be able to, but

1  they're entitled to try, so I think you need to turn that

2  over.

3          MS. WEISSMAN:  And it seems in terms of the phone

4  records themselves, perhaps so, but there seems that there

5  should be some logical end point --

6          THE COURT:  Yes.

7          MS. WEISSMAN:  -- to the scope, and so to see --

8          THE COURT:  That's why I asked.

9          MS. WEISSMAN:  -- all of her emails and text

10 messages for an entire year --

11         THE COURT:  Well, I didn't understand that they were

12 looking for the content.  I think they're just looking for the

13 addresses, right?

14         MS. WEISSMAN:  Based on the subpoena that they

15 initially planned to file and submit to her -- at least one of

16 her phone providers, Sprint, they are looking -- and it

17 sounded to me earlier that they are looking to ultimately get

18 access to all of her email communications, her text messages,

19 the --

20         THE COURT:  Right, and so I would limit that,

21 because based on what Mr. Despotakis told me, they're just

22 trying to match the phone numbers and the email addresses, and

23 so that would be the only thing relevant at this point.  Now,

24 if they get hits on -- and they're sharing that information

25 with you that these are known criminals, and somehow your

1  client is having communications with them, then I think they

2  would be entitled to look at those communications

3  specifically, but not all her communications with family

4  members and friends or whatever.  But in the first instance, I

5  think they are entitled to look at the phone numbers that

6  she's communicated with and the email addresses that she's

7  communicated with so that they can determine whether they

8  match up with their known criminal list.  Okay?  So now let's

9  move on to the ID of the banks.  Okay?

10            MR. BROMBERG:  Your Honor, if I may for one moment?

11            THE COURT:  Yes.

12            MR. BROMBERG:  It would seem that -- well, one

13  thing -- well, first of all, it would seem that any subpoenas

14  which they're allowed to issue should be made returnable

15  either in my office or in Ms. Weissman's office, so that at

16  the very least we can look at the responses to see whether

17  they raised any issues as to confidentiality, privilege --

18            THE COURT:  Well, there's -- why would there be

19  confidentiality or privilege?

20            MR. BROMBERG:  We don't --

21            THE COURT:  It's not content.

22            MR. BROMBERG:  No, the problem is they say that

23  they're -- they --

24            THE COURT:  Well, what I can do is have them propose

25  the subpoena to me for my review before they send it out.

1          MR. BROMBERG:  Okay.  The other thing is, with

2     respect to the proposal we made of possibly having the target

3     phone numbers given to us and then we go through them and see

4     whether there are any hits, that's very commonly done and --

5          THE COURT:  I know, but it sounds like it's -- it

6     does sound cumbersome, and maybe I can ask Mr. Despotakis to

7     tell me how that would work.  It's just as easy to have them

8     run their list against your client's phone list, rather than

9     have somebody take a list of -- I don't know, is it ten

10    numbers, is it 100 numbers -- and check it against your

11    client's list, so --

12         MR. BROMBERG:  I mean, I certainly don't want the

13    additional work, Your Honor.  However, I do have concerns

14    about, you know, calls to friends, calls to neighbors --

15         THE COURT:  Right, but --

16         MR. BROMBERG:  -- calls to babysitters.  That's all

17    in people's phone records.

18         THE COURT:  Yes, I understand, but they're not

19    getting content, so if what I'm being told, and I will take

20    Mr. Despotakis's word for it, they're going to take your

21    client's phone log and run it against a list of known numbers

22    and then see if there are any hits, and that's all they're

23    going to do with it in the first instance, then I don't see

24    why they can't do that.

25         MR. BROMBERG:  Would there be limitations to that

1  effect in the Court's order, something that they can't

2  basically --

3           THE COURT:  Well, we could --

4           MR. BROMBERG:  -- start calling neighbors,

5  friends --

6           THE COURT:  Yes.  Okay.

7           MR. BROMBERG:  I do have concerns about that kind

8  of --

9           THE COURT:  Okay.  If that's your concern, then

10  fine, let's -- you know, we'll figure out a way to --

11           MR. BROMBERG:  Okay.

12           THE COURT:  -- circumscribe that.

13           MR. DESPOTAKIS:  Your Honor, yeah, I mean, if there

14  are hits, of course we can determine and talk about the next

15  steps, obviously.

16           THE COURT:  Right, but the concern is other than the

17  hits, if you find a phone number that she's calling a lot,

18  somebody might get curious and say, "Let's call that phone

19  number," and it turns out to be a boyfriend or something like

20  that, right?  And so it just seems like a fair thing to say,

21  because what you've told me is you're looking to see if the --

22           MR. DESPOTAKIS:  Communications.

23           THE COURT:  -- phone log matches your known criminal

24  list, right?

25           MR. DESPOTAKIS:  Right, and I would commit --

43

1          THE COURT:  So if we limit it that way, it sounds

2     like it should be fine.

3          MR. DESPOTAKIS:  Yeah, and I can commit to do this,

4     that once we reach -- if the bank determines that there's a

5     pattern here and there's certain numbers that are critical to

6     the continued discussion, we'll share those with the Court and

7     with plaintiff's counsel and we can determine at that point

8     what we need to do from there, because --

9          THE COURT:  Right, but then you wouldn't be able to

10    make use of the other phone numbers that were not a hit.

11         MR. DESPOTAKIS:  That's correct, Your Honor.

12         THE COURT:  Okay.  So -- but that --

13         MR. DESPOTAKIS:  And the importance to all of this

14    is to get the pattern of communications --

15         THE COURT:  Yes.

16         MR. DESPOTAKIS:  -- to see what that gives us in the

17    first instance --

18         THE COURT:  I understand, but I think the parties

19    can work out some agreement as to circumscribing your use of

20    the phone.  So in other words, I will authorize the subpoena

21    to these -- well, I guess the first thing is to turn over --

22         MR. DESPOTAKIS:  The identification.

23         THE COURT:  -- yeah, the identification.  And then

24    the second phase, which I'm taking an extra step now because

25    we're all here, is to say that your subpoena needs to be

44

1  circumscribed to just the phone log and the email list, rather

2  than content, all right, so no content, and then you will

3  commit to taking the log and running it against the bank's

4  known criminal list --

5           MR. DESPOTAKIS:  Right.

6           THE COURT:  -- and then whatever hits there are you

7  will share with plaintiffs and then you discuss what you're

8  going to do with that.  And beyond that you're not going to do

9  anything else with the phone logs or email addresses that you

10  get as a result of the subpoena, right?

11          MR. DESPOTAKIS:  Perhaps Your Honor, with one

12  proviso, except if we do see something that we need to verify

13  and ask the plaintiff about, we would have the right to apply

14  to the Court, you know, on notice to counsel --

15          THE COURT:  Well, if you --

16          MR. DESPOTAKIS:  -- as to why we think we need that

17  other information that may not be a hit because --

18          THE COURT:  Well, but then you will be talking with

19  plaintiff's counsel --

20          MR. DESPOTAKIS:  That's correct.

21          THE COURT:  -- so that you can figure out if -- I

22  mean, you'll see it, right?  So if you see something that you

23  think is weird, you can talk to plaintiff's counsel and you

24  can have a discussion about whether that's something you can

25  pursue --

45

1          MR. DESPOTAKIS:  If I --

2          THE COURT:  -- but you can't do it without talking

3    to plaintiff's counsel.

4          MR. DESPOTAKIS:  That's right.  In the first

5    instance we would do that, but here's the fine point, as Your

6    Honor would understand once I say this.  You know, yes, there

7    will be one category of calls that the bank will match to see,

8    "Okay, are these known to us from other fraud investigations,

9    national or international?"  But then if they see, for

10   example, telephone -- let's go with telephone numbers or text

11   messages or even email addresses that look that they're out of

12   country or that look like they might be going to a hot spot of

13   fraud that's known to the banks, whether it comes out of

14   Taiwan, Romania, Ukraine, Nigeria, any of those countries that

15   are known hot spots, we're going to wonder, what is she doing

16   calling those numbers.  Now, we're not about to pick up and

17   call anybody, but we would like to have a method to bring that

18   to counsel's attention and to the Court's, if need be, so that

19   we can get at those further --

20         THE COURT:  Well, so, but my point is, if you see

21   something like that, you can pick up the phone and call

22   plaintiff's counsel and have a discussion about it --

23         MR. DESPOTAKIS:  Yeah.

24         THE COURT:  -- and then you can jointly figure out

25   what if anything you're going to do about it, and if you don't

1   come to an agreement then you can come to the Court.  But I'm

2   just saying that you can't do anything else with it, like pick

3   up the phone or start doing some other investigation without

4   checking with plaintiff's counsel first --

5            MR. DESPOTAKIS:  That's fine, Your Honor.

6            THE COURT:  -- because there may well be an innocent

7   explanation and they need to have an opportunity to talk to

8   their client about it.

9            MR. DESPOTAKIS:  That's fine, Your Honor.  And

10  again, as to the subpoena, where the document should go, I

11  think they should probably come to our office.  I will be

12  happy to give copies of those documents to plaintiff's

13  counsel.

14           THE COURT:  Well, they can go to both --

15           MR. DESPOTAKIS:  They'll go to both --

16           THE COURT:  -- offices --

17           MR. DESPOTAKIS:  -- because they'll be listed on

18  these, right.

19           THE COURT:  -- simultaneously and we could --

20           MR. DESPOTAKIS:  And we would submit those --

21           THE COURT:  -- you could work that out.

22           MR. DESPOTAKIS:  -- to Your Honor for approval

23  before we --

24           THE COURT:  The subpoenas.

25           MR. DESPOTAKIS:  -- send them, if I understood you

1    correctly.

2            THE COURT:  I don't need the results, just the

3    subpoenas themselves so that --

4            MR. DESPOTAKIS:  Very well.

5            THE COURT:  -- everybody knows what's being asked

6    for.  Ms. Shin?

7            MS. SHIN:  Your Honor, yes, I wanted to express our

8    concern that, you know, it's one thing if BANA has provided us

9    this information already and we could know that that's the

10   known universe of information that they're seeking to check

11   against our client's records, but I don't feel any reassurance

12   from what's been discussed so far that they may not just take

13   information that they discover in our client's records and add

14   it to their list and say, "Oh, we saw these numbers and they

15   looked suspicious to us for some reason as well."  We have no

16   reassurance that they are not going to just work within their

17   known numbers, whatever known hot spots they allude to.  They

18   might just say, "Oh, well, this number, let's check this out

19   too."  We have no protection for our client against undue

20   harassment --

21           THE COURT:  So --

22           MS. SHIN:  -- that they're not going to subject her

23   friends, her family, to this kind of harassment.

24           THE COURT:  Well, hold --

25           MS. SHIN:  If they could provide, in some limited

1  way at least, the list of numbers or other kinds of

2  information, which they have withheld from us.  They

3  supposedly refer to this in their *ex parte* settlement letter,

4  but we have not seen an iota of that.  If we could see that in

5  some way so that we have some reassurance that they're not

6  going to invent, after the fact, after they've seen our

7  client's records, that, you know, some basis for saying, "Oh,

8  we already knew about this, and so now we're going to say that

9  her mom and her cousins and all of these other people she

10  communicates with are part of this ring of fraudsters."  It

11  seems like we are exposing our client to just rampant exposure

12  and just harassment.

13          THE COURT:  Okay.  So, Mr. Despotakis, how long is

14  this list?

15          MR. DESPOTAKIS:  Your Honor, as I said, whatever

16  that list is, it is the subject of what the bank has from

17  various fraud investigations --

18          THE COURT:  I know, but --

19          MR. DESPOTAKIS:  -- involving all kinds of matters.

20          THE COURT:  I know, but it's --

21          MR. DESPOTAKIS:  It's not about to reveal --

22          THE COURT:  Wait.

23          MR. DESPOTAKIS:  -- that information.

24          THE COURT:  So did you hear what Ms. Shin just said?

25          MR. DESPOTAKIS:  I did, and I think I addressed it

49

1   earlier when I said the reason we need these records is to

2   determine whether there's a match, anything that the bank --

3            THE COURT:  Right, but she's concerned --

4            MR. DESPOTAKIS:  -- might already know, but --

5            THE COURT:  -- that it's -- hold on.

6            MR. DESPOTAKIS:  Yeah.

7            THE COURT:  She's concerned that it's not a static

8   list, right?  So she's concerned that people will show up on

9   the list because they show up on the phone log, okay, because

10  if you already believe that she's part of a criminal ring

11  and --

12           MR. DESPOTAKIS:  Yeah.

13           THE COURT:  -- you see phone numbers that are --

14  that show up a lot you may say, therefore, those are part of

15  the ring.  And so what assurance is there that you have a

16  static list, that's a list that you have as of today, let's

17  say?  Yeah.

18           MR. DESPOTAKIS:  Yeah, there is a static list as of

19  today within the bowels of the bank, you know, in their fraud

20  areas, but the -- anything new that might be discovered, I

21  thought I addressed it before, we would share that information

22  before we reached out or made any calls --

23           THE COURT:  Well, but --

24           MR. DESPOTAKIS:  -- and then we see how we resolve

25  it.

1          THE COURT:  -- so that's the question is, how do we

2    assure that it's a static list as opposed to a list that

3    has -- gets added to as a result of the phone logs being

4    turned over?

5          MR. DESPOTAKIS:  Well, I think I can make the

6    commitment on behalf of my client that that's not going to

7    happen.  We have a list.  If anything does get added onto the

8    bank's records as a result of the information produced here,

9    that will certainly not -- we won't make the claim that we

10   relied on that information.

11         THE COURT:  Right, but what reassurance, let's say

12   from their discovery angle --

13         MR. DESPOTAKIS:  Yeah.

14         THE COURT:  -- what are the -- when the phone

15   numbers are added to the list, is there a record of what date

16   they were added?

17         MR. DESPOTAKIS:  Yeah, we can have the bank provide

18   that if there are hits when they acquired that number -- when

19   they acquired that information.  To me that's not an issue at

20   all.

21         THE COURT:  Okay.  So if there's a hit then you'll

22   get the date, and if the date is after the date that the

23   subpoena --

24         MR. DESPOTAKIS:  Right.

25         THE COURT:  -- is responded to, then you'll know --

1          MR. DESPOTAKIS:  Yeah, yeah.

2          THE COURT:  -- that it was added.

3          MR. DESPOTAKIS:  That information is easily put

4   together --

5          THE COURT:  Okay.

6          MR. DESPOTAKIS:  -- I would think.

7          THE COURT:  All right.

8          MS. WEISSMAN:  Your Honor?

9          THE COURT:  Yes?

10          MS. WEISSMAN:  Just perhaps a final point on this;

11   the time frame.  So, you know, the cases that -- there's two

12   common types of cases that come up with phone records.  One is

13   Fair Labor Standards Act cases where phone records are

14   circumscribed to the period of time that the plaintiff was

15   employed.  Another common way in which these kinds of phone

16   records might be turned over is in the context of car accident

17   cases where the relevant time period is generally limited to

18   often just a few hours before and after the accident.

19          So I suppose I'm just wondering, you know, how Bank

20   of America has come up with this one year before and three

21   months after.  And it seems like a large time period, given

22   that the fraud all happened on one specific day and nobody

23   seems to dispute that.  So I'm not sure -- you know, perhaps

24   Bank of America has some basis, based on other fraud that

25   they're aware of, but again nothing has been turned over to

1   sort of explain why a year before and three months after --

2            THE COURT:  Okay.

3            MS. WEISSMAN:  -- is appropriate.

4            MR. DESPOTAKIS:  I can address that, Your Honor.

5            THE COURT:  Yes.

6            MR. DESPOTAKIS:  Again, based on the bank's

7   institutional experience in its fraud investigations, again,

8   dealing with these kinds of issues, other kinds of issues,

9   these things don't happen overnight.  These things -- the

10  potential victim or cohort is identified very early on at some

11  point in time.  The fraud doesn't take place the very next day

12  or the very next month.  There's all kinds of cons out there.

13           And again, we had a much broader time period

14  initially.  We've narrowed it down to the year before because

15  we think that's fairly -- it's a fairly good indicator.  You

16  know, Ms. Ruane had lived in several jurisdictions.  There

17  were other issues involving -- or there were other judgments

18  against her.  There were things going on out there.  And I'm

19  not saying it to categorize it one way or the other, but there

20  were things going on out there.

21           And it seems to me, these things unfold over time.

22  Sometimes the -- if Ms. Ruane was involved, we'll call her a

23  cohort, a co-conspirator, whatever you want to call it for

24  purposes of our argument only, it could have laid low for a

25  while.  This thing could have jelled.  She could have said

53

1    "no" perhaps at first and then they prevailed on her.  She

2    could have come into financial difficulty and then succumbed

3    to the lure of potentially quick money for doing nothing, so

4    we don't know.

5          We reduced it to a significant period of time.  It

6    is a year and a couple of months afterwards, because remember

7    what happened here.  The checks were stopped.  The proceeds

8    never got into Ms. Ruane's account.  So it is conceivable that

9    the fraudsters at the other end could have been in

10   communication with her and had been saying, "What happened

11   here?  We were supposed to get the money.  You were supposed

12   to get your cut.  What do you mean, the banks -- the checks

13   are stopped here?  You reported these to the bank, you know,

14   what's going on?"

15         So I think three months after is reasonable.  If

16   there were any follow-up conversations with the bad guys

17   expressing their displeasure at the fact that the checks

18   hadn't been cleared, and certainly within a year, if she was

19   involved, I think that's a reasonable time period for anything

20   like this to unfold.  And again, there may be nothing found --

21              THE COURT:  Okay.

22              MR. DESPOTAKIS:  -- but we're entitled to see it, is

23   the point.

24              THE COURT:  I got it.  So I think the year before

25   and the three months after is reasonable for what's being

1   sought here, so for that, as we said before, I grant your

2   motion to compel the information to identify the servers, the

3   providers and the devices for a year and three months after --

4   a year before and three months after, and then when you draft

5   your subpoena to the providers, then you need to run it by the

6   Court before you send it out.  Okay?

7          MR. DESPOTAKIS:  Yes, Your Honor.

8          THE COURT:  So the second one is the banking

9   relations -- relationships.  Ms. Weissman, I don't know if

10  you've had a chance to address that.

11         MS. WEISSMAN:  Yeah, I don't believe we have.  I

12  mean, I think that's -- the arguments are certainly similar.

13  For this one it seems just so clear that there are much less

14  intrusive ways of obtaining this information.  I mean, for one

15  thing her consumer reports -- I mean, where the banks

16  themselves report when there's this kind of activity are

17  readily available and available to Bank of America, so --

18         THE COURT:  Well, but sometimes things get lost or

19  they don't get reported for some reason, so why shouldn't they

20  be entitled to just find out what banks your client had

21  accounts at and then they can issue a subpoena to get

22  information about similar claims and then also the monthly

23  account statements -- or monthly account balances?

24         MS. WEISSMAN:  Your Honor, again, there's -- as we

25  sort of keep coming back to and I don't want to be repetitive,

55

1  there's no foundation.  There's no reasonable basis or

2  information that's been provided, at least with the bank's --

3  with -- I'm sorry, with the phone records, it sounds like

4  there are phone numbers that can be compared and that the bank

5  is at least claiming that they have some reason to think that

6  there are phone numbers that could show up there.

7           THE COURT:  But again, they're allowed to find out

8  whether in fact your client was involved in a criminal ring,

9  and so to find out whether she has engaged in similar, let's

10  just call it suspicious behavior with other banks would tend

11  to show -- tend to prove their point.

12           MS. WEISSMAN:  Your Honor, they asked as part of

13  their discovery request whether or not she ever filed any

14  similar claims with other banks.  She responded --

15           THE COURT:  Why can't they --

16           MS. WEISSMAN:  -- you know that --

17           THE COURT:  -- go behind her word and actually get

18  the records to make sure that's true?

19           MS. WEISSMAN:  Can you just --

20           THE COURT:  That's part of discovery.

21           MS. WEISSMAN:  Your Honor, can I just have a

22  moment --

23           THE COURT:  Yeah.

24           MS. WEISSMAN:  -- to confer with my co-counsel?

25                [Pause in the proceedings.]

1          MS. WEISSMAN:  Thank you, Your Honor.  Your Honor,

2    again, we would submit to the Court that this kind of

3    information is intrusive.  It is laying bare a low income

4    person's entire --

5          THE COURT:  Well, if she doesn't have any bank

6    accounts -- other bank accounts, then there's nothing to lay

7    bare.

8          MS. WEISSMAN:  There could be many reasons also,

9    Your Honor, why she might have certain balances or other

10   balances in accounts.  I mean, is the fact that maybe she is

11   getting money from family, for example, is the fact that she

12   has money in an account at one time or another going to be

13   construed to say that she must have been involved in some kind

14   of fraud because she suddenly -- you know, there's an uptick

15   in the account balance?  I mean --

16         THE COURT:  Okay.

17         MS. WEISSMAN:  -- we could argue --

18         THE COURT:  Well, you can argue that either way, but

19   they're entitled to have the information it sounds so they can

20   at least make the argument.  They're not -- it's not

21   conclusive, of course.

22         MS. WEISSMAN:  It certainly seems like

23   information -- we would be willing to agree that -- for them

24   to have information about whether or not there were

25   complaints, similar complaints at other banks.

57

1          THE COURT:  Okay.

2          MS. WEISSMAN:  I think that we are okay with that.

3     We think that the three-year time period is overly broad and

4     it should be a similar --

5          THE COURT:  I thought it was two years before and

6     then one year after.

7          MS. WEISSMAN:  Yeah.

8          THE COURT:  Right, so that's the three years you're

9     talking about.

10         MS. WEISSMAN:  That's the three-year time period.  I

11     mean, if anything, perhaps a similar time period that was just

12     agreed to on the phone records, but her --

13         THE COURT:  Well, but the year after might be

14     important, because you're saying that she was not able to open

15     any bank account, so if in fact she did have open bank

16     accounts, that would disprove your client's claim.

17         MS. WEISSMAN:  Well, we said that she couldn't, yes,

18     open bank accounts --

19         THE COURT:  That's what I'm saying.

20         MS. WEISSMAN:  -- for a certain period of time.

21         THE COURT:  But if it turned out that she did --

22         MS. WEISSMAN:  Yeah.

23         THE COURT:  -- open bank accounts in the year after,

24     then that would tend to disprove your client's claim.

25         MS. WEISSMAN:  But so perhaps a year before and a

1  year after, in terms of -- Your Honor, the other thing is

2  though, I mean, certainly information about her statements, it

3  sounds like that's off the table.  We would be very concerned

4  about that --

5          THE COURT:  Yes.

6          MS. WEISSMAN:  -- being relevant and being overly --

7          THE COURT:  Right, and so I think --

8          MS. WEISSMAN:  -- intrusive and broad.

9          THE COURT:  -- I heard Mr. Despotakis say that he's

10 modified the request so that it would just be the monthly

11 account balances so he can look at during this three-year

12 period where her account balances were, because when people

13 talk about -- I guess your client has said that she had an

14 inability to support her family because she lost her job and

15 she had to move back to New York and had to borrow money, that

16 that would tend to show -- you know, would be another way --

17 another piece of the puzzle in addition to the income loss.

18          So in other words, people can lose their income but

19 still have savings and that is a cushion against financial

20 ruin.  But you've basically pled financial ruin here, and so I

21 think they would be entitled to find out whether that's the

22 case.  And if there is money in the accounts and your client

23 can explain that it's through loans or whatever, then, sure,

24 you're entitled to do that, but I think it sounds like they're

25 also entitled to find out if there's support for your claim of

59

1  financial ruin, so --

2          MS. WEISSMAN:  So, Your Honor, would the Court also

3  be amenable to reviewing the subpoenas in this case as well to

4  make sure that they're truly limited --

5          THE COURT:  Yes.

6          MS. WEISSMAN:  -- to just learning whether there are

7  similar types of claims of fraud and whether there's -- and to

8  the account balances and no other account information?

9          THE COURT:  Yes.

10         MS. WEISSMAN:  Okay.

11         MR. DESPOTAKIS:  Your Honor, if I may?

12         THE COURT:  Yes.

13         MR. DESPOTAKIS:  On the account balances, for the

14 sake of clarity, yes, you're right, we don't want to see the

15 individual transactions, but typically in a bank statement

16 there's a recap section in the front that tells you total

17 amount of deposits, total amount of withdrawals or debits,

18 service fees, interest earned, and then your closing balance

19 for that month.  We would want that raw -- gross information,

20 not just the line that says the balance, because --

21         THE COURT:  So the total debit and the total --

22         MR. DESPOTAKIS:  Right, because in any given month

23 it is conceivable, and I have seen this, you get X-number of

24 dollars going in, you get X-number of dollars going out, but

25 your balance could be zero in June --

60

1          THE COURT:  Yeah.

2          MR. DESPOTAKIS:  -- and still be zero in July --

3          THE COURT:  Okay.  So it would be --

4          MR. DESPOTAKIS:  -- because your ending balance

5    won't be -- right.

6          THE COURT:  Yeah, it would be the balance plus the

7    total debits and total deposits.

8          MR. DESPOTAKIS:  Total debits, total credits,

9    balance, not individual transactions.  It's a place to start.

10          THE COURT:  Okay.  But not individual transactions?

11          MR. DESPOTAKIS:  Correct, just the --

12          THE COURT:  Okay.

13          MR. DESPOTAKIS:  -- total gross numbers.

14          THE COURT:  All right.  Because the monthly number

15    doesn't capture what happened --

16          MR. DESPOTAKIS:  Within the month.

17          THE COURT:  -- within the month.  All right.  So if

18    it turned out, and it may not be an issue because if your

19    client has no money or very limited money, then there -- the

20    account statements and the activity in her accounts will

21    presumably show that.  So if, for example, there's a 10,000

22    deposit -- $10,000 deposit on the second day of the monthly

23    cycle, and then a $10,000 withdrawal on day 20, it wouldn't

24    show up in the monthly balance at the end of the month, but it

25    would show up that somehow a large amount of money got moved

1  during the course of the month.

2          MS. WEISSMAN:  Yeah.  I mean, it just -- it seems

3  like, you know, if she wasn't a low income person, this

4  information wouldn't --

5          THE COURT:  It's -- no, I think --

6          MS. WEISSMAN:  -- there would be no basis for this,

7  but --

8          THE COURT:  Well, but you pled it, right?  You pled

9  financial ruin.  If you didn't plead it, I don't know that

10  they -- it would matter, but you pled it, and you pled that

11  because of what the bank did all these horrible things

12  happened, and they may well have happened.  But you said in

13  addition to her not being able to open a bank account, that

14  she no longer had income, that she wasn't able to support her

15  family, which meant she had to move, which meant she had to,

16  you know, lose her house or, you know, whatever those things

17  are, and once you plead that they're entitled to disprove it,

18  so that's where you are.  Okay?

19          MS. WEISSMAN:  Yeah.  I mean, we have submitted in

20  discovery as far as pay stubs and information about her

21  widow's pension and information --

22          THE COURT:  But that doesn't show --

23          MS. WEISSMAN:  -- about her job application.

24          THE COURT:  But that's just, you know, employment

25  and pension, but if their theory is that she's involved in a

1   criminal ring and the criminal ring is giving her money for

2   work that she's done for them, but it's not showing up on a

3   pay stub, obviously, then they're entitled to get that,

4   because that does support their theory.  Now, if there isn't

5   anything there or there's an innocent explanation, then that's

6   part of the discovery process and part of what the trial will

7   be.

8            MS. WEISSMAN:  Sure.  It just -- theory seems so

9   threadbare, given that she re -- why would she have

10  reported --

11           THE COURT:  But it doesn't --

12           MS. WEISSMAN:  -- the fraud in the first place --

13           THE COURT:  Well, it --

14           MS. WEISSMAN:  -- if she was involved in a seasoned

15  criminal --

16           THE COURT:  But if that's the case, then we don't

17  even need to go to trial and you should move for summary

18  judgment, right?  I mean, there are issue in dispute here, and

19  so that's why during the course of discovery both sides are

20  entitled to get the information so they can make their case.

21  Okay?  But you've pled defamation, so they're entitled to find

22  out the truth of the matter.  You've pled financial ruin, so

23  they're entitled to find out whether that's true, and so

24  that's why I'm going to grant that.  Okay?

25           MS. WEISSMAN:  Okay, Your Honor.  Well, then I would

1  just say for the third and final --

2          MR. BROMBERG:  Your Honor, if I may, for a moment?

3  There is a concern here that I've subpoenaed records from

4  banks before.  They are not particularly selective.  Even

5  though Bank of America's attorneys are going to ask -- may ask

6  for, you know, just the gross debits and deposits, I can

7  guarantee you that the banks are going to turn over the whole

8  monthly statements.

9          THE COURT:  Well, then we should put something in

10  the subpoena to say, "You shall not disclose this part."

11          MR. BROMBERG:  They're going to do it anyway.

12          THE COURT:  Well --

13          MR. BROMBERG:  I mean, if it -- I would prefer to

14  have it come to one of our offices first and then we can

15  redact everything --

16          THE COURT:  Well, you can --

17          MR. BROMBERG:  -- but the summary section.

18          THE COURT:   -- put that in the subpoena and I can

19  court order it so that if they disclose it they will be in

20  violation of a court order.  Okay?

21          MR. DESPOTAKIS:  Your Honor, may I --

22          THE COURT:  Yes.

23          MR. DESPOTAKIS:  -- address those two concerns?  I

24  don't know what banks Brian is talking about, but I know how

25  it works with Bank of America and most money center banks.

64

1    They do not respond beyond it for a very simple reason.  Under

2    15 U.S.C. 6801, *et seq.*, that's the federal financial

3    confidential -- Financial Privacy Act, the Gram -- whatever it

4    is --

5              MR. BROMBERG:  <u>Gram-Leach-Bliley</u>.

6              MR. DESPOTAKIS:  Thank you.  Okay.  They would be in

7    severe regulatory and legal heap of trouble if they

8    disregarded it and gratuitously released information not

9    covered by the specific terms of the subpoena.  We will craft

10   the subpoena exactly as I have indicated it, and I know most

11   banks -- and if I get something that is beyond the scope of

12   that, I will commit -- since it will be coming to me, I will

13   commit that I will promptly advise plaintiff's counsel and

14   return whatever excess pages I receive.  But we will craft the

15   subpoena very, very succinctly.  We will make it clear what it

16   is that we want.

17             THE COURT:  Well, you should also make it clear what

18   you don't want.

19             MR. DESPOTAKIS:  That's correct.

20             THE COURT:  Yeah.

21             MR. DESPOTAKIS:  Right.  And I will commit to do

22   that.  We will craft it carefully and we'll cover the concerns

23   expressed by --

24             THE COURT:  And then you again --

25             MR. DESPOTAKIS:  -- plaintiff's counsel.

1           THE COURT:  -- submit it to plaintiff's counsel and

2   the Court so that we can look at it.

3           MR. DESPOTAKIS:  Absolutely, no problem.

4           THE CLERK:  All right.  So the final point is tax

5   returns.

6           MS. WEISSMAN:  The final point is the tax returns.

7   Your Honor, given the other information Bank of America is now

8   going to have access to, I really can't see any basis why they

9   would also need five years' worth of her tax returns.  I mean,

10  certainly if the information that's going to now be provided

11  starts to produce some kind of leads to support these kinds of

12  allegations, that so far have been unsupported, then perhaps

13  we could return to the conversation.  But I mean, to show her

14  income they're going to have access to now all of her banking

15  institutions to show her potential communication or contact

16  with a fraud ring; they're going to have access to her phone

17  records.

18          I'm left with not seeing any basis for why the tax

19  returns at this stage could be proper, and courts have

20  submitted tax returns to a higher level, a more stringent

21  level of scrutiny, you know, because there's a public policy

22  incentive to make sure that people file accurate returns, and

23  they're not readily required to be turned over as part of

24  discovery.

25          THE COURT:  Right.  Well, so you've also pled as

66

1   part of the damages, loss of income, and so whether there is

2   in fact a loss of income is something that the tax return

3   could show.  And it sounds from what Mr. Despotakis said

4   earlier, they're looking for only two things:  one is the

5   income and the other is reported losses.  So the income, since

6   you pled it, I think it's fair for them to get, at least the

7   income line.

8           MS. WEISSMAN:  So we could redact the tax returns

9   other than the income line?

10          THE COURT:  Right.  And then the losses, if she

11  had -- I don't know whether she would do this, but whether she

12  would report losses related to fraud that was perpetrated on

13  her or reported to be perpetrated against her in other

14  instances, so that -- I recognize that the information that

15  I've asked to be turned over, in terms of complaints to other

16  banks, may be relevant to that point, but if in addition to or

17  outside of any reports of the banks, she's reporting to the

18  IRS that she had losses because of fraud, that would also be

19  relevant to whether in fact she was involved in a criminal

20  ring.

21          MS. WEISSMAN:  Your Honor, if we're to turn over

22  redacted tax returns, other than her income and, I mean, any

23  reported losses due to fraud, I think that that's -- I just

24  want to confer with my co-counsel before I say that we're okay

25  with that, but -- sorry, Your Honor, one moment.

1          THE COURT:  That's okay.

2               [Pause in the proceedings.]

3          MS. WEISSMAN:  So, Your Honor, the one other caveat

4    we would have is that going back five years seems unduly far.

5    I mean, perhaps three years would be more reasonable and we

6    could provide that information, again, the income line and any

7    reporting of losses due to fraud.

8          THE COURT:  Okay.  Thank you.  Mr. Despotakis?

9          MR. DESPOTAKIS:  Since counsel is agreeing, subject

10   to a reduced period, I was just going to point out that, you

11   know, there could be inconsistencies.  If our theory of the

12   case is correct and Ms. Ruane was involved, she could be

13   reporting one thing to IRS and in the meantime there's an

14   inconsistency in the bank statements in terms of balances that

15   would also go to the issue of her credibility, her damages,

16   and everything else, that would be equally fair game.

17         THE COURT:  Right.  And so the time period will be

18   similar.  So it's three years, not five years, if you want to

19   look at that.

20         MR. DESPOTAKIS:  That's fine, Your Honor.

21         THE COURT:  Yes.  Okay.

22         MR. DESPOTAKIS:  We would agree to that.

23         THE COURT:  So it'll be tax returns going back three

24   years.  Are you say -- so it wasn't clear to me if the request

25   is five years prior to the incident or prior years -- five

68

1   years from today.

2           MR. DESPOTAKIS:  No, prior to the incident.

3           THE COURT:  Prior to the incident.

4           MR. DESPOTAKIS:  That has to be our ground zero

5   reference point, Your Honor.

6           THE COURT:  Okay.

7           MS. WEISSMAN:  So, Your Honor, we just wanted to

8   clarify two points that have come up in the course of this

9   discussion.  And one is to just understand when the *ex parte*

10  information is going to be turned over, when that decision is

11  going to be made, and whether any of the rulings today or

12  decisions today are contingent on that.  And the second is

13  just to clarify this question about whether or not they have a

14  static list and how we will ensure a static list.

15          I understand -- we talked about the fact that there

16  perhaps would be some kind of time stamp.  Would that come

17  with some -- I think we would just want to make sure that

18  there's something to verify that it is an authenticated

19  business record, you know, that the time stamp is somehow part

20  of their normal course and process and it's not something

21  that's put on there just for the purpose of this litigation,

22  but that there is in fact a process in place, and what is that

23  procedure, what is that process to date when these phone

24  numbers appear in their records.

25          MR. DESPOTAKIS:  Your Honor, I have to say something

1    at this point.  What's being suggested is that the bank would

2    be in effect altering records, creating false and fraudulent

3    records --

4              THE COURT:  Well, I don't think that's -- I don't

5    think --

6              MR. DESPOTAKIS:  What I'm saying -- I want to dispel

7    that.

8              THE COURT:  Wait -- no, but I don't think that's

9    being said, so I don't think that --

10             MR. DESPOTAKIS:  That's what I'm hearing, though.

11             THE COURT:  Well, I didn't hear that --

12             MR. DESPOTAKIS:  All right.

13             THE COURT:  -- so let me clarify.  So all they're

14   saying is they want to make sure that there aren't -- that

15   there's -- because if there's -- with electronic records it's

16   often tricky because it's not static, right, so things are

17   constantly changing.

18             MR. DESPOTAKIS:  Correct.

19             THE COURT:  And unless there's a way to re-trace the

20   steps to say when things changed, then it's hard to say

21   whether something was on the list prior or added later.  Okay?

22             MR. DESPOTAKIS:  And I've committed --

23             THE COURT:  And so --

24             MR. DESPOTAKIS:  -- to provide that information.

25             THE COURT:  Right, so that's an outstanding issue is

1   just for you to confirm, because it didn't sound like you knew

2   100 percent that there was a time stamp on the list.

3               MR. DESPOTAKIS:  Right.

4               THE COURT:  Okay.

5               MR. DESPOTAKIS:  And I would be happy to confirm

6   that.

7               THE COURT:  Okay.

8               MR. DESPOTAKIS:  I will get the bank's confirmation

9   and I as counsel will relay that to plaintiff.

10              THE COURT:  Okay.  So --

11              MR. DESPOTAKIS:  I had no problem with that earlier.

12              THE COURT:  All right, all right.  So then --

13              MR. DESPOTAKIS:  One more thing, if I may, Your

14  Honor, just to be clear?

15              THE COURT:  And then the other part was about

16  turning over -- you said you had to talk to your client about

17  the one piece of missing information.

18              MR. DESPOTAKIS:  The one piece that created --

19              THE COURT:  So when are you going --

20              MR. DESPOTAKIS:  -- the conundrum last time, yes.

21              THE COURT:  Yes.  And so when are you going to be

22  able to --

23              MR. DESPOTAKIS:  I will commit to have that

24  discussion with my client tomorrow --

25              THE COURT:  All right.

1          MR. DESPOTAKIS:  -- and I will get back to

2   Mr. Bromberg or to Eve or to Susan no later than Monday.

3          THE COURT:  Okay.  And so I will hold off on

4   enforcing this until Tuesday so that if there's a problem with

5   the information, if your client balks or you can't reach an

6   agreement with the plaintiff as to what you're turning over,

7   that I will look at what I've ruled on today to see if it's

8   still relevant.

9          MR. DESPOTAKIS:  Yeah, Your Honor, if I may, as to

10  the tax return issue, we would be asking for three years

11  before on the tax returns and one year afterwards, because,

12  again, as she was saying that she was destitute, she's put her

13  financial condition into direct dispute, so we want to know

14  what she reported the subsequent year as well --

15         THE CLERK:  All right, so --

16         MR. DESPOTAKIS:  -- if that's reasonable, because

17  this all happened I believe --

18         THE COURT:  -- the three years before and one year

19  after.

20         MR. DESPOTAKIS:  After the date of the incident,

21  yeah, for the next applicable tax returns.

22         THE COURT:  Can we just give the tax years so that

23  we don't have a problem?  What tax years are we talking about?

24         MS. WEISSMAN:  Your Honor, the tax years that are

25  requested go through 2017, so my understanding was if we were

72

1  doing three years it was 2015, 2016, and 2017.

2        MR. DESPOTAKIS:  Right, because this incident

3  happened when, September seven --

4        MS. WEISSMAN:  So that's the -- it happened in 2016,

5  so that's the year before --

6        MR. DESPOTAKIS:  2016, so it would be tax year --

7        MS. WEISSMAN:  -- the year of, and the year after.

8        THE COURT:  Wait, don't talk over each other.  So if

9  you're saying this happened in 2016, so it would be -- 2017

10 would be the year after --

11       MR. DESPOTAKIS:  Right.

12       THE COURT:  -- and then the -- it would be 2014, '15

13 and '16, right?

14       MR. DESPOTAKIS:  Yes, yes.

15       THE COURT:  Okay.  So it was --

16       MR. DESPOTAKIS:  I think we agree on the years.

17       THE COURT:  -- 2014, 2015, 2016, 2017.  Those are

18 the years.

19       MS. WEISSMAN:  Yeah, I thought we said the same

20 years as the bank statements, so two years before and one year

21 after.  I'm not sure why they're now saying three years before

22 for this.

23       THE COURT:  2016 -- well, 2016 is when it's

24 happening --

25       MS. WEISSMAN:  It happened towards the end of the

73

1  year.

2          THE COURT:  -- so technically -- yeah.

3          MS. WEISSMAN:  Yeah.

4          THE COURT:  So I think it's fair to just say 2014

5  and 2015, and then 2016 and 2017.

6          MS. WEISSMAN:  Okay.

7          THE COURT:  Okay.

8          MS. WEISSMAN:  And then just to clarify that our

9  turning over the information about the phone internet provider

10 is contingent on first receiving this information from Bank of

11 America about the process and confirming that there's this

12 process in place and what that process is to ensure this

13 static universe.

14         THE COURT:  Yes, but they don't have to turn over

15 the phone numbers, their phone number list --

16         MS. WEISSMAN:  I understand.

17         THE COURT:  -- just so that when you get the list of

18 hits, you would be able to confirm that those phone numbers

19 were already on the list and not added as a result of what

20 you've turned over.

21         MS. WEISSMAN:  But something in writing that just

22 describes the fact that there is a process in place to ensure

23 that those numbers are dated in some way.

24         MR. DESPOTAKIS:  I've already committed to do that,

25 so --

74

1            THE COURT:  Yes.

2            MS. WEISSMAN:  Okay.

3            THE COURT:  Okay.

4            MR. DESPOTAKIS:  -- twice.

5            THE COURT:  All right.  So --

6            MR. BROMBERG:  If I may, Your Honor?  Is there

7   actually a physical list in defense counsel's possession?

8            MR. DESPOTAKIS:  No.

9            THE COURT:  Well --

10           MR. BROMBERG:  Okay.

11           THE COURT:  -- it's -- when you say "physical list,"

12  we're in an electronic world, so what do you mean?

13           MR. BROMBERG:  Well, whether it be -- in some fixed

14  form, whether it be a file -- an Excel spreadsheet,

15  something --

16           THE COURT:  Well --

17           MR. BROMBERG:  -- with this list so we can ensure

18  that there's --

19           THE COURT:  Well, but --

20           MR. BROMBERG:  -- you know, that we know what it is

21  now.

22           THE COURT:  Well, the problem is these things are

23  happening in real time, right, and so it's -- the only -- and

24  it doesn't really matter when they're added, it just -- you

25  just need to know that it wasn't added after you turned over --

75

1  after the phone company turned over the list to check against,

2  right?

3           MR. DESPOTAKIS:  And --

4           MR. BROMBERG:  But I'm just wondering if there's any

5  need for any -- if we have a need for verification later on, if

6  there's something we can go back to.

7           THE COURT:  Verification of what?

8           MR. BROMBERG:  Verification that nothing's been

9  added if --

10          THE COURT:  Right, that's what we're talking about,

11 and so --

12          MR. BROMBERG:  What I'm saying is, it might help if

13 defense counsel actually has an Excel spreadsheet with all

14 these numbers sitting in there --

15          THE COURT:  But nobody has Excel spreadsheets

16 anymore.  It's --

17          MR. BROMBERG:  Well, no, you can --

18          THE COURT:  -- a database.

19          MR. BROMBERG:  -- output all this -- but you can

20 output a list to an Excel spreadsheet or to an ASCII delimited

21 file, whatever.  It can be some --

22          THE COURT:  Okay.  So what you want to do is to

23 create something static out of --

24          MR. BROMBERG:  Let's create something static so that

25 in the event there's ever any dispute --

76

```
 1              MR. DESPOTAKIS:  Yeah, and --
 2              MR. BROMBERG:  -- down the line about when something
 3 got added --
 4              THE COURT:  Okay.  No --
 5              MR. BROMBERG:  -- we can go back to a static record.
 6              THE COURT:  -- that's fair.  So is there --
 7              MR. DESPOTAKIS:  I have a problem with that, though,
 8 Your Honor --
 9              THE COURT:  Why?
10              MR. DESPOTAKIS:  -- if I may be heard?  Okay.  As I
11 said, this is institutionally within Bank of America, and it
12 deals with a lot of different frauds around the world, around
13 the country constantly.  So these numbers I assume are there
14 and they're known institutionally to the fraud investigators,
15 but that is proprietary.  It is revealing --
16              THE COURT:  No, wait, wait, wait, wait.
17              MR. DESPOTAKIS:  -- security information.
18              THE COURT:  I hear you on that --
19              MR. DESPOTAKIS:  Right.
20              THE COURT:  -- but the question isn't about you
21 giving them the phone numbers -- all your phone numbers.  I've
22 already said you don't have to turn that over.
23              MR. DESPOTAKIS:  Okay.
24              THE COURT:  Okay?  What I am saying is, once you get
25 the hits, they want to be able to go back and say, "Did you add
```

77

1  this phone number just because you got it from my client?"

2             MR. DESPOTAKIS:  Okay, and I've committed to do

3  that.

4             THE COURT:  So if -- but the proposal from

5  Mr. Bromberg is that you -- that your client creates -- it's a

6  non-static list, but if there's a way to freeze it in time so

7  that there's a record of it, okay, so that later on if there's

8  a question as to, was it on the list before or was it on the

9  list afterwards, you can go back and check.  Now, that may not

10 work, but it's a good suggestion, right, to have some way to

11 download that information and put it in a list someplace, but

12 it someplace to hold for now, so that that's the list you're

13 going to check against or that you're --

14            MR. DESPOTAKIS:  All right.  Okay.

15            THE COURT:  -- checking against the non-static list,

16 but if it's not on that static list, that a question will be

17 raised.  Now, we're not saying you have to create the static

18 list today, right?

19            MR. DESPOTAKIS:  Yeah.

20            THE COURT:  It may be that you create the static

21 list an hour before you run it against the information that

22 you've got --

23            MR. DESPOTAKIS:  I understand.

24            THE COURT:  -- right, or an hour before the return

25 is received, you see what I'm saying --

78

 1            MR. DESPOTAKIS:  I understand.

 2            THE COURT:  -- so that there's no way that you could

 3  have -- your client could have messed with that list by adding

 4  a number that wasn't on it.

 5            MR. DESPOTAKIS:  Right, because we certainly can't

 6  do anything prior to receiving the information of the providers

 7  and receiving the names and receiving the --

 8            THE COURT:  Correct.

 9            MR. DESPOTAKIS:  Okay.

10            THE COURT:  So if there's a way --

11            MR. DESPOTAKIS:  That's fine.

12            THE COURT:  -- to create a static list and just put

13  it in a vault --

14            MR. DESPOTAKIS:  I --

15            THE COURT:  -- so that everybody can be sure of

16  that.  Now, I understand your client is very concerned about

17  revealing that list, and so it doesn't sound like you want that

18  list, per se, right?

19            MS. WEISSMAN:  Actually --

20            THE COURT:  You just want to -- well, I know you

21  want it, but I don't know that you necessarily -- I haven't

22  ruled that you should get it and I'm -- maybe I should talk

23  through all that right now, because if the list is of all known

24  criminals and they're saying they don't think they should have

25  to give it to you because it has nothing to do with your

79

1   client, that might be --

2            MR. DESPOTAKIS:  Just the hits, Your Honor.

3            THE COURT:  -- that --

4            MR. DESPOTAKIS:  Just the hits.

5            THE COURT:  -- may be an issue, right?  So if

6   they've got a list of 1,000 known criminals that they're

7   worried about, they're concerned about giving you that list if

8   it has nothing to do with your client, right?

9            MR. BROMBERG:  Your Honor, ideally we want it

10  deposited with the Court, but frankly if defense counsel has --

11  keeps it on his computer in some kind of locked form with a

12  date stamp, we're fine.

13           THE COURT:  Okay.  All right.  Okay.  Because I know

14  you're concerned about creating a document that you later

15  will --

16           MR. DESPOTAKIS:  Doesn't exist.

17           THE COURT:  -- have to turn it over in discovery --

18           MR. DESPOTAKIS:  Right.

19           THE COURT:  -- so that's why I'm talking through

20  this.

21           MR. DESPOTAKIS:  And I will discuss this issue with

22  the client, too, and find out if it's capable or they can

23  gather their information and put it into a newly created list

24  and --

25           THE COURT:  Right, that's static for purposes --

80

1          MR. DESPOTAKIS:  Static, and they would send it to

2 me.

3          THE COURT:  -- of establishing that it hasn't been

4 added to as a result of the plaintiff's disclosure.

5          MR. DESPOTAKIS:  I understand.

6          THE COURT:  All right.

7          MR. DESPOTAKIS:  Yeah, that's fine.

8          THE COURT:  Okay.  So I think I've dealt with the

9 defendant's motion to compel.  I should turn now to the

10 plaintiff's motion.

11          All right.  So, Ms. Weissman?

12          MS. WEISSMAN:  Yes, Your Honor, thanks.  So we're

13 seeking three broad categories of information that can be at

14 least clumped together in that way that are highly

15 discoverable, highly relevant to the case, from Bank of

16 America, that Bank of America has so far refused to produce.

17 The first category, which is sort of -- will take the most time

18 to sort of quickly go through and explain, has to do with

19 information that's relevant to whether Bank of America

20 conducted a good-faith investigation under the Electronic Fund

21 Transfer Act, and a reasonable investigation under the Fair

22 Credit Reporting Act concerning our client.

23          So the types of documents and information that we're

24 seeking here has to do with things that pertain to what Bank of

25 America knew, what information was available to Bank of America

1  at the time that it conducted its investigation, whether the

2  alleged misconduct is a repeated conduct or was an isolated

3  incident, and similarly the frequency, persistence and nature

4  of the alleged misconduct.

5        And so there's five specific types of information

6  that fall into this first broad category about good faith and

7  reasonable investigations.  The first is the average amount of

8  time and the average cost of investigating disputes under the

9  Electronic Fund Transfer Act, Fair Credit Reporting Act.  Based

10  on the case law, this seems to be information that is routinely

11  kept and routinely available, and court say does have bearing

12  on whether or not a particular investigation was indeed

13  reasonable.

14        The second has to do with complaints filed against

15  Bank of America, both regulatory and in court, for the type of

16  conduct alleged.  Your Honor will remember we requested similar

17  information from Chex Systems and were granted that request in

18  some limited form that we found acceptable.

19        The third has to do with the use of a fake Barack

20  Obama signature to commit fraud on Bank of America accounts.

21  Here again we're really just looking to understand what

22  information Bank of America was aware of and had available to

23  it at the time that it conducted its investigation concerning

24  plaintiff.  Bank of America has said, as you've heard of

25  course, that this was -- they determined this was part of a

1   certain kind of fraud trend, and we think we are entitled to

2   know whether Bank of America was aware of this other fraud

3   trend, that we've at least identified based on this and at

4   least one previous case that was brought, but we think that

5   there are others.

6              The fourth bucket of information in this larger

7   category has to do with whether there were data or security

8   breaches at Bank of America which would have compromised

9   plaintiff's personal information; for example, allowing a

10  fraudster to know her log-in information and therefore be able

11  to deposit these fake checks into her account.

12             And the final thing -- the final question here in

13  this first category has to do with the accuracy of Bank of

14  America's investigations, and based on interagency guidelines,

15  CFR Rules promulgated by the Consumer Financial Protection

16  Bureau, it seems pretty clear to us that Bank of America --

17  that all banks, in fact furnishers of this kind of information,

18  are required to have certain documentation and information in

19  place and to look back at the accuracy.  So we're trying to

20  understand what information Bank of America has about the

21  accuracy of these types of investigations.

22             And secondly, looking to get some pretty basic

23  information about certain accounts at Bank of America where

24  there were either claims of unauthorized funds or whether there

25  were disputes about negative reporting where the bank looked

1  into these matters and made determinations one way or the

2  other.

3          What we're really trying to understand here is

4  whether there is in fact a pattern and practice, as we've

5  alleged, that Bank of America routinely neglects to conduct

6  reasonable investigations when people bring to the bank's

7  attention that there's fraud on their account or contest the

8  reporting of themselves to consumer reporting agencies, whether

9  the bank routinely failed to conduct reasonable investigations

10  when these kinds of claims involve people who are low income.

11  And again, throughout the course of this litigation, this is

12  something we alleged in our complaint, and throughout the

13  course of the litigation it has come up time and again from

14  Bank of America, that indeed the income status of our client

15  seems to have been a big factor here.  So that's the first main

16  category.

17          The second category concerns simply the policies and

18  procedures that Bank of America has in place pertaining to both

19  its investigations under these two federal statutes.  Again, it

20  seems clear that Bank of America has policies and procedures in

21  place.  They've actually provided some documentation along

22  these lines, although it is heavily, and we would argue

23  improperly, redacted.  And the production so far, what we have

24  been able to read, does suggest that relevant policies and

25  procedures exist, for example, haven't been produced, for

84

example there's references to something called a front line

unit that would be investigating these types of claims and

would put certain procedures in place, and so we're wondering

where those front line unit procedures are.  We listed a number

of other examples, and we really provided them by way of

example, of the types of things that are alluded to or

referenced in Bank of America's production that certainly seem

relevant, that we have not received.

And then the third category has to do with Bank of

America's contractual relationships with the CRAs.  And the two

things I really want to just highlight here are, first of all,

that we know Bank of America reported our client to Early

Warning Services.  However, Bank of America has turned over

nothing by way of contractual agreements or even communications

between itself and Early Earning Services, even though again we

know that they reported her and now they are in fact a partial

owner of the company.  And Chex Systems has actually agreed,

through the course of discovery, to turn over its contract or

agreement with Bank of America, pending Bank of America's

agreement to do that mission, which Bank of America so far has

withheld.

And Judge, I just want to say in general that

discovery has been going on for seven months now.  We've been

doing our best to meet and confer and work through these

issues.  We do genuinely feel that Bank of America has not

85

1   acted in entirely good faith in responding to our requests.

2   Bank of America, for example, to all but I believe one of all

3   of our discovery requests, gave the same boilerplate

4   objections.  Bank of America has refused to tell us whether

5   they are actually withholding any information that's

6   responsive, based on those objections.

7           And Bank of America seems to continually bring new

8   things up that weren't disclosed or shared earlier; for

9   example, now saying that our client simply has to sign an

10  authorization form in order to get access to her unredacted

11  bank records.  I mean, I'm just -- it's surprising that this is

12  coming up so much later.  Certain documents we've been

13  requesting are now -- suddenly we're learning perhaps not

14  readily available.  I'm' not sure what "readily available"

15  means, but again it's the first time that we've even gotten

16  into the territory of not just a pure objection, but, you know,

17  this information might exist and might be hard for us to find,

18  and therefore we don't want to produce it, so that's been

19  troubling.

20          THE COURT:  Okay.  So it sounds like the information

21  that you're seeking is going primarily to the argument that

22  Bank of America did not do a reasonable good faith

23  investigation, right?

24          MS. WEISSMAN:  That's right, and there were two

25  investigations, just to be really clear.  There was the EFTA

86

1  investigation, which has to be a good faith investigation under

2  the statute, and there's the reinvestigation, as it's actually

3  called under the FCRA, which has to be reasonable under the

4  statute.

5       THE COURT:  Right.  Okay.  And so you're looking at

6  what they knew at the time, so let's go to the -- let me start

7  with the policies and procedures.  So why can't you just turn

8  those over, Mr. Despotakis?

9       MR. DESPOTAKIS:  On the policies and procedures,

10  Your Honor, we have turned them over.  We have simply redacted

11  what does not apply to the facts and the claims in this

12  particular action --

13       THE COURT:  But why?

14       MR. DESPOTAKIS:  -- because the procedures that

15  we've given, okay, the Fair Credit Reporting Act procedures,

16  are not just procedures that relate to the kind of scenario we

17  have here.  They cut across the board institutionally; for

18  example, for credit cards, for consumer credit debt, that is,

19  by notes --

20       THE COURT:  Right.  So did you make clear that

21  that's what you've redacted, or you just have big --

22       MR. DESPOTAKIS:  Well, we have told counsel we've

23  redacted everything that is not relevant --

24       THE COURT:  Well, no.

25       MR. DESPOTAKIS:  -- to this type of fact scenario.

1          THE COURT:  Yeah, but that's not helpful.  So if

2  you've said, for example, under these black bars is the

3  information on credit cards, which is not what's at issue here,

4  that might give some guidance to the plaintiffs, "Okay, sure,

5  it's credit cards, it might not be useful here."  Under this --

6  underneath here is something else.  So in other words, you

7  haven't given them the tools to actually get --

8          MR. DESPOTAKIS:  We --

9          THE COURT:  -- the information to say, "Okay, that's

10  fine," or "No, actually, that's relevant," so you can --

11          MR. DESPOTAKIS:  We had expressed a willingness to

12  show the Court unredacted --

13          THE COURT:  No, I don't want to see it.

14          MR. DESPOTAKIS:  -- complete version, but --

15          THE COURT:  I don't want to see it.  What I'm saying

16  is, you need to give your opposing counsel the tools to make

17  the argument, and not just say, "We think it's not relevant."

18  But maybe they think it's relevant and maybe they can make a

19  good argument for it, so --

20          MR. DESPOTAKIS:  Your Honor, that's fair enough.

21  And if your -- if what the Court is suggesting is that we

22  enunciate the general nature of what has been redacted --

23          THE COURT:  No.

24          MR. DESPOTAKIS:  -- we'll try to get it as speci --

25          THE COURT:  No, I don't mean the general nature.  I

1  want you to say what is redacted without --

2           MR. DESPOTAKIS:  Well, yeah, yeah.

3           THE COURT:  So for -- yes?

4           MR. DESPOTAKIS:  That's what I'm talking about.  I'm

5  saying this relates --

6           THE COURT:  You said "general nature."

7           MR. DESPOTAKIS:  -- this relates to credit card

8  transactions --

9           THE COURT:  Okay.

10          MR. DESPOTAKIS:  -- not involved in this case.

11          THE COURT:  Yes.

12          MR. DESPOTAKIS:  This relates to front line unit

13  dealing with this on our fact pattern.

14          THE COURT:  That's fine.

15          MR. DESPOTAKIS:  That's the kind of thing I mean.

16          THE COURT:  Okay.

17          MR. DESPOTAKIS:  I don't mean talking ambiguously, I

18  mean, by giving --

19          THE COURT:  Right.  When you said "general" --

20          MR. DESPOTAKIS:  -- a clear indication --

21          THE COURT:  -- that made me concerned and so -- and

22  I've seen some of the arguments that you've made even in your

23  pleading, which is in the nature of totally over-broad,

24  speculative, senseless, vague, ambiguous --

25          MR. DESPOTAKIS:  Yeah.

1              THE COURT:  -- unduly burdensome, which isn't

2   helpful even to the Court.  So I'm concerned that you're not

3   giving the information that is specific enough.  So I'm not

4   saying you have to actually reveal what's under it, because

5   then it's -- it might as well not be redacted, but you do have

6   to give at least as specific as you've now stated.

7              MR. DESPOTAKIS:  I understand.

8              THE COURT:  This is credit card investigations, this

9   is --

10             MR. DESPOTAKIS:  That's agreeable, Your Honor.  We

11  can do that.

12             THE COURT:  Okay.  So --

13             MR. DESPOTAKIS:  We agree to do that.

14             THE COURT:  -- you need to provide that.  All right?

15             MR. DESPOTAKIS:  Make a note.

16             THE COURT:  There was this question about the front

17  line unit.

18             MR. DESPOTAKIS:  Yeah, again, it's one of those

19  things that falls under that category --

20             THE COURT:  But what is the front-line unit and why

21  is it irrelevant?

22             MR. DESPOTAKIS:  Off the top of my head, I do not

23  recall at the moment --

24             THE COURT:  Okay.

25             MR. DESPOTAKIS:  -- but I do recall that it had

1  nothing to do with sold account scenarios or counterfeit check

2  deposits --

3             THE COURT:  Well, again --

4             MR. DESPOTAKIS:  -- or transactions.

5             THE COURT:  -- you need to give your opposing

6  counsel enough information so they can argue it.

7             MR. DESPOTAKIS:  Yeah.

8             THE COURT:  But just calling it front line unit, not

9  relevant, isn't helpful, because they can't say anything.

10            MR. DESPOTAKIS:  We'll undertake to do that.  I --

11            THE COURT:  Right, and the presumption in a case --

12  in a situation like this is that you do have to turn it over,

13  unless there's a good reason not to, so you've got to

14  present --

15            MR. DESPOTAKIS:  All right.

16            THE COURT:  -- the reason to opposing counsel.

17            MR. DESPOTAKIS:  We'll go through it item by item

18  and whatever has been redacted --

19            THE COURT:  Yes.

20            MR. DESPOTAKIS:  -- we can give an explanation.

21            THE COURT:  Okay.

22            MR. DESPOTAKIS:  That's fine, we agree.

23            THE COURT:  You need to do that, and if you can't --

24            MR. DESPOTAKIS:  We agree.

25            THE COURT:  -- give a reason then you need to turn

91

1  it over.  So let me --

2          MR. DESPOTAKIS:  Your Honor, just --

3          THE COURT:  -- turn to the third point --

4          MR. DESPOTAKIS:  Your Honor, I'm sorry.  If I may

5  one moment?

6          THE COURT:  Oh.  Yes?

7          MR. DESPOTAKIS:  The procedures and policies

8  relating to EWS, that was not our document.

9          THE COURT:  All right, but --

10          MR. DESPOTAKIS:  I want to make clear that we're

11  talking Bank of America documents.

12          THE COURT:  Yes, the policies and procedures are

13  Bank of America documents --

14          MR. DESPOTAKIS:  Okay.

15          THE COURT:  -- right?  Yes?

16          MR. WEISSBERG:  Your Honor, I just wanted to address

17  two aspects.  In the rubric of policies and procedures that

18  they've made a request, they gave a list, among the items are

19  some documents that are not Bank of America documents.

20  Specifically, is a document from Chex Systems and there's a

21  document from EWS that is theirs.  It's both confidential and

22  proprietary of theirs.  We -- it is subject to nondisclosure.

23  We can't disclose it without --

24          THE COURT:  But why is it part of your policies and

25  procedures?

1          MR. WEISSBERG:  No, no, it's not our policies and

2   procedures.  I'm just saying when she discusses policies and

3   procedures, among the requests for discovery that she had made

4   were for items that -- policies and procedures of EWS and Chex

5   Systems that she's asking us to produce, and it's not our

6   policies and procedures.  And I'm just saying since EWS and

7   Chex Systems has not consented to us producing those, it's not

8   for us -- we cannot produce them.

9          THE COURT:  Okay.  So, Ms. Weissman, did you request

10  Bank of America to turn over co-defendants' documents?

11         MS. WEISSMAN:  I don't believe we did, Your Honor.

12  First of all, a couple things.  The list of documents that

13  counsel is referring to, again, was provided by way of example

14  to say, "Look, you've redacted a lot of stuff here, but, yeah,

15  look at all these things that seem to be relevant policies and

16  procedures that haven't been provided, suggest that something

17  that's redacted might actually be relevant."  The --

18         THE COURT:  So Mr. Despotakis will now provide you

19  more details as to what's been redacted.

20         MS. WEISSMAN:  Yes, and I don't expect them to

21  provide documents that they don't have or that aren't theirs --

22         THE COURT:  Well, it sounds like they have the

23  documents but it's not theirs.

24         MS. WEISSMAN:  Well, this particular document, to

25  talk about it, it shows up in a section of the policies and

1  procedures that were provided that's titled, "Duty of

2  furnishers of information to provide accurate information," and

3  it goes on then to talk about, "The following guidelines for

4  reporting information to the CRA's."  So while this is a

5  document that I understand they're saying was created by Early

6  Warning Services, it very clearly has to do with how Bank of

7  America reports information to Early Warning Services, for

8  example, which is certainly relevant to, if not at the heart of

9  this litigation.  So it is certainly relevant, and there is a

10 protective order in place, and if they want to withhold or

11 redact it, then, you know, as we've already discussed, they

12 should tell us specifically what's in it.  And Bank of -- I'm

13 sorry, Early Warning Services, who's on the call right now, has

14 also raised some issues with us, which I'm happy to respond to.

15          THE COURT:  Right, but what I'm still confused about

16 is the document request was for policies and procedures of Bank

17 of America, right?  And that's the request that's here.  And it

18 sounds like embedded in those policies and procedures are some

19 references to these other entities.  And so if the procedures

20 are Bank of America procedures, that should be turned over.  So

21 I don't know what it is that doesn't belong to Bank of America

22 that Bank of America is now saying, "Why should we turn it

23 over, because how is it even responsive then to the request for

24 Bank of America's policies and procedures?"

25          MR. DESPOTAKIS:  Well, we've addressed I think one

1  half of this, because as we explained the redactions, will

2  explain the basis as to why we believe it doesn't apply and

3  they'll have a chance to review it.  The second piece of this

4  is that it may not be substantive.  It may have nothing to

5  do -- and that's my general recollection and sense.  I don't

6  want to misrepresent to the court, but that's my general

7  recollection, that it simply relates to the computerized

8  mechanics of how do you go on a keyboard to transmit to EWS or

9  to Chex the information that you're reporting to them?  All

10 this is being generated by the bank after it made its core

11 decision to transmit.  These are all technical and data kinds

12 of things that are very confidential and proprietary between

13 EWS and Chex and the bank --

14             THE COURT:  Well, but that --

15             MR. DESPOTAKIS:  -- but it's the how-to, it's the

16 mechanics --

17             THE COURT:  Right, but that --

18             MR. DESPOTAKIS:  -- not substance, not --

19             THE COURT:  Right, but there are two pieces to that,

20 right?  One is, is that relevant, right, because you keep --

21 you've said a couple of times now that it's mechanical?

22             MR. DESPOTAKIS:  Okay.

23             THE COURT:  But the other part of it is you're

24 saying we have a -- it's not our document and we want to

25 respect the confidentiality of these other parties.

95

1           MR. DESPOTAKIS:  Right.

2           THE COURT:  So which one is it?  Is it that it's not

3   relevant --

4           MR. DESPOTAKIS:  It's --

5           THE COURT:  -- or that it's relevant, but it's

6   proprietary and not our business to disclose?

7           MR. DESPOTAKIS:  Well, I would respectfully say,

8   Your Honor, it's both.  The first step of this is that it's

9   proprietary, and barring the consent of EWS and Chex to turn it

10  over, that would resolve that issue.  The second leg of this is

11  that to the extent it's mechanical -- in other words, it was

12  simply Bank of America transmitting to both of these agencies,

13  "This is what we've concluded.  We are reporting this

14  depositor."

15          THE COURT:  But it's two different things because --

16          MR. DESPOTAKIS:  And they're two different things,

17  right.

18          THE COURT:  Well, they're two completely different

19  arguments, because if Bank of -- if Early Warning Services or

20  Chex Systems consent to have those disclosed, then they'll be

21  disclosed, if it's the second argument.  If you say they're

22  still not relevant, then that would be a different analysis.

23          MR. DESPOTAKIS:  But we're arguing the relevancy of

24  it --

25          THE COURT:  Okay.  So you're saying --

1          MR. DESPOTAKIS:  -- and we would explain --

2          THE COURT:  -- because it's mechanical --

3          MR. DESPOTAKIS:  It's mechanical --

4          THE COURT:  -- that it's not relevant.

5          MR. DESPOTAKIS:  -- it has technical data as to what

6  [indiscernible] there are security protocols not governing the

7  claim, but security protocols governing the transmission of

8  that customer's information --

9          THE COURT:  So have you -- was that information that

10  was conveyed to plaintiffs --

11          MR. DESPOTAKIS:  It's part of the --

12          THE COURT:  -- that it's not relevant?

13          MR. DESPOTAKIS:  -- redaction and it falls under the

14  same approach we just talked about, Your Honor, and we'll go

15  through and explain to them what is in there and why we feel it

16  should be protected.

17          THE COURT:  So, Ms. Weissman, do you know of

18  information that's different from what Mr. Despotakis has

19  characterized as being withheld?

20          MS. WEISSMAN:  I just know -- Your Honor is

21  absolutely right, that we requested their policies and

22  procedures.  That's all that we're asking them to produce.  If

23  this is a document that we received -- and I don't think that

24  it simply being technical makes it irrelevant.  Then if it's

25  not a document that Bank of America says is responsive to the

97

1   request, we certainly can request it --

2              THE COURT:  That's why I'm wondering --

3              MS. WEISSMAN:  -- from Early Warning Services, so --

4              THE COURT:  That's why I'm wondering why we're

5   having this discussion.

6              MS. WEISSMAN:  Yeah, I think that's -- I think it's

7   a bit of a red herring.  I agree, Your Honor.

8              THE COURT:  Okay.  So once you disclose what has

9   been redacted, it will become clear whether it is in fact a

10  Bank of America policy and procedure document or it's somebody

11  else's document.  If it's someone else's document and it's not

12  your policy or procedure, it's simply not responsive and you

13  don't have -- to the request and you don't have to disclose it

14  on that basis, but if there -- if it's some other basis that

15  you're withholding or redacting, then you need to state that.

16             MR. DESPOTAKIS:  All right, Your Honor.

17             THE COURT:  Okay.  So based on what I've been told,

18  I'll deny that.  Well, I'm going to hold off on it until

19  Mr. Despotakis gives you more information as to what has been

20  redacted, and then we can revisit --

21             MS. WEISSMAN:  Exactly.  We'd like to know

22  certainly --

23             THE COURT:  Yes.

24             MS. WEISSMAN:  -- if it's part of their

25  procedures --

1          THE COURT:  Yeah.

2          MS. WEISSMAN:  -- which it seems to be, in which

3   case it would seem responsive, but if they're saying it's not

4   responsive, we're happy to take a look at what they have and --

5          THE COURT:  Yeah, and so my general ruling on that

6   is the policies and procedures of Bank of America need to be

7   produced, unless there's a very good reason to withhold it, and

8   it's not just you don't think it's relevant, but it's simply

9   irrelevant, and you need to provide enough details to

10  plaintiff's counsel as to what it is so that they can

11  counteract the argument, or make a relevancy argument that's

12  informed by that knowledge.  Okay?

13         MR. DESPOTAKIS:  All right, Your Honor.

14         THE COURT:  And so at that point, once you've had a

15  chance to look at it, if you think that what's been redacted is

16  in fact relevant and its being redacted on the basis of

17  relevance, then you can come back to the Court with that

18  information.  All right?  But if it's not Bank of America

19  policy and procedure, it's not -- it's simply not responsive to

20  that request and so you don't have to worry about it, but if

21  it's incorporated and it is in fact a policy and procedure of

22  Bank of America, then it is responsive and you've got to turn

23  it over unless there's a very good reason based on relevance or

24  some other thing, which you haven't told me.

25         MR. DESPOTAKIS:  That's fine, Your Honor.  Agree.

1        THE COURT:  All right.  So Ms. Hanson, I heard you

2   start to say something on the phone.  Is what you were trying

3   to say still relevant?

4        MS. HANSON:  Well, Your Honor, the letter that we

5   submitted addresses this one document.  I guess I will talk

6   with plaintiff's counsel.  We will take the position that it is

7   irrelevant because it is completely technical in nature and

8   highly proprietary, but I'm happy to have that discussion off

9   line with plaintiff's counsel.

10        THE COURT:  Okay.  So please do and, you know,

11   sometimes it's not clear when it says "technical requirements"

12   what exactly it is, so again, without revealing what the actual

13   technical requirements are, if you can have a discussion as to

14   what is governed by it, then plaintiffs will then have the

15   information to make their relevance argument.  okay?

16        MS. HANSON:  Understood.

17        THE COURT:  So let me look at the third one,

18   contractual relationships.  So it says -- what I've got here is

19   Chex is agreeing to turn that over, so is it being turned over?

20   Mr. Wait?

21        MR. WAIT:  So quite sometime ago when we were going

22   through all the other discovery issues with plaintiff's

23   counsel, one of the things that came up was the fact that Chex

24   has a contract, in fact a series of contracts, with Bank of

25   America.  They're Bank of America generated contracts.  They

100

1  have in there, you know, that they're confidential and

2  proprietary, et cetera.  Our position was, and remains, that

3  while we don't object to turning them over, we wanted to get

4  Bank of America sign-off, and accordingly we sent those

5  documents over to Bank of America for their review.  I believe,

6  although I don't want to speak for them, that they concluded

7  that in fact they were proprietary and they don't want to

8  produce them.

9           THE COURT:  All right.  So then the problem is Bank

10 of America, not Chex.  Chex is fine turning it over.  Bank of

11 America says no.

12          MR. BROMBERG:  I think, Your Honor, from what I

13 remember seeing, these contracts fall within the same kind of

14 analysis that we just went through, as to the procedures and

15 policies.  They are full of technical data, again, mostly

16 dealing with the how-to's, is my recollection having gone

17 through it, and it's in the same exact category as we've just

18 discussed on the policy and procedure side of the equation.

19          THE COURT:  So the -- your reason for not turning it

20 over isn't that it's Chex's document --

21          MR. DESPOTAKIS:  No, this is a contract clearly

22 between --

23          THE COURT:  This -- right --

24          MR. DESPOTAKIS:  -- Chex and Bank of America.

25          THE COURT:  -- but Chex is fine with turning it over

1  and Bank of America is not, so you're withholding it because

2  you think it's not relevant because it's technical.

3         MR. DESPOTAKIS:  It's technical, on grounds of

4  relevancy.  It has nothing to do with claims investigations or

5  the substance of any investigation.  It simply is the technical

6  transmission of data, such as the bank's conclusion as to what

7  it's reporting.

8         THE COURT:  Okay.  So Ms. Weissman, what

9  specifically makes that contract relevant?

10        MS. WEISSMAN:  So first of all, I would just say

11 again that things being technical, I'm not sure why that makes

12 them irrelevant.  Certainly, to us it doesn't make it

13 irrelevant.  For us to understand the relationship between

14 these entities; how information is reported, how information is

15 deemed reliable.  What kinds of procedures and technical or

16 otherwise are in place?  What kinds of warranties or

17 representations are made about the data that's furnished and

18 received between these kinds of companies?  Are there

19 indemnification obligations going -- you know, going on in

20 there that would impact the kinds of rigor or the types of

21 investigations that are going to be done?

22        And again, this isn't only -- I want to just

23 highlight, it's not only about investigations.  As we talked

24 about last time we were here with you, Judge, the case has to

25 do with both investigations and initial reporting.  And so data

102

1  and -- I'm sorry, not just data, but any kinds of requirements

2  or procedures, technical or otherwise, about how information is

3  reported, how information is conveyed, we very much think is

4  relevant and germane.

5          THE COURT:  Okay.  So it may be that you don't want

6  to turn over information about specific names of databases and

7  where they're turned over or individuals who are responsible

8  for turning the information -- sharing the information from one

9  entity to the other, but all those other things, right, I think

10 all those other things about whether there are representations

11 or indemnifications would be relevant to the relationship and

12 what Bank of America is claiming to an outside party as to the

13 data that is -- that they are conveying outside.

14         MR. DESPOTAKIS:  I guess, well, things certainly

15 such as contract price and those provisions --

16         THE COURT:  Yeah, you could --

17         MR. DESPOTAKIS:  -- we would say are proprietary.

18         THE COURT:  Sure.

19         MR. DESPOTAKIS:  The technical data is proprietary.

20 But you're right, Your Honor, in one respect, but the main

21 point I think is that there's nothing in this contract that

22 provides instructions as to how the bank, on the one hand, is

23 to investigate anything --

24         THE COURT:  No, no, it's not about --

25         MR. DESPOTAKIS:  -- or it's just simply --

103

1          THE COURT:  -- the investigation, that's clear.

2          MR. DESPOTAKIS:  Yeah.

3          THE COURT:  It's about the conveyance of the

4  information.

5          MR. DESPOTAKIS:  Simple conveyance of the

6  information.

7          THE COURT:  Correct.  And that is part of this

8  claim, that it was not reporting accurate information.

9          MR. DESPOTAKIS:  But, Your Honor, it's undisputed.

10  The bank made the decision to report it.  That's not in

11  dispute.

12          THE COURT:  Right.

13          MR. DESPOTAKIS:  We reported it, and Chex and EWS

14  accept that transmission from the bank --

15          THE COURT:  But if --

16          MR. DESPOTAKIS:  It's not for them to dispute, in

17  terms of --

18          THE COURT:  Well --

19          MR. DESPOTAKIS:  -- what the bank is reporting

20  initially.

21          THE COURT:  -- but it's --

22          MR. DESPOTAKIS:  We report it.

23          THE COURT:  -- part of what the bank is saying

24  itself that it is reporting.

25          MR. DESPOTAKIS:  That's correct.

104

1              THE COURT:  Right, and so --

2              MR. DESPOTAKIS:  Yeah.

3              THE COURT:  -- they're entitled to see what you're

4    claiming to be reporting.  It may be the proprietary

5    information.  The cost, fine, I don't think anybody cares about

6    the cost, where the specific database is, where the information

7    is located or, you know, where in its systems things are, I

8    don't think that -- that part you can redact.  What I'm having

9    a problem with is your wholesale redaction of an entire

10   document, and I think that the plaintiffs have made enough of

11   an argument that it's relevant to their claim, that you should

12   turn it over, subject to redactions for those very narrow

13   specific things that are in fact proprietary.

14             So you need to go back and look at those documents

15   and turn them over, redacting only the things that are

16   proprietary, as you've said, because Chex has already said that

17   they don't care; you can turn it over.  So it's on you to

18   assert that there are specific things that are truly not

19   relevant, such as the price.  Okay?

20             MR. DESPOTAKIS:  I understand about the technical

21   transmissions, Your Honor, and all that stuff, but again, I

22   have a problem -- for example, what do we do when we review

23   that document, and lets say there's an indemnification

24   provision that has absolutely nothing to do with --

25             THE COURT:  It doesn't matter --

1          MR. DESPOTAKIS:  -- indemnification.

2          THE COURT:  -- if you don't think it has anything to

3   do with anything.

4          MR. DESPOTAKIS:  No, no, I'm saying, really by its

5   literal text has nothing demonstrable to do with the facts of

6   any particular claim or the bank undertaking to indemnify Chex,

7   or Chex undertaking to indemnify the bank, on something not

8   involving a customer disputed claim.

9          THE COURT:  I --

10          MR. DESPOTAKIS:  Obviously, that we would look to

11   carve out, because that relates to the relationship --

12          THE COURT:  No, but --

13          MR. DESPOTAKIS:  -- between the two institutions,

14   having nothing to do with claims processing or certainly not

15   the kinds of claim involved in this case.  There may be

16   broad-based indemnifi --

17          THE COURT:  But it's not about claims processing.

18   It's about conveying information, so it's just about the

19   relationship.  You are conveying information to Chex, okay, and

20   so --

21          MR. DESPOTAKIS:  And the repercussions of that

22   conveyance is what Your Honor is saying?

23          THE COURT:  Whatever you're saying about that

24   conveyance, right, other than the specific database, the price,

25   you know, those kinds of things no one cares about for this

1  litigation, but --

2          MR. DESPOTAKIS:  That's fine.

3          THE COURT:  -- you have to turn over the contract,

4  subject to those things.  Now, you may not care about -- you

5  may not think the indemnification is important, but plaintiffs

6  may, and so they're entitled to see it and then they can decide

7  whether it's relevant or not.

8          MR. DESPOTAKIS:  All right.  We'll take that

9  approach, Your Honor --

10          THE COURT:  Okay.

11          MR. DESPOTAKIS:  -- especially since I'm hearing

12  that EWS and Chex has no -- if I heard them right.

13          THE COURT:  Well, Chex --

14          MR. DESPOTAKIS:  Do you have any underlying

15  obligation?

16          THE COURT:  -- doesn't have an objection.  EWS, do

17  you have anything to say about this?

18          MS. HANSON:  I don't, Your -- I don't at this time,

19  Your Honor.  We have been served with discovery a couple of

20  days ago requesting the contract, and to be candid, I haven't

21  discussed it yet with my client.  But I have heard the

22  conversation that has transpired here and will take that into

23  account once I advise my client.

24          THE COURT:  All right.  So if you have a concern,

25  talk to Mr. Despotakis so that you can figure out specifically

1 the proprietary information that you think should be withheld

2 because it's neither here nor there for this case.  All right.

3 So now let's turn to the first part of the motion to compel,

4 which is about what Bank of America knew at the time of the

5 investigation, so that plaintiffs can make their case that it

6 was -- the investigations were not in good faith or reasonable.

7 So the first question is about average time and cost of similar

8 investigations.  Is that right, Ms. Weissman?

9           MS. WEISSMAN:  Yes, Your Honor.

10           THE COURT:  So how is that being defined?  Because

11 one of the objections that Mr. Despotakis has brought up is

12 there are lots of different investigations, every one is

13 different.  What difference does average make?  Average is not

14 a real number.  It's just a -- it's sort of a made up,

15 mathematical number.  You add up all of the time or all of the

16 money and then you divide it by the number of investigations

17 and you get a number that perhaps is never true.  Okay?  So

18 why -- number one, how are you going to define the universe,

19 and number two, what good is an average?

20           MS. WEISSMAN:  Sure.  So the universe is defined, in

21 terms of the theory side of it, claims where somebody -- or I

22 should say investigations where an account holder disputed Bank

23 of America's reporting of them for suspected fraud activity,

24 and for the EFTA side of it, it would be claims where somebody

25 disputed unauthorized deposits into their account.  You know,

108

1  look, we're not -- if Bank of America has other more rational

2  way of defining those categories based on what this information

3  is about, I would be open to hearing what they are.  I mean,

4  this is based on our best understanding of -- based on the

5  litigation, based on our best understanding of what information

6  they would have.

7          But courts do seem to find this information relevant

8  in understanding whether or not the investigation with respect

9  to a particular plaintiff was reasonable, and to whether or not

10  the actions and the alleged violations of the bank were

11  willful.  Because if it turns out that, you know, the bank is

12  taking no time at all, for example, and going back to one of

13  the things that we alleged that we keep coming back to, this

14  idea of for low-income folks they're routinely failing to

15  conduct a reasonable investigation and just denying claims of

16  fraud on somebody's account.

17          Well, if it turns out that they're indeed -- you

18  know, either way, right, either you can see the amount of time

19  they spent with regard to plaintiff was much less time than the

20  average, or perhaps the information would show that they indeed

21  always spend very, very little time, which could help build a

22  claim around willfulness, and the fact that they're not

23  actually taking these kinds of complaints seriously, and

24  they're not spending the time that a court would find is

25  reasonable to actually investigate and determine one way or the

109

1 other.

2         THE COURT:  Right.  So that's why I don't understand

3 why "average" helps you at all, because if you're saying that

4 they always take a little -- too little time for low income

5 people's investigations, the average isn't going to give you

6 that information, because the average lumps in low income, high

7 income, everyone, right, and then you really are only concerned

8 about how much time they spent on your client's investigation.

9 So if you -- I mean, I don't know how much time was spent.  Is

10 that one of the --

11         MS. WEISSMAN:  That is one of the --

12         THE COURT:  -- things that you've --

13         MS. WEISSMAN:  -- questions, is how much --

14         THE COURT:  Okay.

15         MS. WEISSMAN:  -- I mean, how much --

16         THE COURT:  All right.  So --

17         MS. WEISSMAN:  -- to understand what the average is

18 so that we can get a better sense of -- with respect to what

19 we've done in her particular case, that --

20         THE COURT:  Well, but I guess my question is, do you

21 know how much time was spent on your client's investigation?

22 And how do you count that, right?  Is it from the day in and

23 then the conclusion --

24         MS. WEISSMAN:  And --

25         THE COURT:  --  because you don't also know how much

110

1  is being done while that's happening.  It could have been, you

2  know, reported on, I'm just making it up, Christmas Eve, and

3  the investigation doesn't get concluded until the day after New

4  Year's, right, and it looks like ten days, but actually only a

5  day's work was done on it, you know.  And so there's just a lot

6  of flaws with your methodology, in terms of what you've told me

7  you want to say.  And then the other part of it is, if you say,

8  well, then, if Bank of America is always giving poor people a

9  short shrift, that's bad, but the information that you've

10  requested doesn't really give you -- doesn't get you to that

11  conclusion at all, because it's an average.

12        MS. WEISSMAN:  I think the information would start

13  to get -- and part of the reason we were looking for average,

14  we were trying to make a request that was sort of reasonable

15  and doable, and based on reading case law where averages are

16  used, it seemed like a reasonable metric.  I think that through

17  depositions we could then have a baseline to ask some questions

18  to better understand how much time was spent in this particular

19  case, how decisions are made about, you know, what steps are

20  going to be taken, and if different steps are taken with

21  respect to different people.

22        But to just have some kind of baseline understanding

23  I think was our goal at least, to just have a sense of -- and

24  there's another important piece of this, actually, which is

25  that the average cost of the investigations is really relevant

1  here.  I mean, if Bank of America, you know, just -- for all

2  the similar reasons we've said, but, you know, it certainly

3  seems to us that there is not a big incentive, at least right

4  now, for the bank to take these kinds of claims seriously,

5  perhaps because low income people, you know, don't have a lot

6  of money in the bank.

7           THE COURT:  But you keep putting it in there, but

8  this has nothing to do --

9           MS. WEISSMAN:  Yeah.

10           THE COURT:  -- with this argument, right?  So the

11  cost -- how would you measure the cost?  If the cost -- if all

12  the investigations are being done in-house, it doesn't cost

13  them anything, right?

14           MS. WEISSMAN:  Well, they --

15           THE COURT:  So what is the cost?

16           MS. WEISSMAN:  I guess there's -- if there's --

17  depending on how many disputes there are, it does cost them

18  something, because they're hiring people to do the disputes,

19  and there may be an incentive, and there may be certain

20  incentive structures.  I mean, what we're really -- there --

21  this is --

22           THE COURT:  But you're making -- but, you see, then

23  you're making an institutional argument, and you are only

24  making -- you've only brought a case on behalf of your client.

25  Okay.  So to say that Bank of America needs to change its

112

1  attitude toward poor people because they're treating them

2  badly, is neither here nor there for the purposes of this case.

3  So that's why I'm concerned about -- you've talked about a

4  baseline, but I don't know that you've really identified

5  parameters that get to an accurate baseline.

6          MS. WEISSMAN:  Let me take a step back, Judge.  I'm

7  sorry about this, but I think in our effort to keep the letter

8  motion to three pages, we sort of lost some of the nuance of

9  what we're --

10          THE COURT:  So for --

11          MS. WEISSMAN:  -- actually asking about.

12          THE COURT:  Let me just stop.  For both sides,

13  you've both mentioned the three-page limit.  If you need it, if

14  you need more pages, you can always ask the Court to do that.

15  And don't waste your time on, you know, the boilerplate

16  language, and certainly don't make the margins so small and the

17  font so small, you know, that that's not a way to hit the page

18  limit.  Okay?  So since you've now brought up --  both sides

19  have brought up the page limit, I want you to know you

20  should -- if you need to make the argument because there's

21  multi-pronged -- just ask the Court for more pages and don't

22  waste the pages you've got on boilerplate language.  Okay?

23          MS. WEISSMAN:  Thank you, Judge.

24          THE COURT:  So moving forward you should be aware of

25  that, but go ahead.

113

1            MS. WEISSMAN:  We -- the cat -- the broader category

2   about average time and cost, for example, includes specific

3   interrogatories asking for the identity of people at Bank of

4   America who have knowledge about the average and/or median

5   amount of time that was spent and the cost of investigating

6   these types of claims.  So we're trying to identify the

7   universe of people who might have relevant information and

8   could answer questions in a deposition about the overall

9   processes that the bank uses to do this kind of work, to

10  perform these types of investigations.

11           THE COURT:  Okay.  So let me ask Mr. Despotakis,

12  what systems are -- so is this information available, and how

13  can we get to establish a baseline?

14           MR. DESPOTAKIS:  A couple of things, Your Honor.

15  This information would not be readily available.  It would have

16  to be painstakingly put together at some cost to the bank to do

17  this.  I would add to that that this is one case involving

18  Ms. Ruane, and I have to harken back to the fact that the

19  bank's decision in this matter to report her, and to reach the

20  conclusion it did, was based on not only documentary evidence

21  before it pertaining to Ms. Ruane and the deposit of these

22  checks, but also the electronic information before it as it did

23  its investigation.

24           When these claims come in, they're not segregated;

25  you put pile one with people who are rich, and let's look at

114

1   their account balances to make sure they're rich, and here's

2   pile B with everybody who's not rich and we put them in this

3   pile.  These things go in to seasoned investigators.  They are

4   assigned a claim as it's received, is my pretty general, but I

5   think pretty accurate understanding, and it is investigated,

6   consonant with the facts of the transaction, the electronic

7   record, the documentary evidence.  In this particular case, as

8   our discovery responses have shown, the initial investigator

9   made her conclusion.

10          THE COURT:  Okay.

11          MR. DESPOTAKIS:  It was reviewed by a supervisor --

12          THE COURT:  All right.  Let --

13          MR. DESPOTAKIS:  -- who came to the same

14   conclusions.

15          THE COURT:  Okay.  So let me stop you there.

16          MR. DESPOTAKIS:  This is irrelevant.

17          THE COURT:  Let me stop you there.  It seems like a

18   very basic problem in this case is the parties don't have a

19   clear idea of how the -- how investigations are done and how

20   this investigation was done, right, because if you understand

21   all the different steps, that would go a long way toward the --

22   resolving the issue of whether this investigation was in good

23   faith and reasonable.  Right?

24          And so it sounds like this issue of the baseline is

25   a proxy for the reasonableness, and to me it seems at this

1  stage anyway extremely rough, right, because it could be that

2  the bank did a very short investigation and very efficient

3  investigation because it already had a lot of information from

4  prior investigations.  And so to judge the reasonableness of

5  the investigation on the time or cost doesn't strike me as

6  being fair or relevant, especially given the difficulty that

7  we're having in coming up with the metrics of how to calculate

8  that average.

9              So it seems to me much more important for this case

10  that everyone get their arms around how this invest -- how

11  investigations are generally done and how this investigation

12  was done, because then you can compare, not based on numbers,

13  time or money, but based on what happened and the steps that

14  were taken.  And it doesn't sound like the parties actually

15  have their arms around that.  Right, Ms. Weissman?  Do you know

16  how the investigations are done?

17             MS. WEISSMAN:  I'm going to turn to my co-counsel,

18  actually.

19             THE COURT:  Mr. Bromberg, do you know how the

20  investigations are done --

21             MR. BROMBERG:  Well, I mean --

22             THE COURT:  -- or am I not giving you enough credit?

23             MR. BROMBERG:  Well, with respect, I honestly have

24  not had a lot of litigation with Chex Systems, and I think  all

25  the --

1          THE COURT:  No, more importantly, with Bank of

2  America --

3          MR. BROMBERG:  I --

4          THE COURT:  -- because the investigation is

5  really -- was Bank of America's issue.

6          MR. BROMBERG:  I know how FCRA investigations take

7  place in general, more particularly with the "Big Three," with

8  TransUnion, Equifax, and Experian.  Essentially, what happens

9  is --

10          THE COURT:  Well, I don't need to have -- we don't

11  have time.  We've already spent two hours here --

12          MR. BROMBERG:  Okay, okay.

13          THE COURT:  -- so I don't need to know -- I don't

14  need to know, but I want to know that the parties know.  And

15  what I'm saying is to use this baseline calculation as a proxy

16  for the details of what happened here and what should happen

17  seems so rough, that when I'm looking at the proportionality of

18  ordering the production, given that it doesn't seem to exist,

19  because we also can't agree at the moment on what the

20  measurements are, right, so that I'm going to deny this

21  request.  But it seems more important for the parties to

22  actually understand what was happening, so you don't need a

23  proxy for the baseline.  Right?

24          MR. BROMBERG:  But, Your Honor, actually, something

25  that will come up, and I know it's going to come up when we get

117

1  to the depositions, is there's going -- we're going to have to

2  have some kind of discussion with whoever did the particular

3  investigations at the various stages, we're going to need

4  information as to how many investigations they did that day,

5  how much time they spent on each investigation --

6            THE COURT:  That's fine.

7            MR. BROMBERG:  -- or that week, for instance --

8            THE COURT:  That's fine.

9            MR. BROMBERG:  -- and drill down to the fact that

10 very little time is in fact --

11           THE COURT:  That's fine.

12           MR. BROMBERG:  -- devoted to these in --

13           THE COURT:  If that's the argument you want to make

14 in that context, that sounds fine, but to ask for an average of

15 sort of everything just seems like the bigger the universe, the

16 more meaningless the average number is.  So I -- and it's going

17 to be difficult to generate that concrete number, because

18 sitting here I don't know that the parties have agreed on what

19 that -- or, you know, has a conception of what that definition

20 is going to be.  All right?

21           MR. BROMBERG:  Okay.

22           THE COURT:  So I am going to deny the motion to

23 compel the average of this investigation time and cost --

24           MR. BROMBERG:  There may also be --

25           THE COURT:  -- because I don't think it's --

118

1          MR. BROMBERG:  We may find that there are metrics

2     that approximate a lot of this.

3          THE COURT:  Yes, that's fine.

4          MR. BROMBERG:  I believe that some --

5          THE COURT:  You can explore that.

6          MR. BROMBERG:  -- of the "Big Three" do keep these

7     kinds of metrics.

8          THE COURT:  That's fine.  You can explore that --

9          MR. BROMBERG:  Okay.

10         THE COURT:  -- but to ask them to generate that

11    number now seems disproportionate.

12         MR. BROMBERG:  Okay.

13         THE COURT:  Okay?  So -- yes?

14         MS. WEISSMAN:  Your Honor, I'm sorry, there's

15    just -- there's one other request for production that isn't so

16    well captured I think by this discussion so far that we had

17    made, but which we do reference in our letter under this

18    category, which is documents concerning any programs under

19    which there were any kinds of bonuses or incentives or other,

20    you know, payment structures around the investigations arising

21    under the Electronic --

22         THE COURT:  You made that request and they have

23    refused to turn over information?

24         MS. WEISSMAN:  That's right.  That's request for

25    production 19.  It's on Page 11 of Exhibit D.

1          THE COURT:  Well, I don't see it in your papers.

2   Number 1-A just talks about the average time and cost of

3   investigating.  So where are -- where have you said that

4   there's a problem with the bonuses?

5          MS. WEISSMAN:  So it lists a number of requests for

6   production that are encompassed within this general heading.

7          THE COURT:  But I haven't -- so I --

8          MS. WEISSMAN:  And I'm specifically looking at 19.

9          THE COURT:  Right, but I don't -- I didn't have a

10  cha -- this was not brought to my attention, so I haven't had a

11  chance to look at it.  What exactly are you looking for at this

12  point?

13         MS. WEISSMAN:  Well, again, this -- the reason that

14  we put this under this request is because it goes to cost and

15  it goes to this question, but this is a little bit -- we're not

16  looking for average cost, but to understand whether there are

17  programs in place that would incentivize spending more or less

18  time on these types of investigations.

19         THE COURT:  Well, you should go back, and if there

20  are specific -- like I've said, that the -- I'm denying as to

21  the average, because that's what you asked for, okay, and --

22  but I'm saying -- because I'm denying it because I think the

23  baseline that you've proposed is meaningless.  All right?  I

24  understand ultimately what your argument is going to be, and so

25  I'm suggesting that there are other ways for you to get it.

1            Now, if you're saying that they've -- that you've

2    specifically asked the question getting to something other than

3    averages and it has not been produced, then you can make a

4    specific argument on that point and then I'll look at it, but

5    at this point I've only focused on the average, so the

6    specifics are a different issue, which is not before me now,

7    notwithstanding that it's encompassed in that particular

8    request for information, or request for production.  All right.

9            MR. DESPOTAKIS:  Your Honor, on that --

10           THE COURT:  So we're also --

11           MR. DESPOTAKIS:  Oh.

12           THE COURT:  -- really running out of time so I want

13   to move.  Okay?  So if -- you've brought it up.  I've looked at

14   it, but if you didn't really bring it to my attention I haven't

15   focused on the issues, so I won't be prepared to rule on that.

16   But if there's something specific, and I think both sides

17   understand what I'm talking about, Mr. Despotakis, you need to

18   go back and look at your approach.  I think the plaintiffs are

19   entitled to understand exactly how this process works.  So you

20   can't say, "Well, we don't think it's relevant," so I think you

21   need to go back, and to the extent that there are responses

22   that you can revisit or you should be revisiting, you should do

23   so.

24           MR. DESPOTAKIS:  I can commit to -- from my general

25   understanding and what I've been told from the client, there is

121

1   no such program, and if that would be the easy answer, in the

2   interest of moving it along, I'll be happy to --

3          THE COURT:  Right, but please --

4          MR. DESPOTAKIS:  -- pick up the phone and let

5   plaintiffs know.

6          THE COURT:  -- just the flavor of the responses that

7   have gone back and forth causes me concern, and it's causing us

8   to spend massive amounts of time on discovery.  It would just

9   be helpful if parties would stop saying things like unduly

10  burdensome, over-broad, speculative, senseless, vague and

11  ambiguous, okay, because if you've got a specific reason for

12  not turning it over, just say it.  Okay?  And if you don't --

13  if it's too vague, ask them what they mean.  What exactly are

14  you looking for, right --

15         MR. DESPOTAKIS:  And in all honesty, Your Honor --

16         THE COURT:  -- instead of just saying it's vague and

17  ambiguous.

18         MR. DESPOTAKIS:  In all honesty, Your Honor, we also

19  viewed that as part and parcel of the average time, because it

20  went to the issue of how do these investigators perform their

21  duties, within what time frame, what averages --

22         THE COURT:  I know, but what I'm saying is that

23  everybody should be exchanging full information as to how

24  investigations are done and how they were done in this case --

25         MR. DESPOTAKIS:  All right.  I'll speak to the

1 client.

2          THE COURT:  -- and that's the heart of the case, so

3 just get that information exchanged.  And I don't understand

4 why it's taken so long and everybody's being so, you know,

5 squirrelly about the information.  This is what the case is

6 about, so turn it over.  All right?  And again, in responses to

7 the discovery requests, if you say over-broad, speculative,

8 senseless, vague, ambiguous, unduly burdensome, it gives the

9 other side no information as to the basis and it gives the

10 Court no information as to the basis.

11          MR. DESPOTAKIS:  I was reminded of something by

12 Mr. Weissberg, if he can be heard --

13          THE COURT:  All right.  Did you --

14          MR. DESPOTAKIS:  -- on this point.

15          THE COURT:  You were talking while I was talking.

16 Did you hear what I said?

17          MR. DESPOTAKIS:  I did, Your Honor, I did.

18          THE COURT:  All right.

19          Yes, Mr. Weissberg, what did you want to say?

20          MR. WEISSBERG:  Just to clarify, Your Honor, I

21 believe we had given them discovery about the process -- I'd

22 have to go through my papers to find it, but I believe we did

23 elaborate with them in some of our discovery responses about

24 the processes that -- identifying the things that they would

25 value -- take into account in evaluating the -- a claim in

1  their investigation --

2          THE COURT:  Okay.

3          MR. WEISSBERG:  -- I recall.

4          THE COURT:  So sit down and talk through it.  All

5  right?  Have an informal discussion, you know, short of a

6  deposition, where you've gotten all the information you need

7  from your client.  I'm still hearing from you, you know, "My

8  client informs this, or I'm not exactly sure, but it's that."

9  But you need to get your arms -- you need to have a very frank

10  discussion with your client about everything that happened, and

11  then you need to make an assessment as to how much of that

12  should be revealed, given that you have obligations in

13  discovery.  All right?  I'm not ordering that you have to turn

14  it all over, because obviously you have attorney/client

15  privilege, but you -- it doesn't feel like you actually know

16  how this investigation was done, and I -- and if you do know,

17  you've got to start sharing that information with the

18  plaintiffs, and if the plaintiffs have questions about it,

19  because it's not clear because of the way you phrased it, then

20  you need to clarify it, so just do that.

21          MR. DESPOTAKIS:  I recall what Mr. Weissberg was

22  referring to, and I think Brian will remember.  One of the

23  responses we gave in our written discovery was exactly what the

24  particular investigator did, what metrics she used and what

25  considerations went into her decision, and we gave that chapter

124

1  and verse over in discovery.

2          THE COURT:  Okay.  But if there are other issues

3  related to it, how long did it take, were there other people

4  consulted or hired to help out, were -- you know what I mean,

5  right?

6          MR. DESPOTAKIS:  That's right.  We disclosed that.

7  We [indiscernible] --

8          THE COURT:  Okay.  So then --

9          MR. DESPOTAKIS:  Yeah.

10          THE COURT:  Well, I'm hearing that some of it

11  wasn't, but so sit down and clarify, because sometimes it's not

12  clear.  You think you're clear, but you haven't made yourself

13  clear or there are lingering questions.  And for example on the

14  bonuses, why wasn't the response, "There wasn't any," right, so

15  that's the problem.  When you give responses that are vague,

16  speculative, et cetera, instead of "There weren't any," if

17  there weren't any, then just say it.  Then we're done and we

18  wouldn't have to have a discussion about it, and we'll create

19  an illusion or the impression that there's something you're

20  hiding or not disclosing.  So I'm just imploring the parties to

21  take that approach with this case.  Okay?

22          We tried to settle it, it wouldn't settle, so the

23  case is headed toward a dispositive motion and a trial, and at

24  that point everything will come out.  Okay?  So there's no

25  point in prolonging the process.  Just get it out there, have a

1 discussion, understand what your client's process is,

2 understand what you need for your case, and then start -- or

3 move more efficiently in exchanging that information.  All

4 right?  So if you don't have it, just say you don't have it.

5 All right.  So that was A.

6          Let's look at B, complaints against Bank of America.

7 You're talking about all complaints of this nature and you want

8 to see what problems they had, because of what notice they

9 might have about this kind of case.

10          MS. WEISSMAN:  Exactly.

11          THE COURT:  Right.  Okay.  So why is that not

12 relevant, Mr. Despotakis?

13          MR. DESPOTAKIS:  First, Your Honor, I don't know

14 that the bank maintains the metrics; in fact, I know they don't

15 maintain metrics along these parameters.  And complaints --

16 now, again, it's a single action involving a single plaintiff

17 and what happened to her.  People file complaints and

18 litigation against Bank of America daily across a broad

19 spectrum of claims.  It doesn't bear any relationship as to

20 what those other cases and those fact patterns are.  They don't

21 tie into what happened to Ms. Ruane and her claims, and --

22          THE COURT:  Well, okay, but here it's specifically

23 not about all complaints, like a bank teller was rude to me or

24 something like that.  It's about Bank of America's failure to

25 properly or accurately investigate disputes of fraud, identity

126

1 theft or unauthorized transactions, so that's pretty narrow.

2          MR. DESPOTAKIS:  Well, again, the bank, to my

3 understanding and my knowledge, does not maintain the metrics

4 in that fashion.  And what do we mean by complaints?  If we

5 mean --

6          THE COURT:  Well, when you say "maintain those

7 metrics," they keep a record of all the investigations they

8 did, right?

9          MR. DESPOTAKIS:  The actual investigation --

10          THE COURT:  Yes.

11          MR. DESPOTAKIS:  -- but whether there's a way to

12 correlate it and pull up --

13          THE COURT:  And then --

14          MR. DESPOTAKIS:  -- what involved -- the types of

15 claims that are defined by the request, such as Reg. E --

16          THE COURT:  So Bank of America cannot say how many

17 investigations they did into fraud, identity theft or

18 unauthorized transactions?

19          MR. DESPOTAKIS:  To compile those metrics, it's

20 almost counterintuitive, Your Honor, because on the one hand

21 plaintiff is saying, "What did you do with Ms. Ruane?  How did

22 you investigate this?"

23          THE COURT:  Right, but --

24          MR. DESPOTAKIS:  How do other complaints --

25          THE COURT:  -- my question isn't about relevance at

127

1  this point.  You said they don't compile those metrics, so

2  you're saying Bank of America literally does not know --

3          MR. DESPOTAKIS:  No, I'm saying to --

4          THE COURT:  -- how many investigations they did?

5          MR. DESPOTAKIS:  -- compile them would be out of

6  range and out of --

7          THE COURT:  Why can't they just run -- it seems like

8  you'd just run the database, all the cases where there was

9  fraud, identity theft or unauthorized transactions, and you

10  come up with a number; let's say it's 100.

11          MR. DESPOTAKIS:  For what time period and what --

12          THE COURT:  Okay.  Well, we can talk about the time

13  period.

14          MR. DESPOTAKIS:  -- and what state?  In what time

15  period; in what state?

16          THE COURT:  Okay.  Well, we can talk about that, but

17  that wasn't your objection, right?  So you said they don't have

18  the metrics, but let's talk -- it sounds to me that they should

19  be able to run those metrics pretty easily, but we need to have

20  parameters around it.

21          MR. DESPOTAKIS:  And again, is it a phone dispute

22  and somebody who backed off the claim and didn't pursue it?

23          THE COURT:  Well, let's find --

24          MR. DESPOTAKIS:  Is it -- yeah.

25          THE COURT:  So this is what I'm saying, to say, "I

128

 1  don't know what you're talking about," isn't a reason to come

 2  to the Court and ask for clarification.  It means you talk to

 3  the plaintiff and get clarification.  Right?  If you don't know

 4  what it's about, you should have that discussion.  Yes.

 5              MS. WEISSMAN:  Your Honor, if I may?  It's very

 6  specifically asking about regulatory complaints or complaints

 7  filed in court.  We're not asking for any time there was ever a

 8  complaint about --

 9              THE COURT:  By an individual?

10              MS. WEISSMAN:  Yes, exactly.

11              THE COURT:  Right, it's regula -- I see.  All right,

12  so that's even better.

13              MS. WEISSMAN:  Complaints filed in court.  And so,

14  you know, right, if they have a legal department who tracks

15  this kind of information --

16              THE COURT:  Yes, okay.  I didn't see that because

17  your first sentence was complaints, so --

18              MR. DESPOTAKIS:  Your Honor, the other issue to

19  this --

20              THE COURT:  -- wait, no --

21              MR. DESPOTAKIS:  Oh, I'm sorry.

22              THE COURT:  -- don't put in another issue.

23              MR. DESPOTAKIS:  Oh, no.

24              THE COURT:  We're just talking about the narrow

25  issue --

129

1          MR. DESPOTAKIS:  Yeah.

2          THE COURT:  -- of regulatory and legal complaints.

3          MR. DESPOTAKIS:  Customer --

4          THE COURT:  It seems like that would be very easy to

5   track.

6          MR. DESPOTAKIS:  Customer privacy under the --

7          THE COURT:  No, but --

8          MR. DESPOTAKIS:  -- federal statute.  These

9   complaints would contain information on customers --

10         THE COURT:  No, they're not asking you to turn it

11  over, they're just saying the complaints -- it's a list of the

12  complaints by regulatory -- regulatory complaints and legal

13  complaints, just a list.

14         MS. WEISSMAN:  Your Honor?

15         THE COURT:  Yes.

16         MS. WEISSMAN:  In the context of this same

17  conversation that happened with Chex Systems, you had

18  determined that they could provide a list, but to the extent

19  that they had some things in their possession that were easy to

20  turn over, therefore, that they should do that, so that we're

21  not unduly burdened to going to track them down, so I think

22  we're looking for a similar result.

23         MR. DESPOTAKIS:  But the federal privacy statute

24  precludes that.  We cannot reveal the name of the person who

25  made any claim, assuming this stuff can be pulled together,

1  we'll find that out, but we can't reveal the customer.  We

2  can't reveal the details of their --

3        THE COURT:  Hold on, wait, wait.  Yes.

4        MS. WEISSMAN:  If somebody made a complaint in

5  court, brought a lawsuit or a regulatory complaint, that's

6  public record.  This isn't confidential information.

7  Somebody's put themselves out there.  These complaints are --

8        THE COURT:  Okay.  It's limited to regulatory and

9  legal complaints, not a private complaint to the bank.

10       MR. DESPOTAKIS:  If we're saying regulatory and

11  legal, are we saying --

12       THE COURT:  It's a lawsuit --

13       MR. DESPOTAKIS:  -- complaints by the bank's

14  regulators --

15       THE COURT:  No.

16       MR. DESPOTAKIS:  -- on that side of the equation?

17       THE COURT:  It's a complaint to an administrative

18  body, for example, right --

19       MS. WEISSMAN:  Yes.

20       THE COURT:  -- or a lawsuit.

21       MR. DESPOTAKIS:  Okay.  So that's one category, or

22  an action that was based on that.  All right.  Now we have to

23  address --

24       THE COURT:  Those are public record.

25       MR. DESPOTAKIS:  And I don't know that -- well, to

1  the extent that the regulatory complaints were filed with

2  regulators -- because I'm aware there are some

3  confidentiality --

4          THE COURT:  If you are aware of them --

5          MR. DESPOTAKIS:  -- there are some

6  confidentiality --

7          THE COURT:  No, no.  If there's been a complaint

8  filed with a regulatory body there's no confidentiality,

9  because they filed it with a public body, and therefore if you

10 have knowledge of that information, that's what's being

11 requested.

12         MR. DESPOTAKIS:  The actual filing, not the content,

13 all right, subject to the -- on the items described.

14         THE COURT:  Or if you have a copy of that complaint,

15 turn it over, because it's easy to do.

16         MR. DESPOTAKIS:  There may be regulatory

17 restrictions against providing the actual copy of a

18 regulatorily filed complaint.

19         THE COURT:  No, there aren't, because the regulatory

20 cop -- filing is a public document, so if you have a public

21 document and you're being asked to turn it over in the course

22 of discovery, you turn it over.  There's no restraint on your

23 turning over a public document.

24         MR. DESPOTAKIS:  We will consult with our client,

25 but I think --

132

1           THE COURT:  Well --

2           MR. DESPOTAKIS:  -- there may be some, Your Honor.

3    We will advise properly.

4           THE COURT:  -- if you have a legal basis for that,

5    then fine, assert it --

6           MR. DESPOTAKIS:  Yeah.

7           THE COURT:  -- but you can't just say, you can't

8    turn it over --

9           MR. DESPOTAKIS:  All right.  So --

10          THE COURT:  -- because it doesn't make sense.

11          MR. DESPOTAKIS:  All right.  So we need to talk I

12   guess about --

13          THE COURT:  But, see, this is --

14          MR. DESPOTAKIS:  -- dates?  But I --

15          THE COURT:  -- again, and I'm just going to go back

16   to what I said a few minutes ago.  If you would just ask what

17   they're asking for instead of just saying it's unduly

18   burdensome and vague, then you would know that this is all

19   they're asking for.

20          MR. DESPOTAKIS:  Their definition, Your Honor, of

21   what they were looking for is "unauthorized transactions."

22   Now, identity theft, okay, fraud is a broad brush so we need to

23   narrow that down.

24          THE COURT:  Right, so -- okay.  So I'm going to

25   stop, because we've been at this for two-and-a-half hours.

133

1   I've put off all my other hearings for this.  There are other

2   people waiting.  And the reason this is taking so long is that,

3   Mr. Despotakis, you have not been reaching out to plaintiff to

4   get clarification as to things that they've asked for.  If you

5   would just have a conversation and find out what they're asking

6   for, you would have clarification, because all I'm hearing is,

7   "I don't know what they're talking about."  Right?

8              MR. DESPOTAKIS:  We've had discussions.

9              THE COURT:  So why is this still an issue?

10             MR. WEISSBERG:  If we could address the Court, Your

11  Honor?  There have been discussions back and forth.  The

12  trouble that is -- I believe is that the discovery is so

13  over-broad and over-burdensome -- I mean, when you use terms

14  like --

15             THE COURT:  So why haven't you had a discussion to

16  narrow it?

17             MR. WEISSBERG:  But there have been discussions.  I

18  wasn't part of those discussions, but there were numerous

19  discussions beforehand.  Terms like "unauthorized transactions"

20  encompasses the universe --

21             THE COURT:  Okay, so --

22             MR. WEISSBERG:  -- or general terms like "fraud" --

23             THE COURT:  So did you ask for and get clarification

24  as to what they meant?

25             MR. WEISSBERG:  Well, it seems like they're asking

134

1  not just about this particular customer, Ms. Ruane, but about

2  all the bank's customers, any, and it's just -- it's --

3          THE COURT:  But --

4          MR. WEISSBERG:  -- on their face they're so

5  over-broad --

6          THE COURT:  No, but on their face it's not

7  over-broad, because it's just about regulatory and legal

8  complaints.  Now, regulatory complaint itself might not sound

9  very clear, and if you had asked they would have told you, it's

10 complaints that customers made in a court of law, those are the

11 legal complaints, or in a -- to an administrative body.  Okay?

12 And then your universe has narrowed significantly, because

13 these are now public filings that you may have.  And it's not

14 about customers picking up the phone and complaining to the

15 bank directly.  All right?  So that's --

16         MR. WEISSBERG:  It would be virtually asking the

17 bank for its entire litigation list --

18         THE COURT:  That may be.

19         MR. WEISSBERG:  -- in existence, because --

20         THE COURT:  And then --

21         MR. WEISSBERG:  -- any unauthorized transaction --

22         THE COURT:  Okay.  So then --

23         MR. WEISSBERG:  -- for any customer --

24         THE COURT:  Yes.

25         MR. WEISSBERG:  -- is effectively asking the

135

1  Court --

2           THE COURT:  That may be, in which case if there is a

3  litigation list, it's also very easy to turn over.  All right?

4           MR. DESPOTAKIS:  But it gets to relevance and unduly

5  burdensome.  If the bank --

6           THE COURT:  It's not unduly burdensome, because you

7  have it.  You told me there's a list.

8           MR. DESPOTAKIS:  No, no, I didn't say that there was

9  a list.  I was saying what they're asking for is a list.  I

10 don't know what the bank would have to --

11          THE COURT:  Well, talk to your legal -- to the

12 bank's inside counsel and see if they maintain a list.  I would

13 assume a general counsel has a list of litigation.

14          MR. DESPOTAKIS:  We will discuss, Your Honor, and a

15 potential time frame as well, but in terms of litigation filed

16 with courts, that's a matter of public record.  They can do a

17 search --

18          THE COURT:  Yes, and so I'm --

19          MR. DESPOTAKIS:  -- and find all that information.

20          THE COURT:  -- saying if you have that information,

21 because I'm looking at proportionality and burden, if you're

22 saying you have a list, then you should turn it over, because

23 it's very -- a very low burden, okay, so just turn --

24          MR. DESPOTAKIS:  But we don't have a list.

25          THE COURT:  Well, but you don't --

136

1          MR. DESPOTAKIS:  It would be something the bank
2  would have to comply, back to the proportionality argument.  I
3  don't know what they have.
4          THE COURT:  But you haven't told me what the burden
5  is, so I can't weigh the burden because I don't know what it
6  is.  And you don't know if there's a burden or if it's just
7  typing a few things in the computer and generating a list.  So
8  you're not informed at this moment to make those arguments.
9          MR. DESPOTAKIS:  But the flip side, Your Honor, if
10  plaintiff's counsel wants to find cases filed against the bank
11  in state A, B, C, D, or E --
12          THE COURT:  And that's a --
13          MR. DESPOTAKIS:  -- in whatever court, they can do a
14  search and come up with whatever is there --
15          THE COURT:  Well, I'm --
16          MR. DESPOTAKIS:  -- rather than the bank having to
17  scour --
18          THE COURT:  Well, but I do know what that burden is,
19  and that is a burden, so if I'm weighing burdens, it's a lower
20  burden on the bank, possibly, to turn over the list of
21  litigation, as opposed to making the plaintiffs do it, and
22  that's part of what the Federal Rules say.  I'm supposed to
23  weigh the burdensomeness.
24          MR. DESPOTAKIS:  Right.
25          THE COURT:  And so weighing it based on the

137

1  information I have now, I'm saying it weighs in favor of your

2  turning it over.  Okay?

3          MR. DESPOTAKIS:  All right.  We will consult with

4  our client and we'll speak with Brian and see if we can narrow

5  down the --

6          THE COURT:  Right.

7          MR. DESPOTAKIS:  I mean, it can't be throughout the

8  United States.  That to me --

9          THE COURT:  Well, have that discussion.

10          MR. DESPOTAKIS:  -- instinctively is not -- yeah.

11          THE COURT:  Right?  Just have that discussion as to

12  what it is and why that's important.

13          Yes, Ms. Weissman.

14          MS. WEISSMAN:  Yes, not to belabor the point.  We do

15  set forth a time period.  We haven't been asked to circumscribe

16  it, so --

17          THE COURT:  So have a discussion about the time and

18  the scope, geographic scope.  All right.  I'm going to put a

19  time --

20          MR. DESPOTAKIS:  I guess --

21          THE COURT:  I mean, I don't want to give short

22  shrift to these arguments, because I know they're important to

23  you, and so I will go through the next -- it looks like the

24  three more points and I'll -- I don't want the parties to keep

25  repeating, but I will hear you on it so that we can -- you can

1  move forward with some certainty as to what you need to do.

2  All right.  So the use of the fake Obama signatures; what

3  exactly are you looking for?

4          MS. WEISSMAN:  Exactly that.  Any record that the

5  court [sic] has in their possession, that the court's [sic]

6  aware of or was aware of, that --

7          THE COURT:  The court; you mean --

8          MS. WEISSMAN:  I'm sorry.

9          THE COURT:  -- the defendant?  I'm aware of mine.

10          MS. WEISSMAN:  That the defendant is aware of,

11  excuse me -- that defendant Bank of America is aware of about

12  the use of the signature.  Look, I mean, Your Honor, this is

13  very similar.  Bank of America says that, you know, it's

14  impossible to comply, it handles an enormous volume of checks.

15  I mean, have they spoken to anybody at the bank about how hard

16  it would be to do some basic key word search to look up "Obama

17  signature and state check," or "Obama signature and" --

18          THE COURT:  So you want to know if they were already

19  on notice that this was a fraud, a fraudulent thing?

20          MS. WEISSMAN:  That's all that we're trying to

21  understand.

22          THE COURT:  Right.

23          MS. WEISSMAN:  And again, because there's multiple

24  fraud scams at play here --

25          THE COURT:  This particular one.

139

1          MS. WEISSMAN:  -- so we're entitled to know whether

2    they had knowledge that this was one of them.

3          THE COURT:  Right.  Okay.  So why is that

4    problematic?

5          MR. DESPOTAKIS:  Again, we're focusing on

6    Ms. Ruane's complaint.  The bank looked at these checks,

7    concluded they were fraudulent, and then made its decision.

8    The issue is not the checks.  Everybody knows those checks are

9    counterfeit.  The issue is --

10         THE COURT:  Why does everybody know that?

11         MR. DESPOTAKIS:  -- was Ms. Ruane involved?

12         THE COURT:  Well, why would everybody know that it

13   was counterfeit?

14         MR. DESPOTAKIS:  Let me --

15         THE COURT:  I mean, presumably Barack Obama does

16   write checks --

17         MR. DESPOTAKIS:  Yeah, there's --

18         THE COURT:  -- as a person.

19         MR. DESPOTAKIS:  There's a feature to check cashing

20   that perhaps needs to be explained a little bit.  The days of

21   the horse and buggy in a local Wells Fargo office --

22         THE COURT:  Well, no --

23         MR. DESPOTAKIS:  No, I'm just saying, Your Honor --

24         THE COURT:  No, don't do that.

25         MR. DESPOTAKIS:  No, I'm just saying --

1           THE COURT:  I know how checks work.

2           MR. DESPOTAKIS:  -- checks go through electronically

3  at high speed transmissions.  There are millions of checks that

4  are exchanged through the interbank payment system every day.

5  These checks --

6           THE COURT:  So it's --

7           MR. DESPOTAKIS:  -- are not sorted and looked at by

8  a human being.

9           THE COURT:  Well, so how were they pulled out for

10  investigation?

11           MR. DESPOTAKIS:  We're back to the conundrum that --

12           THE COURT:  Well, then you've got to figure it out.

13           MR. DESPOTAKIS:  -- which is why I will be --

14           THE COURT:  I mean, it's not for the Court to --

15           MR. DESPOTAKIS:  -- speaking to my client.

16           THE COURT:  Right, so that's the problem, okay?  And

17  if that's what's holding up discovery, you need to have this

18  cleared up.  And if you don't get it cleared up, I'm going to

19  order your client to come in here so I can make sure they

20  understand that just because they've got a problem doesn't mean

21  that they get to hold up discovery and the progress of a case

22  in this court.  Right?

23           MR. DESPOTAKIS:  I've committed to discuss that with

24  the client.

25           THE COURT:  I mean, it just -- it's like I know it's

141

1  a problem, it's a conundrum, but you've got to figure it out.

2  It's not for the Court to fig -- unless you want the Court to

3  make some rulings, and then I'll just make some rulings, and

4  then --

5              MR. DESPOTAKIS:  I'll have --

6              THE COURT:  -- you don't have a conundrum anymore,

7  right?

8              MR. DESPOTAKIS:  It may be a relief, but --

9              THE COURT:  Well, no, I'm just saying --

10             MR. DESPOTAKIS:  -- I will discuss this with the

11 client.

12             THE COURT:  -- at the moment I've been exercising a

13 lot of restraint because you have to figure things out, but at

14 some point I may just make a ruling and if you don't like it

15 you can appeal it because this is becoming a little ridiculous

16 that every time we have a discovery conference this conundrum

17 comes up and then it's sort of like, "Well, I don't know what I

18 should do."  You know, this is a rock in a hard place.

19             MR. DESPOTAKIS:  Right.

20             THE COURT:  I appreciate that, but you've got to

21 solve it.  All right?

22             MR. DESPOTAKIS:  And I think it will be solved, as I

23 committed to do.

24             THE COURT:  Yes.

25             MR. DESPOTAKIS:  I will have that conversation.

142

1          THE COURT:  All right.

2          MR. DESPOTAKIS:  I will get back to plaintiffs by

3  Monday at the latest.

4          THE COURT:  But you've got to to work it out, but as

5  far as --

6          MR. DESPOTAKIS:  I --

7          THE COURT:  -- the knowledge -- what the bank's

8  knowledge of this Obama signature scam, I think it is highly

9  relevant, and so you need to turn it over, and you can figure

10 out with plaintiff's counsel how you're going to do that,

11 whether it's key word searches, whether it's a specific

12 location of files, but you need to -- but the subject matter is

13 certainly relevant.

14         MR. DESPOTAKIS:  I think, Your Honor, much will flow

15 from the decision of the bank, once I speak to the client and

16 speak to plaintiff's counsel.

17         THE COURT:  So I'm ordering that C be turned over

18 and that data or security breaches with regard to plaintiff's

19 personal information, that to me actually seems self-evident,

20 in light of some highly publicized data and security breaches

21 in the news in recent months and years.  And so if there are

22 security breaches that might have led Ms. Ruane's information

23 to have been compromised, I think they're -- plaintiffs are

24 entitled to get that.

25         MR. DESPOTAKIS:  We have responded to that in

143

1  written discovery and made it clear in that response that there
2  were no data security breaches regarding her account, that the
3  only breach was regarding I think a 2011 or 2013 ATM card that
4  was not linked to any account information of Ms. Ruane.

5           THE COURT:  So there was a breach of one ATM card?

6           MR. DESPOTAKIS:  There was a breach of an ATM card
7  and the embedded data on that card did not translate to, nor
8  did it include information regarding her account --

9           THE COURT:  Okay.

10          MR. DESPOTAKIS:  -- her passwords, or anything.

11          THE COURT:  So there wasn't kind of a --

12          MR. WEISSBERG:  [Indiscernible.]

13          MR. DESPOTAKIS:  Where was it?

14          MR. WEISSBERG:  It was not a BANA either.  It was --

15          MR. DESPOTAKIS:  Oh, I'm sorry, it was a breach
16 at -- yeah, but it involved a BANA card.  It was a breach at
17 Walmart or one of those places.

18          THE COURT:  Right, but it's not one of the systemic
19 breaches where there's a hacker that goes in and grabs a bunch
20 of information?

21          MR. DESPOTAKIS:  That's correct.

22          THE COURT:  Okay.

23        `  MR. DESPOTAKIS:  The answer is "no" and we've
24 responded to it clearly.

25          THE COURT:  All right.  So is that sufficient?

144

1          MS. WEISSMAN:  Your Honor, given that over the

2   course of seven years, as Your Honor said, there's many data

3   breaches --

4          THE COURT:  Well --

5          MR. WEISSBERG:  -- what we would just ask for at

6   this point is an affidavit at least stating what data breaches

7   occurred and affirming that they -- confirming, excuse me, that

8   they did not affect her information.  Again, the request

9   specifically says for data breaches that may have or did affect

10  her personal information.

11         THE COURT:  All right.  So I want to make sure that

12  it's in writing so it's clear about what specifically the

13  breach was and just -- you need to make sure that you've got

14  it -- got that information from somebody who knows firsthand.

15         MR. DESPOTAKIS:  Yeah, it is in our response.  We

16  said there was no breach involving her account.  How much

17  clearer can we be?

18         THE COURT:  All right.  So what is the -- is it just

19  the "may"?

20         MS. WEISSMAN:  I'm sorry?

21         THE COURT:  Is it just the "may" as opposed to the

22  "did"?

23         MS. WEISSMAN:  We would just like definite,

24  emphatic, and an affidavit from somebody with actual knowledge

25  of this from the bank who can say that there wasn't any data

145

1  breaches over the course of the seven-year period --

2         THE COURT:  Well, but the question wasn't -- okay,

3  so I hear you.

4         MR. DESPOTAKIS:  Her account.

5         THE COURT:  You've qualified the statement and so I

6  think what they're looking for is a more general statement;

7  number 1, no data breaches other than the one, if that's the

8  case --

9         MR. DESPOTAKIS:  Involving her account -- involving

10  her, yes.

11        THE COURT:  No, the question was whether there were

12  any data breaches.

13        MR. DESPOTAKIS:  Your Honor, that's irrelevant, it's

14  broad, and it's got nothing to do with this case.  We've

15  given -- if they need to ask this in the deposition of the

16  bank's witness, they'll get the same answer they've got in this

17  writing.  Nothing affecting --

18        THE COURT:  But the --

19        MR. DESPOTAKIS:  -- Ms. Ruane --

20        THE COURT:  So there may have been data breaches,

21  but they're not relevant to this case, because they didn't come

22  clear -- they -- there's no possibility that they may have

23  impacted her account.

24        MR. DESPOTAKIS:  That is correct, Your Honor.

25        THE COURT:  Okay.  So --

146

1            MR. DESPOTAKIS:  Because the data breach that was

2  identified by the bank that involved her, as it searched its

3  records, was not an account data breach.

4            THE COURT:  Okay.  So that data breach did involve

5  her?

6            MR. DESPOTAKIS:  But not her account.

7            THE COURT:  Right.  Okay.

8            MR. DESPOTAKIS:  It involved an ATM debit card --

9            THE COURT:  I see.

10            MR. DESPOTAKIS:  -- that would not have linked

11  information.

12            THE COURT:  Okay.

13            MR. DESPOTAKIS:  So looking at that card would tell

14  them nothing about her account.

15            THE COURT:  All right.  So go back to the -- what

16  was submitted in response to your -- I don't know if it's an

17  interrogatory or a document request, and then make sure that it

18  has the information that's clear.  All right?  Because if you

19  need it to be crafted a different way, please just let

20  Mr. Despotakis know so that you can close the hole that you

21  think might have been created by the ambiguity of the wording.

22  All right?  So please just go back and revisit that and so that

23  both sides are satisfied that you understand what has been

24  asked and what has been responded.  All right.  So I will deny

25  that, subject to any further dispute on it, because it sounds

1    like it's already been responded to, but if there are further

2    problems you can bring it up.

3            So then you've got the E, which is the accuracy of

4    Bank of America's investigations into claims of unauthorized

5    transactions and negative reporting.  And so how are you

6    determining the accuracy?  Because you also make this claim

7    about "routinely blames customers with low balances."  I don't

8    know that those -- how those are related.  So, Ms. Weissman,

9    tell me more about --

10           MS. WEISSMAN:  Yes, Your Honor.

11           THE COURT:  -- what you mean by "the accuracy."

12           MS. WEISSMAN:  Yes, Your Honor.  So our

13   understanding is that Bank of America would have some documents

14   in its possession concerning the overall accuracy; in other

15   words, when the bank finds that -- it turns out that

16   information, for example, that was reported to a consumer

17   reporting agency in fact was wrong and has to remove that

18   information, or when the bank determines that, you know, on

19   fake checks that it thought a consumer -- an account holder was

20   liable for, in fact they weren't liable for.

21           In August, as part of our discovery, Bank of America

22   sent us interagency guidelines, I referred to them earlier,

23   from the CFPD, which also seemed to suggest quite clearly that,

24   you know, a furnisher would go back and do some kinds of review

25   of its historical records relating to accuracy and consider

1   past error.  So we're just trying to understand what

2   information Bank of America has in its possession, that's it's

3   aware of, that speaks to accuracies and inaccuracies of its

4   reporting to CRA's and of its investigations into these types

5   of fake checks.

6           THE COURT:  So are you concerned about the actual

7   inaccuracy, or are you concerned about their review of whether

8   they're accurate?

9           MS. WEISSMAN:  In this particular moment, I think

10  we're just concerned about what documents they generated and

11  what doc -- and what information they've looked at themselves,

12  because I suppose it sort of speaks a little bit to both,

13  right?  It goes to, have they actually gone ahead and done some

14  kind of historical analysis to know if there are past

15  inaccuracies or not, and also if they have done that kind of

16  analysis and have that information, how, if at all, might that

17  have been considered in the context of this particular case,

18  and how sure or not sure the bank could be in the reliability

19  of the information that it was coming up with as a result of

20  the investigation.

21          THE COURT:  Okay.  So the first one is sort of a

22  process issue, have they gone back to review accuracy, because

23  you say they have a duty to do that, and then -- or an

24  obligation to do that, and the second is, what were the results

25  of those investigations if they did them?  So if they didn't do

149

1 it, you're thinking that might be a problem, and if they did do

2 it, you want to figure out how accurate their -- what the

3 result was in terms of accuracy.

4          MS. WEISSMAN:  Right, which of course goes to their

5 knowledge --

6          THE COURT:  Yes, I get that.

7          MS. WEISSMAN:  -- the information they had,

8 willfulness.

9          THE COURT:  Okay.  Mr. Despotakis?

10          MR. DESPOTAKIS:  There are a couple of problems with

11 what's being requested.  This category in general falls within

12 the same kind of analysis as average time to handle disputes.

13          THE COURT:  No, not really, because if there is some

14 guideline as to going back and doing reviews of accuracy, the

15 quest -- the first question is, is the bank doing that, and if

16 the bank isn't, then that's simple, the bank's not doing it.

17 Okay?

18          MR. DESPOTAKIS:  Oh.

19          THE COURT:  And if they are, then what have they

20 found to be the case?

21          MR. DESPOTAKIS:  Well, here is my next point, Your

22 Honor, to be made.  Accuracy is not required under the statute,

23 in terms of the liability in the statutory scheme at all.

24          THE COURT:  No, that's not the point.  It's about

25 the process.  That's why I was very specific.  The first

1   instance it's about the process.  Do you know whether your

2   client was going back to review the accuracy of their reports?

3          MR. DESPOTAKIS:  I do not know, but we objected to

4   this on the basis that accuracy has nothing to do with us here,

5   because we've already said, and disclosed to counsel for the

6   plaintiff, that the basis for the bank's decision was based on

7   the specific --

8          THE COURT:  I know that.

9          MR. DESPOTAKIS:  -- documentary information.

10          THE COURT:  I've heard that repeatedly.

11          MR. DESPOTAKIS:  Okay.  What --

12          THE COURT:  The question is --

13          MR. DESPOTAKIS:  Yeah.

14          THE COURT:  -- you can do the investigation, but if

15   there's some process where people -- where an institution goes

16   back and reviews what they've done, just to double check and

17   make sure everything is right, the first question is, do they

18   do that?  Maybe you're saying they don't have an obligation to

19   do it.  That's fine.  But the question is simple, do they do

20   it, right?  It's yes or no.  And then if it's no, end of issue,

21   they're not doing it.  If they do it, what did they find?

22          Now, you can argue at the trial or whatever about

23   whether it's important that the accuracy or, et cetera, but I

24   think the plaintiffs are entitled to know to what extent is the

25   bank going back to double-check things, and if they go back and

1  double-check things and says, "Oops, we missed this," are they

2  then revising their procedures so that that error doesn't

3  happen again?  That is relevant to whether it's good faith and

4  reasonable.

5         MR. DESPOTAKIS:  Well, now we've reached the third

6  prong, though, of my point.  That would be at best a remedial

7  measure, and accuracy is not required under the statute.  I

8  have to come back to that, Your Honor.

9         THE COURT:  Well, but it's not remedial if it's --

10 if you're talking about after the -- what happened here.  It's

11 pre-medial if it -- the review was happening before her

12 investigation.  It's not remedial as to her investigation.

13        MR. DESPOTAKIS:  The --

14        THE COURT:  It's about what the bank knew about

15 their process, and if the bank knew before this problem came up

16 with her that there was a problem with their process, because

17 they went back and reviewed it and it was like, "Oh, you know

18 what, we should have two investigators on it rather than one

19 investigator," because, you know, whatever, and they don't fix

20 it, then there might be an issue with the good faith and

21 reasonableness of the investigation.  So the plaintiffs are

22 entitled to understand that process.  Okay?

23        MR. DESPOTAKIS:  I -- Your Honor, on that one, I

24 would leave it to the Court to issue a ruling, because our

25 position is, it has nothing to do with the investigation done

152

1   on Ms. Ruane's claim.  It was based on --

2           THE COURT:  The question is whether it was

3   reasonable or not.  Okay?

4           MR. DESPOTAKIS:  That's correct, that's correct.

5           THE COURT:  Yes, and so --

6           MR. DESPOTAKIS:  And we dis --

7           THE COURT:  -- my ruling is that I think that this

8   information is relevant to the -- to that point, about whether

9   the investigation was reasonable, and so you need to turn over

10  or respond to whether Bank of America did any review of

11  completed investigations to see if there were past errors, and

12  if they did, what did they find.

13          MR. DESPOTAKIS:  When you're saying "review," are

14  you ordering it in point in time prior to Ms. Ruane's --

15          THE COURT:  Yeah, what is the time frame that you've

16  asked for?

17          MR. DESPOTAKIS:  Hers was September 2016.

18          THE COURT:  What's the time frame?

19          MS. WEISSMAN:  The time frame in our request is --

20  it goes from 2011, I believe, to the present.  I would have

21  to --

22          THE COURT:  Okay.  So I think --

23          MS. WEISSMAN:  -- remind myself whether it's --

24          THE COURT:  -- it should stop at the point that the

25  incident happened, because otherwise it is remedial.  Okay?  So

153

1   up till the time of the incident, and you're saying 2011, which

2   would be five years before, so 2011 to the incident itself.

3   Okay?  All right.  And there was the certain other accounts?

4              MS. WEISSMAN:  Yeah, I can explain this a little

5   bit, Your Honor.  So again -- and my apologies.  The next time

6   we will request the Court's permission as needed to file a

7   longer briefing.  So the other pieces of 1-E -- one -- well,

8   two of them that are I believe very concrete and

9   straightforward are the percentage of disputes by account

10  holders who BANA had reported for suspected fraud activity to

11  Chex, just as they had reported plaintiff, where the Court

12  determined that -- I'm sorry, where the bank determined that

13  the information was accurate and continued to report it.  So

14  the percent of dispute -- percentage of disputes where people

15  said, "Hey, this negative reporting of me is not accurate," and

16  the bank said, "It is accurate," and continued to report it as

17  they did in this case.

18             THE COURT:  Why is that important?  Because it's --

19  why is that relevant, because it doesn't involve your client?

20             MS. WEISSMAN:  We believe it's relevant, Your Honor,

21  because if the -- if in 98 percent of cases when somebody says,

22  "Hey, this is not accurate," and the bank continues to report

23  it, then that goes to this question of whether or not their

24  procedures on the whole are reasonable, which is a requirement

25  that they have reasonable procedures in place.

154

1          THE COURT:  Well, but again, if the percentages

2    creates a false accuracy, because percentages are just an

3    aggregation, and it's only as good as the parameters that you

4    put around the data, and so, you know, whether they're

5    reporting 99 percent or not doesn't seem to shed any light on

6    your client.  She could be in the one percent.

7          MS. WEISSMAN:  Part of allegations, though, in the

8    cases, that this is a pattern and this is part of repeated

9    behavior, and so this is getting specifically at that, and

10   perhaps less at the reasonableness of the investigation, with

11   regard to her specifically.

12         THE COURT:  And why is the -- what are you -- what

13   is the --

14         MS. WEISSMAN:  Because --

15         THE COURT:  -- cause of action on the pattern?

16         MS. WEISSMAN:  Yes, because under the Fair Credit

17   Reporting Act, Your Honor, punitive damages are available for

18   conduct that's willful, and so showing that this was part of a

19   repeated pattern on the part of the bank is a key way that one

20   might show that the conduct was in fact willful.

21         THE COURT:  And so what specifically is the

22   information that you're looking for?

23         MS. WEISSMAN:  So there's sort of two components.

24   So we're looking to understand -- and the percentage basis,

25   again, because that seems like a reasonable way of trying to

155

1   actually circumscribe what we're asking for, both of the amount

2   of times that somebody disputed the bank's reporting of them

3   versus actual fraud activity, where the bank decided to

4   continue the reporting in spite of the dispute, and similarly

5   the percentage of times where somebody disputed the bank's

6   determination that they were responsible for unauthorized

7   transactions, where the Court [sic] -- I'm sorry, where the

8   bank denied their dispute in that context as well and said,

9   "No, we are holding you responsible, even though you say that

10  you didn't do that."

11          THE COURT:  Okay.  But the percentage always -- the

12  percentage has two numbers to it, so what are you trying to --

13  it's what number versus what number?

14          MS. WEISSMAN:  Yes, exactly, and so we could have

15  asked for it either way.  So in the context of suspected fraud

16  activity being reported to the CRAs, it's the number of times

17  that an account -- I'm sorry, the percentage, lets say, that an

18  account holder disputed the negative reporting and Bank of

19  America kept the information, would be one number, kept the

20  information on the report, said to the CRA, "Yes, continue to

21  report suspected fraud activity," versus the number percentage

22  that the account holder, multiple account holders said, you

23  know, "I'm disputing this reporting of me for suspected fraud

24  activity," and the bank said -- went back, did a

25  reinvestigation and removed the information.  So those are the

1   dueling numbers; the percentage of times that the information

2   remained on the report, and the percentage of times that the

3   information was removed from a consumer report after --

4           THE COURT:  So those should add up to 100, right --

5           MS. WEISSMAN:  Yes.

6           THE COURT:  -- because those are the two --

7           MS. WEISSMAN:  Yes.

8           THE COURT:  -- scenarios?

9           MS. WEISSMAN:  Yes.

10          THE COURT:  So you're saying of the cases where a

11  consumer disputes how many times, what is the percentage of

12  times where it's reported, nevertheless --

13          MS. WEISSMAN:  Correct.

14          THE COURT:  -- versus when Bank of America does go

15  back and reinvestigates?

16          MS. WEISSMAN:  Yes.

17          THE COURT:  Okay.

18          MR. DESPOTAKIS:  Your Honor --

19          THE COURT:  Yes.

20          MR. DESPOTAKIS:  -- if may?  Apart from the

21  percentage issue, you know, that you've identified yourself,

22  you have the other issue.  What claim?  Things are reported to

23  Chex and to EWS or complaints are made to the bank, but they

24  could be credit card disputes, those are reported to the bank

25  as claims, they could be forged checks drawn on accounts of

1  depositors who say, "I didn't sign that check," other bills --

2          THE COURT:  I think that's what we're talking about

3  here.

4          MR. DESPOTAKIS:  There could be sold account

5  scenarios, which is what Ms. Ruane's complaint was determined

6  to be.  There could be identity theft.

7          THE COURT:  Okay.

8          MR. DESPOTAKIS:  So when we say "claims," that's a

9  broad --

10          THE COURT:  Yeah, so again --

11          MR. DESPOTAKIS:  -- broad, broad landscape.

12          THE COURT:  -- if you had asked plaintiffs, they

13  might have -- plaintiff's counsel, they might have told you

14  what they're specifically looking for.

15          MR. DESPOTAKIS:  Well, we dispute the relevancy of

16  the thing altogether.

17          THE COURT:  Okay.  So why --

18          MR. DESPOTAKIS:  And if the Court's going to order

19  we comply, there has to be some limitations in terms of the

20  content.

21          THE COURT:  Well, the content is a number, which is

22  based on two numbers, right?  So percentage is always two

23  numbers and the -- it sounds like the two numbers here are the

24  number of disputes where customers -- the number of cases where

25  a customer has disputed based on fraud, and you're saying it's

158

1   not clear because it might be a credit card fraud versus a --

2              MR. DESPOTAKIS:  Right, we're talking about --

3              THE COURT:  -- credit card versus ATM fraud, okay,

4   so we can talk about that.  And then the other number in the

5   percentage is, notwithstanding the dispute, how often is Bank

6   of America reporting that fraud, nevertheless, versus the times

7   they go back and reinvestigate it.

8              MR. DESPOTAKIS:  To the extent the bank has those

9   metrics.

10             THE COURT:  Yes, of course.

11             MR. DESPOTAKIS:  Okay.

12             THE COURT:  Okay.  So --

13             MR. DESPOTAKIS:  But we need to define the type of

14  fraud we're talking about.

15             THE COURT:  Yes.

16             MR. DESPOTAKIS:  I has to be the deposit of

17  counterfeit checks into an account.

18             THE COURT:  That's right.  Right.  Okay.  So can

19  you --

20             MS. WEISSMAN:  Yes, so --

21             THE COURT:  -- confer on the parameters of that?

22             MS. WEISSMAN:  Yes.

23             THE COURT:  The concept is reasonable.

24             MS. WEISSMAN:  Yes.

25             THE COURT:  I just need you to iron out what the

1  parameters are, in terms of those -- again, those two numbers.

2  Okay?

3              MS. WEISSMAN:  Um-hum.

4              MR. DESPOTAKIS:  And time frame, Your Honor.

5              THE COURT:  And time frame.  Okay?  So I will grant

6  you --

7              MS. WEISSMAN:  And --

8              THE COURT:  -- for that certain -- the other -- the

9  dispute percentage --

10             MS. WEISSMAN:  The -- yes, and Your Hon --

11             THE COURT:  -- dispute -- the reporting versus

12  dispute percentage.

13             MS. WEISSMAN:  Right.  And, Your Honor, that goes to

14 both, again, suspected fraud activity being reported to CRA's

15 and also to determinations regarding unauthorized transactions.

16 So there's two different requests and we're happy to confer

17 additionally and make sure it's clear exactly what we're

18 looking for.

19             THE COURT:  Right.  Okay.

20             MS. WEISSMAN:  And there's just one more component

21 to this final category, which is documents and communications,

22 so -- and this is sort of along similar lines, but basically

23 we're looking for information -- some information about bank

24 accounts, where let's say Bank of America on the one hand

25 reported somebody for suspected fraud activity.  As we just

160

1    said, the person disputes it, and the bank determines that, no,

2    they are in fact liable for the fraud or they're not.  So that

3    was what we just talked about in terms of this percentage.

4         But we're also interested in some basic information

5    about particular accounts, where this takes place on one side

6    of the equation or the other.  Yes, we're keeping the

7    information, or, no, we're not.  We're looking for information,

8    for example, about things like the average -- I'm sorry, not

9    the average, but the monthly balance in such accounts and

10   information about the ZIP Code of such accounts, because we're

11   trying to, again, understand -- back to something Your Honor

12   brought up earlier, we're trying to really hone in on this

13   question of whether the bank's treatment of low income people

14   here is different than its treatment of more affluent

15   individuals.  And so we've identified things like ZIP Code and

16   things like account balance as ways to hone in.

17        THE COURT:  I don't think that's relevant.  I mean,

18   I know that's your argument, but that's really not here -- if

19   it' a question you want to ask at deposition, "Do you take

20   those things into account?" you can ask it.  I think ZIP Codes

21   are really rough.  I mean, you know, you've got ZIP Codes that

22   cut through really different neighborhoods.  And then the

23   monthly balance, it's not at all clear that that's information

24   that was available at the time of these disputes.

25        Now, if you have a deposition and someone tells you

1  that, "Yeah, we have access to this information and we take it

2  into account," that becomes a different issue.  You can have

3  follow-up discovery on that.  But at the moment I don't see

4  that you should get specific information related to that.

5              MR. DESPOTAKIS:  Again, Your Honor --

6              THE COURT:  Yeah.

7              MR. DESPOTAKIS:  -- so I'm clear, we're talking

8  about claims relating to the deposit of counterfeit checks, not

9  credit cards, not other types of claims involving accounts,

10  because that's what this case is about.

11             THE COURT:  Yes, and I've asked the parties to work

12  that part out --

13             MR. DESPOTAKIS:  Okay.  Just --

14             THE COURT:  But this second part is something else.

15             MR. DESPOTAKIS:  Okay.

16             THE COURT:  What Ms. Weissman was talking about just

17  now is something else.

18             MR. WEISSBERG:  Well, Your Honor, if I could just

19  make a comment, and this just goes to the relevancy of what the

20  bank is being asked to do.  When a customer makes a complaint,

21  a report is made and a customer disputes that complaint and

22  they continue the report or don't continue the report, that

23  doesn't bear on the accuracy -- if she wants to generalize as

24  to accuracy, just because a customer disputed a claim doesn't

25  mean that the customer was right or not right.  It doesn't --

162

1  you can't generalize or draw inferences from that.  A customer

2  could dispute a claim, yet they're complicit or involved.  If

3  the claim turns out to be unfounded, well, we're now going to

4  add that to a statistic of all the disputed claims by customers

5  that are unfounded as a percentage, it doesn't seem to bear --

6  I don't see how you could extrapolate to then conclude, "Well,

7  look" -- because they want to take this information and present

8  it to a jury, that's the only thing I can infer to say, "Well,

9  these are the percentages of cases where customers made a

10  complaint, right, but they continued reporting."  Okay, but

11  even though the customer disputed that, well, maybe 90 percent

12  of those disputes were wrong and --

13          THE COURT:  They're trying to find out to what

14  degree BANA adheres to a policy that the customer's always

15  right, and --

16          MR. WEISSBERG:  Here's the thing.  It's a slippery

17  slope, because now --

18          THE COURT:  Yes, and you can certainly make that

19  argu --

20          MR. WEISSBERG:  -- we're litigating not this case,

21  we're litigating all these other cases --

22          THE COURT:  You can certainly make that argument,

23  but I think that the rough outlines of what Bank of America is

24  doing in this case is relevant.  All right.  So just work out

25  the details in terms of the time period and the parameters that

1 they -- yes.

2          MS. WEISSMAN:  Your Honor, may I make one more

3 comment?

4          THE COURT:  Yes.

5          MS. WEISSMAN:  We've been suffering from a dearth of

6 information concerning why Bank of America decided to conclude

7 that our client was liable.  The only real basis that they seem

8 to have shared with us was that our client is a person of

9 modest means.  And they did provide information that shows that

10 they do have the account balance for her at the time and that

11 that's they took into consideration, which is the basis for our

12 request, because we believe that this shows a potential bias in

13 how they are, based on their statements and based on what

14 they've provided.

15          THE COURT:  Well, but if they've already told you

16 that it was something they took into account, then you've got

17 that information.  Why do you need --

18          MS. WEISSMAN:  We're not --

19          THE COURT:  -- any other people's information?

20          MS. WEISSMAN:  Well, because we believe that that's

21 an unreasonable basis to conclude that --

22          THE COURT:  And it may be and you can argue that,

23 but I'm just saying to find out whether they're doing it with

24 other people doesn't matter.  If they've already -- if what

25 you're saying is they've already told you that they did take

164

1  this consideration, then you've got what you need.

2          MS. WEISSMAN:  Your Honor, but that's the only thing

3  that they've suggested.  What they have said very clearly is

4  that there are other factors as well --

5          THE COURT:  Yes, and at the beginning I said -- or

6  earlier in this discussion I said the parties need to sit down

7  and talk through exactly what happened here --

8          MS. WEISSMAN:  Yes, Your --

9          THE COURT:  -- because I do appreciate that you

10 haven't been given a lot of information, and that's frustrating

11 to me as well.  Okay?

12         MS. WEISSMAN:  So what we're just trying to get at

13 is whether those other reasons, that we may learn of at some

14 time, are simply pretext for the real reason that they are

15 concluding that our client was -- and others in her

16 situation --

17         THE COURT:  And you'll get all the information as to

18 how this investigation was done and what Bank of America

19 considered, and if you want to make an argument that they

20 shouldn't have considered income, that's fine, because if they

21 tell you that's what they did consider, then you can argue that

22 they shouldn't have.

23         MS. WEISSMAN:  Okay.

24         THE COURT:  But what they did with other people, I'm

25 just saying I don't think that's relevant at this point.  Okay?

1          MS. WEISSMAN:  Okay.  Thank you, Your Honor.

2          MR. DESPOTAKIS:  Yeah, and I appreciate what you've

3    just said, just for the record.  The issue of the consideration

4    of the client's balance was one of the points considered in the

5    context of, well, all of a sudden five checks --

6          THE COURT:  Yes, I know --

7          MR. DESPOTAKIS:  -- for a significant amount --

8          THE COURT:  -- and I don't need to --

9          MR. DESPOTAKIS:  Okay, so we don't need to go over

10   that, but --

11         THE COURT:  Yes, I appreciate that.  I'm just trying

12   to resolve the discovery issues.

13         MR. DESPOTAKIS:  All right.

14         THE COURT:  Okay?  So I'm not going to burden my law

15   clerk with making all the rulings in something here, because I

16   think there are some things -- I'm just going to put on the

17   record, granted in part and denied in part, right, and I want

18   the parties to be clear and go over it, and order the

19   transcript if you need to to figure out what you're supposed to

20   do.  I try to be clear.  If there are things that are

21   ambiguous, you can come back to me and ask.  And so just to

22   give you fair warning, that's how I'm going to deal with this,

23   because it's a lot of stuff.  And there are some things that

24   the parties have committed to do unilaterally, there are some

25   things the parties have considered -- committed to do

166

1  collectively, and you should go ahead and do that.

2           As a general matter, I am going to repeat, parties

3  need to do a better job talking to each other and trying to

4  understand what the other side is asking for, and getting

5  clarification instead of just say, "I don't know what you're

6  talking about." All right? I know the rules sort of allow you

7  to just assert "vague and over-broad," but I think at this late

8  stage, and this is a late stage in this proceedings, you've got

9  to get more clarity, and you get the clarity by talking to each

10 other. Come to agreements when it's possible and reasonable.

11          And I would say most importantly, Mr. Despotakis,

12 you need to talk to your client and figure out -- get all the

13 information you need, because I sense that there's still a lot

14 of gaps in your knowledge. Okay? And so I need to make sure

15 that you're very clear and thorough in your understanding of

16 your client's processes. And I will also reiterate that if I

17 sense at our next hearing, when these issues come up, that you

18 haven't gotten that knowledge, maybe it's not your fault,

19 right, that your client just hasn't given it to you, then I

20 will order your client to be here so that some of these issues

21 can be resolved so we don't have these gaps about, "I don't --

22 I'm not sure what was happening and I'm not sure what the

23 process is. I'm not sure where these things might be held."

24          And so I just feel like this case has been around a

25 pretty long time. For my docket, this is a pretty old case,

1  okay, so you've got to get moving and start getting to those

2  depositions and moving forward, because I -- it may be that as

3  you move forward there is room for settlement, okay, and I

4  don't want you to lose the opportunity because you've been

5  expending so many resources in these kinds of discovery

6  disputes.  We've had a three-hour discovery hearing.  This is

7  the longest discovery hearing I've had in any of my cases, and

8  I think a lot of this could have been avoided or cut short if

9  the parties did a better job talking to their clients and

10 talking to each other.

11         So I'm happy to have resolved a lot of these issues.

12 I hope I've been clear.  If I haven't been, I'm happy to hear

13 you at a later date and tell me what you need clarification on,

14 but not before you talk to each other and try to work it out on

15 your own.  All right?

16         Ms. Weissman, do you have anything to add?

17         MS. WEISSMAN:  Yeah, thank you, Your Honor, and I'm

18 sorry to bring up one more thing.  According to the initial

19 scheduling order, the close of paper discovery is set to end on

20 November 9th --

21         THE COURT:  Yes, so you --

22         MS. WEISSMAN:  --  and I wanted to bring that to the

23 Court's attention --

24         THE COURT:  Yes.

25         MS. WEISSMAN:  -- since there are some matters

168

1   continuing.

2          THE COURT:  Right.  And so part of what you need to

3   do is to confer and propose additional extensions if you need

4   it.  If you can still make -- meet it, great, but if you can't,

5   then you need to, before the deadline comes, make a joint

6   application with a new proposed scheduling order, all right, in

7   light of all the rulings.  Mr. Despotakis, is there anything

8   you want to add?

9          MR. DESPOTAKIS:  That's fine, Your Honor.

10         THE COURT:  All right.  And --

11         MR. DESPOTAKIS:  And I will reach out and maybe we

12  can have a conversation next week and try to at least go

13  through our respective understanding of what the Court has

14  ruled today and work those issues out.

15         THE COURT:  Okay.  Ms. Hanson --

16         MR. WEISSBERG:  Not this week; next week.

17         THE COURT:  Right.  Ms. Hanson, do you have anything

18  you want to add?

19         MS. HANSON:  No, Your Honor.  Thank you.

20         THE COURT:  All right.  And Mr. Wait?

21         MR. WAIT:  No, Judge.  Thank you.

22         THE COURT:  All right.  Thank you, everybody.

23         MR. WEISSBERG:  Thank you, Your Honor.

24         MR. DESPOTAKIS:  Thank you, Your Honor.

25         MR. BROMBERG:  Thank you.

169

1    (Proceedings concluded at 1:07 p.m.)

2                         * * * * * * * *

170

1          I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5

6   _____

7          Ruth Ann Hager, C.E.T.**D-641

8   Dated:   October 20, 2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25