UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                   :

ADIAHA A. RUANE,                    :    No.: 17-CV-3704 (PKC) (PK)
                                   :

                Plaintiff,     :    **SECOND AMENDED**
                                   :    **COMPLAINT**
     – against –               :    **AND**
                                   :    **JURY DEMAND**

BANK OF AMERICA, N.A., CHEX SYSTEMS, INC.,  :
and EARLY WARNING SERVICES, LLC,     :
                                   :

                Defendants.    :
                                   :
-------------------------------------------------------------------- X

      Plaintiff ADIAHA A. RUANE hereby alleges, upon personal knowledge as to herself and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

      1.     Plaintiff Adiaha A. Ruane ("Plaintiff" or "Ms. Ruane") brings this civil action against Defendants Bank of America, N.A. ("BANA"), a national bank; Chex Systems, Inc. ("ChexSystems"), a consumer reporting agency; and Early Warning Services, LLC ("EWS"), a consumer reporting agency (together, "Defendants").

      2.     Defendant BANA violated the Electronic Fund Transfer Act (EFTA), 15 U.S.C. § 1693 *et seq.*, and the rules and regulations thereunder, the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq.*, and the rules and regulations thereunder, New York General Business Law § 349, California Business and Professions Code § 17200 *et seq.*, California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785 *et seq.* ("CCCRAA"), New York Uniform Commercial Code §§1-203 and 4-103, California Commercial Code §§ 1304 and 4103, California Civil Code §§44, 45a, and 46, and New York common law by, *inter alia*, failing to

-1-

conduct a good-faith investigation into fraudulent checks deposited into Plaintiff's BANA checking account; improperly holding Plaintiff liable for the fraud on her account; reporting Plaintiff to ChexSystems and EWS for fraud; failing to delete inaccurate, derogatory information from Plaintiff's ChexSystems report; and engaging in other misconduct. Because BANA failed to comply with its legal obligations and negatively reported Plaintiff for fraud, Plaintiff was forced to relocate across the country and was effectively forced out of the mainstream banking system.

3.      Defendant ChexSystems violated the FCRA and the rules and regulations thereunder, the New York Fair Credit Reporting Act (New York General Business Law §§ 380 *et seq.*) (NY FCRA), California Consumer Credit Reporting Agencies Act, California Civil Code § 1785 *et seq.* ("CCCRAA"), California Civil Code §§44 and 45a, and state common law by, *inter alia*, failing to properly reinvestigate Plaintiff's dispute of inaccurate, derogatory information on her ChexSystems report and by misreporting and failing to delete inaccurate information on Plaintiff's ChexSystems report, thus severely impairing Plaintiff's ability to open a bank account.

4.      Defendant EWS violated the FCRA and the rules and regulations thereunder, the New York Fair Credit Reporting Act (New York General Business Law §§ 380 *et seq.*) (NY FCRA), California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785 *et seq.* ("CCCRAA"), California Civil Code §§44 and 45a, and state common law by, *inter alia*, failing to maintain reasonable procedures designed to assure maximum possible accuracy of the information concerning Plaintiff, thus severely impairing Plaintiff's ability to open a bank account.

5.      Plaintiff seeks damages, along with injunctive relief, reasonable costs, and attorney's fees.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiff's claim pursuant to 15 U.S.C. §

1693m(g) and 28 U.S.C. § 1331. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201

and 2202. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to

28 U.S.C. § 1367.

7.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because

Defendants BANA, ChexSystems, and EWS all do business in this district. Venue in this district

is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to

Plaintiff's claims occurred in this district.

## PARTIES

8.     Plaintiff Adiaha A. Ruane is a 46-year-old African-American widow who

currently lives in Brooklyn, New York and supports her two children, aged nine and sixteen.

9.     Plaintiff is a "consumer" as defined by the Electronic Fund Transfer Act, 15

U.S.C. § 1693a(6), because she is a natural person who had an account held by a financial

institution, and who was issued an access device by that financial institution and entered into an

agreement with that financial institution for the provision of electronic fund transfer services.

10.     Defendant Bank of America, N.A. ("BANA") is a national banking association

whose principal place of business is located at 100 North Tryon Street, Charlotte, North Carolina

28202. As of December 31, 2017, Defendant BANA had $2.3 trillion in assets; as of June 30,

2017, it ranked sixth among banks in deposit market share in New York City, and had 126

branches throughout New York City.

11.     Defendant BANA is a "financial institution" as defined by the Electronic Fund

Transfer Act, 15 U.S.C. § 1693a(9), because it is a national bank and directly or indirectly holds

accounts belonging to consumers or issues an access device and agrees with consumers to provide electronic fund transfer services.

12.     Defendant ChexSystems is a Minnesota corporation authorized to do business in New York State.

13.     Defendant ChexSystems is a "consumer reporting agency" as defined by both the FCRA, 15 U.S.C. § 1681a(f), and the NY FCRA, N.Y. Gen. Bus. Law § 380-a(e), because it regularly engages in the practice of assembling, evaluating, and distributing information concerning consumers for the purpose of furnishing consumer reports, as defined by the FCRA, 15 U.S.C. § 1681a(d), and the NY FCRA, N.Y. Gen. Bus. Law § 380-a(c), to third parties.

14.     Defendant ChexSystems disburses such consumer reports to third parties for monetary compensation.

15.     Defendant EWS is a Delaware corporation authorized to do business in New York State.

16.     Defendant EWS is a "consumer reporting agency" as defined by both the FCRA, 15 U.S.C. § 1681a(f), and the NY FCRA, N.Y. Gen. Bus. Law § 380-a(e), because it regularly engages in the practice of assembling, evaluating, and distributing information concerning consumers for the purpose of furnishing consumer reports, as defined by the FCRA, 15 U.S.C. § 1681a(d), and the NY FCRA, N.Y. Gen. Bus. Law § 380-a(c), to third parties.

17.     Defendant EWS disburses such consumer reports to third parties for monetary compensation.

18.     According to information posted on its website, at https://www.earlywarning.com/pdf/early-warning-corporate-overview.pdf, Defendant EWS is

"100% bank-owned," and lists one of its owners as Defendant BANA (in addition to BB&T, Capital One, JPMorgan Chase, PNC Bank, U.S. Bank, and Wells Fargo).

## FACTUAL ALLEGATIONS

### I.   *Plaintiff's Dispute of Transactions on Her BANA Account*

19.    Plaintiff Adiaha A. Ruane is a 46-year-old African-American woman who currently lives in Brooklyn, New York. She supports herself and her two children, aged nine and sixteen, on her earnings from employment and a widow's pension from Ireland.

20.    On or about December 7, 2016, Ms. Ruane was forced to relocate from San Francisco, California, to her mother's home in Brooklyn, New York, after BANA improperly held her responsible for fraud committed on her BANA checking account, closed her account, and reported her to at least two consumer reporting agencies, which prevented her from opening an account at another bank and consequently from receiving her widow's pension from Ireland. Without her widow's pension, Ms. Ruane was unable to afford her rent in San Francisco.

21.    From early September 2016 to early December 2016, Ms. Ruane lived in San Francisco, supporting herself and her family on wages averaging about $300 per week and her widow's pension of about $970 per month. Her rent was $1,500 a month.

22.    Ms. Ruane had moved to San Francisco from Athens, Georgia, where she had lived for about five years, working for FedEx. She had relocated to San Francisco to continue working for FedEx as part of the company's California operations, which she had heard were expanding rapidly and offered enhanced opportunities for job growth and promotion. She hoped that her five-year tenure at FedEx positioned her well for a promotion to management.

23.     For years, Ms. Ruane had received both her wages from FedEx and her widow's pension from Ireland by direct deposit into her BANA checking account, which she had opened in 2005, along with a BANA savings account (which she closed in around 2011).

24.     Because Ms. Ruane lived paycheck to paycheck, she monitored her BANA accounts frequently to check on her balance, often by logging into her BANA accounts via BANA's mobile app from her iPhone. Given her modest income, she had incurred numerous overdraft fees over the years, especially if her debit card charges posted to her account before her weekly paycheck was directly deposited, and if the larger debit card charges posted before the smaller ones.

25.     Other than overdrafts and overdraft fees, Ms. Ruane was not aware of having had any problems with her BANA accounts since she opened them in 2005.

26.     On or around September 27, 2016, Ms. Ruane was particularly anxious about her BANA checking account balance. Her rent was due soon and she worried that she had just spent too much on her younger daughter's eighth birthday celebration. She wondered when her debit card charges would post to her account and if they would trigger a lot of overdraft fees.

27.     The next morning, on September 28, 2016, Ms. Ruane again logged into her BANA account and saw that it contained nearly $5,000 more than it should. Assuming that this was a mistake, Ms. Ruane called BANA that same morning and informed BANA that her account contained funds that she did not recognize.

28.     According to information that BANA later provided Ms. Ruane, on September 27, 2016, someone deposited five fraudulent checks in the amounts of $989.00, $975.00, $958.00, $969.00, and $947.97 ("September 2016 deposits") – a total of $4,838.97 – into Ms. Ruane's BANA checking account.

29.     Ms. Ruane did not make the September 2016 deposits.

30.     Fortunately, Ms. Ruane discovered these erroneous or fraudulent deposits and reported them to BANA before any of the funds from the deposits were used or withdrawn. BANA therefore suffered no loss as a result of the September 2016 deposits.

31.     The BANA employee Ms. Ruane spoke to asked her whether she made or recognized the September 2016 deposits. Ms. Ruane said she did not make or recognize the deposits, did not know where the money came from, and was calling to request that BANA remove the funds from those deposits from her account. The BANA employee said BANA would rectify the situation.

32.     However, shortly afterwards, a different BANA employee called Ms. Ruane and again asked her whether she made the September 2016 deposits. Ms. Ruane again said she did not make the deposits. The BANA employee said BANA believed that Ms. Ruane did make the deposits and that BANA was closing her account, holding her responsible for the fraud, and reporting her to ChexSystems.

33.     Ms. Ruane asked the BANA employee why BANA was blaming her for the September 2016 deposits and how BANA could have determined that she was responsible for the deposits in such a short amount of time. The BANA employee said he could not discuss why BANA was blaming her, but that BANA would send her information by mail.

34.     Ms. Ruane also asked the BANA employee why BANA was closing her account when she had been a loyal customer for many years, and how she could retrieve any money remaining in the account. The BANA employee said BANA would release any remaining money to her by the end of the week.

35.     Ms. Ruane asked the BANA employee whether he was police or law enforcement. The BANA employee said no, but that he was part of BANA's fraud detection unit, which worked closely with police. He said BANA might notify police about the fraud on Ms. Ruane's account.

36.     The BANA employee told Ms. Ruane that she would never again be able to open an account with BANA and that if he were Ms. Ruane, he would immediately open an account at another bank because she would not be able to do so the following day. He also said Ms. Ruane should be more careful with her account.

37.     That same day, after she had returned home from work, Ms. Ruane logged into her BANA account online and saw that there been prior log-ins to her account from an Android phone, whereas she used only an iPhone to log into her BANA account, via BANA's mobile app. She again called BANA and shared this information, but BANA still refused to help her – even though Ms. Ruane has never owned an Android phone.

38.     Ms. Ruane called BANA at least five times over the course of the next week to request that BANA release any money that was still in her account, maintain that she was not responsible for the September 2016 deposits, and plead with BANA not to close her account.

39.     Ms. Ruane also attempted multiple times to file a police report regarding the September 2016 deposits. She contacted the local police precinct, in the Diamond Heights neighborhood of San Francisco, by phone and asked to file a police report. The precinct told her to call a different number, which she understood to be for its fraud division. Though she attempted to call the number multiple times, she was not able to get through and was unable to leave a message because the voice mailbox was always full.

## II.     *BANA's Written Responses to Plaintiff's Dispute*

40.     Ms. Ruane received three separate letters from BANA, all dated September 29, 2016 – one day after she had reported the September 2016 deposits to BANA.

41.     One letter consisted of five nearly identical pages, each referencing one of the five fraudulently deposited checks and stating, "We found it necessary to place a freeze on one or more of the items you recently deposited."

42.     A second letter stated that the five checks deposited into Ms. Ruane's account were returned unpaid and that "As a result, we've deducted them from your account. You will see the adjustment on your account statement." This letter included copies of the five fraudulent checks and showed a "return items fee" of $60.00.

43.     The third letter stated, "After a careful review, we've made the decision to close your account." This letter also stated that BANA "may report the account to the following reporting agencies: ChexSystems, Inc., Early Warning Services, LLC, or both. *This may affect your ability to open an account at another financial institution for up to seven years.*" (Emphasis added.)

44.     None of the letters explained why BANA had decided to hold Ms. Ruane responsible for the September 2016 deposits and close her account.

45.     Each of the five checks attached to the September 29, 2016 letter is dated September 24, 2016 and purports to be drawn on a BANA account belonging to "Grand Lux Café LLC, The Cheesecake Factory Inc, 26950 Agoura Road, Calabasas Hills." None of the checks includes a state or zip code for this entity.

46.     The supposed payer's signature on the front of each of the five checks bears an exact resemblance to the signature of former U.S. President Barack Obama.

47.     All five checks are payable to Ms. Ruane, yet the endorsement signature on the back of each of the checks bears no resemblance whatsoever to Ms. Ruane's actual signature.

48.     Ms. Ruane has never worked for or received any checks from "Grand Lux Café LLC" or "The Cheesecake Factory Inc". Nor has she ever worked for any business in Calabasas Hills.

49.     On or about October 5, 2016, Ms. Ruane went to a BANA branch in San Leandro, California, and asked to withdraw her most recent paycheck of $398.81 – which had been deposited into her BANA checking account on September 30, 2016 – and her most recent pension disbursement of $971.43, which had been deposited into her BANA account on October 3, 2016.

50.     A BANA teller gave Ms. Ruane $912.33 and told her that the lower amount was the result of bank fees and charges posted to Ms. Ruane's account after it was closed. BANA did not provide any documentation itemizing these fees and charges.

51.     Ms. Ruane's September 15, 2016 to October 13, 2016 BANA account statement shows a $60 "returned item chargeback fee" charged on September 29, 2016 and two legal order fees charged on September 30, 2016 in the amounts of $54.18 and $125. Upon information and belief, these fees are related to the fraud on her account.

52.     Ms. Ruane received another letter from BANA, dated October 11, 2016, stating that her account had been closed and that BANA had "informed a consumer reporting agency about a late payment, missed payment, or other default on your account."

**III.     Impact on Plaintiff's Life**

53.     Ms. Ruane soon realized that BANA's negative reporting of her to consumer reporting agencies such as ChexSystems and EWS had made it virtually impossible for her to open an account at another financial institution.

54.     After BANA closed her account, Ms. Ruane visited at least three banks and credit unions in California, including Wells Fargo, BBVA Compass, and Fedex Employees Credit Association, and applied to open an account. Each of these financial institutions turned her down.

55.     Ms. Ruane also applied online for an account at Visions Federal Credit Union, where her mother has an account. This credit union also turned her down.

56.     Ms. Ruane felt deeply embarrassed and depressed each time she was turned down by a financial institution for an account. She felt she was being treated like a criminal.

57.     On or about November 10, 2016, Ms. Ruane opened a Green Dot prepaid debit card that she could use to access her wages. However, she learned that she could not receive her widow's pension from Ireland through this prepaid card.

58.     A few days later, on or about November 14, 2016, Ms. Ruane called American Express to find out whether she could use an American Express prepaid card to receive her widow's pension from Ireland. She learned that though American Express offered a prepaid card that accepted international deposits, that card carried high fees – fees she could not afford.

59.     Ms. Ruane was unable to afford her rent on her wages alone. Unable to support herself and her family without access to her widow's pension, Ms. Ruane had no choice but to relocate herself and her then eight-year-old daughter to Brooklyn, New York on or about December 7, 2016 and move in with her mother. (Ms. Ruane's older daughter was already living

with her mother by that time.) This was just three months after she had moved to California in pursuit of career advancement opportunities.

60. Ms. Ruane was devastated that at the age of 46, and as a mother of two, she was unable to afford her rent and had to move in with her mother. Ms. Ruane became fearful that she and her children could become homeless.

61. Ms. Ruane was also devastated that she had to leave her job at FedEx, where she had worked for the past five years and where she had hoped that she could someday be promoted to management.

62. Ms. Ruane was able to give her boss at FedEx only two days' notice that she had to quit her job and leave California. Upon information and belief, FedEx will not re-hire her due to her abrupt departure.

63. Ms. Ruane also felt terrible that she had to relocate her younger daughter, who was then eight years old and had just started a new school, from California to New York, only three months after they had moved from Georgia to California. Her younger daughter became depressed and fearful at the prospect of starting all over in a new school in the middle of the school year. She cried frequently for about six months after they moved to New York. Ms. Ruane felt very guilty seeing her younger daughter suffer in this way.

64. Ms. Ruane was also deeply upset about how BANA had treated her. She could not understand how BANA could have made its decision to hold her responsible for the September 2016 deposits, close her account, and report her for fraud in such a short time, when she had been a BANA customer for 11 years. She felt that BANA had immediately started treating her as a criminal, and without giving her any opportunity to show that she had nothing to do with the fraud.

-12-

65.     In around late December 2016, Ms. Ruane obtained a copy of her ChexSystems report.

66.     According to her ChexSystems report, dated December 20, 2016, BANA negatively reported Ms. Ruane to ChexSystems on or around October 7, 2016, in relation to her closed BANA account, for "suspected fraud activity."

67.     The ChexSystems report shows inquiries from two financial institutions at around this time: Visions Federal Credit Union, on November 14, 2016, and FedEx Employees Credit Association, on November 16, 2016. As stated above, both of those financial institutions rejected Ms. Ruane's application for an account.

68.     On or about January 12, 2017, despite her still-negative ChexSystems and EWS reports, Ms. Ruane was finally able to open a checking account at a community development credit union (CDCU) called Brooklyn Cooperative Federal Credit Union, whose mission is to serve low-income communities.

69.     While Ms. Ruane is now able to receive her widow's pension from Ireland with this CDCU account, she must wait several more days each month to receive it than when she still had her BANA account.

70.     Once she had her CDCU account, Ms. Ruane was able to stop using her Green Dot prepaid card account. However, during the approximately two months that she needed to use the Green Dot card, she incurred numerous fees, which she estimates totaled approximately $20-25 each month.

71.     In addition to reporting Ms. Ruane negatively to ChexSystems, BANA also negatively reported her to EWS. According to an EWS report that Ms. Ruane obtained, dated February 14, 2018, BANA negatively reported Ms. Ruane to EWS, in relation to her closed

BANA account, for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" and reported that her BANA account was "Closed For Cause."

72.     On or about May 25, 2017, Ms. Ruane went to the Citibank branch located at 430 Myrtle Avenue in Brooklyn and applied to open an account. Soon after, she received a denial letter from Citibank dated May 27, 2017, stating that the denial "was based in whole or in part on information received from the reporting agency or agencies listed below." The letter lists ChexSystems. Ms. Ruane's EWS report also indicates that Citibank inquired about her to EWS on May 27, 2017.

73.     In September 2017, after more than nine months of being unemployed and looking for a job, she finally obtained a job working as a customer service representative at National Grid, in Brooklyn, where she continues to work today.

74.     In the interim, Ms. Ruane had to borrow money from her family.

75.     Living together has strained Ms. Ruane's relationship with her mother.

76.     For Ms. Ruane, this entire ordeal was a bizarre, complicated, and emotionally taxing life experience, which left her bereft and depressed.

### IV.     Plaintiff's ChexSystems and EWS Disputes

77.     After relocating to Brooklyn, Ms. Ruane contacted New Economy Project, one of her counsel in this lawsuit, for assistance.

78.     On or about March 2, 2017, Ms. Ruane sent a dispute letter to ChexSystems and mailed a copy to BANA, both by Certified Mail Return Receipt Requested. The dispute letter states, in relevant part:

> I did not engage in any fraud activity. In September of 2016, without my knowledge or consent, an unknown thief accessed my Bank of America checking account and deposited five fake checks from the Cheesecake Factory for a total amount of $4,838.97. These checks were fraudulently signed "Barack Obama."

When I detected this fraud, I immediately reported the fraud to Bank of America, but instead of resolving this issue in my favor, Bank of America closed my account and reported me negatively to ChexSystems. This prevented me from opening a new bank account. Without access to a bank account, I was unable to receive my widow's pension and pay rent. As a result, I was forced to quit my job in California and relocate with my daughter to New York City to live with my mother. Five month later, I am still in the process of getting back on my feet. This item should be removed from my ChexSystems report because I was not in any way responsible for the fraudulent deposits.

79.      ChexSystems sent Ms. Ruane a response dated April 11, 2017, which states "the investigation of information contained in your consumer file at ChexSystems is complete" and "[t]he information submitted to ChexSystems by [BANA] has been verified to be accurate."

80.      ChexSystems' April 11, 2017 letter also states, "[BANA] stated that no fraud claims were filed with them."

81.      However, Ms. Ruane reported the September 2016 deposits to BANA and told BANA multiple times that she had not made and did not recognize those deposits.

82.      To the extent that Ms. Ruane may not have filed a formal or official "fraud claim" with BANA – in the sense that BANA and ChexSystems used the term – concerning the September 2016 deposits, that is because BANA did not ask Ms. Ruane if she wished to file a "fraud claim" and/or because BANA's own actions prevented her from doing the same.

83.      ChexSystems' April 11, 2017 letter also states, "[BANA has] provided examples of the deposited checks as well as account statements."

84.      Only two of the five deposited checks were enclosed with ChexSystems' April 11, 2017 letter.

85.      None of the account statements enclosed with ChexSystems' April 11, 2017 letter contain any evidence that Ms. Ruane made the September 2016 deposits.

86.     Ms. Ruane also received a response from BANA dated March 24, 2017, which states, "We've completed our investigation and have confirmed the information we previously provided to the CRAs is accurate." BANA's letter provides no explanation.

87.     On or around March 19, 2018, during the pendency of this litigation, through counsel, Ms. Ruane sent a dispute letter to EWS and mailed copies of the dispute letter to counsel for Defendants BANA and ChexSystems. The dispute letter states, in relevant part:

> Ms. Ruane did not transact, or attempt to transact, with any account in an unauthorized or prohibited manner (see first disputed item). Nor did she take any actions to cause any account to be "closed for cause" or "closed for cause-purged" (see second disputed item). In September 2016, without Ms. Ruane's knowledge or consent, an unknown thief accessed her Bank of America checking account and deposited five fake checks, totaling $4,838.97. All of the checks purport to be drawn from a Bank of America account belonging to "Grand Lux Café LLC, The Cheesecake Factory Inc, 26950 Agoura Road, Calabasas Hills". The five fake checks bear numerous red flags indicating their fraudulent nature, including the following: The payer's address does not contain the state or zip code; the supposed payer's signature on the front of each check bears an exact resemblance to the signature of former U.S. President Barack Obama; and the supposed endorsement on the back of each check does not resemble Ms. Ruane's signature at all (see Ms. Ruane's actual signature on the attached signed verification). When Ms. Ruane detected this fraud, she immediately reported the fraud to Bank of America, before any of the unauthorized funds were used or withdrawn. Instead of resolving this issue in Ms. Ruane's favor, Bank of America closed her account and reported her negatively to consumer reporting agencies, including Early Warning Services. These items should be removed from Ms. Ruane's Early Warning Services report because she was not in any way responsible for the fraudulent deposits.

88.     On or around April 2, 2018, counsel for Defendant BANA informed Plaintiff's counsel that BANA "has determined to delete the negative reports filed with ChexSystems and EWS in connection with plaintiff's account arising out of the deposit and negotiation of the spurious checks involved in this matter….*with full*

*reservation of BANA's rights to re-report plaintiff* as may be applicable at the conclusion of the litigation." (Emphasis added.)

89.     Ms. Ruane then received a letter dated April 9, 2018 from EWS stating, "This letter is to notify you that our reinvestigation of the information you disputed has been completed. The reinvestigation found that the disputed information is incomplete, inaccurate, or its accuracy cannot be verified as of the date it was furnished to Early Warning….As a result, Early Warning has deleted the disputed information from your consumer report."

90.     By April 2018, however, Ms. Ruane had already been rejected by at least one bank that shows up on her EWS report as having inquired about her – Citibank, on May 27, 2017.

## V.     *BANA's Failure to Properly Investigate, and Lack of a Reasonable Basis to Hold Plaintiff Responsible for the September 2016 deposits and Report Her for Fraud*

91.     Though Ms. Ruane was the victim, and not the perpetrator, BANA decided to blame her for the fraud on her account, and report her to others accordingly.

92.     BANA did not conduct a good-faith investigation of Ms. Ruane's dispute to BANA of the September 2016 deposits into her BANA account, although federal law and regulations required BANA to do so, and although BANA was in the best position to obtain and review information regarding the disputed deposits on Ms. Ruane's account.

93.     BANA also did not have a reasonable basis for its decision to hold Ms. Ruane responsible for the September 2016 deposits into her BANA account and to report Ms. Ruane to ChexSystems for "suspected fraud activity" and to EWS for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner."

94.     Nevertheless, BANA knowingly and willfully concluded that Ms. Ruane's account was not in error – *i.e.*, that Ms. Ruane had made the September 2016 deposits – when

BANA could not have reasonably drawn such a conclusion from the evidence available to BANA at the time of its investigation.

95.     For example, BANA ignored the fact that Ms. Ruane had told BANA multiple times that she did not make the September 2016 deposits.

96.     BANA also either did not review a sample of Ms. Ruane's actual signature – *e.g.*, from the Signature Card that Ms. Ruane signed upon opening her BANA accounts – or ignored the fact that Ms. Ruane's actual signature bears no resemblance whatsoever to the forged endorsement on the fraudulent checks.

97.     BANA also either did not review Ms. Ruane's pattern of use such as location and types of transactions on her BANA checking account, or ignored the fact that Ms. Ruane had never deposited any checks from "Grand Lux Café LLC" or "The Cheesecake Factory Inc", and that for years she had received paychecks by direct deposit from only one employer, FedEx.

98.     BANA also ignored the fact that the supposed payer's signature on the fraudulent checks bears an exact resemblance to the signature of former U.S. President Barack Obama.

99.     Moreover, BANA was on notice of at least one other case in which fraudulent checks also bearing the fake signature of Barack Obama were deposited into the BANA account of another BANA customer in December 2015. In or around July 2017, New Economy Project and Bromberg Law Office, P.C., which represent Ms. Ruane in the instant lawsuit, resolved a federal lawsuit against BANA and ChexSystems, *George Campbell v. Bank of America, N.A. and Chex Systems, Inc.*, 1:16-cv-9734 (AJN) (S.D.N.Y.), alleging, *inter alia*, that BANA failed to conduct a proper investigation and limit a customer's liability as required by law, where fraudulent checks bearing the signature of former U.S. President Barack Obama were deposited into a low-income, African-American BANA customer's account in December 2015.

100.    BANA also ignored the fact that Ms. Ruane had informed BANA on or about September 28, 2016 that there had been log-ins to her BANA account from a phone – an Android phone – that she did not recognize. Even before Ms. Ruane informed BANA of this fact, BANA appears to have been in possession of this information – that there had been log-ins to her BANA account via BANA's mobile app from an Android phone.

101.    BANA also ignored the fact that prior to the September 2016 deposits, the only phone used to log into Ms. Ruane's BANA account via BANA's mobile app was an iPhone.

102.    BANA also appears to have been in possession of the Internet Protocol, or IP, addresses from which the Android phone was used to log into Ms. Ruane's BANA account.

103.    These IP addresses appear to indicate that the Android phone was located in Chicago, Illinois at the time of the September 2016 deposits.

104.    By contrast, the two IP addresses from which it appears that Ms. Ruane logged into her BANA account via her iPhone on September 27, 2016 were located in California.

105.    BANA never asked Ms. Ruane if she had an Android phone or if she was in Chicago on September 27, 2016.

106.    Ms. Ruane has never owned an Android phone and has not been to Chicago since the 1990s.

107.    BANA claims that the person who made the September 2016 deposits did so through BANA's mobile app, which requires the user to log in with an Online ID and Passcode.

108.    However, BANA never asked Ms. Ruane if she had ever shared her Online ID and Passcode with anyone else.

109.    Ms. Ruane has never shared her Online ID and Passcode with anyone else.

-19-

110.   BANA also ignored the fact that Ms. Ruane herself had informed BANA of the September 2016 deposits and did so before any of the funds from the deposits were used or withdrawn.

111.   BANA ignored the fact that it did not lose any money because of the September 2016 deposits.

112.   BANA also ignored the fact that Ms. Ruane did not benefit in any way from the September 2016 deposits.

113.   Other than asking Ms. Ruane if she made the September 2016 deposits – to which Ms. Ruane repeatedly responded that she did not – BANA did not ask Ms. Ruane any questions to try to learn whether she was in fact a victim of the fraud perpetrated via the September 2016 deposits (as she was).

114.   Ms. Ruane had been a BANA customer for 11 years, since 2005.

115.   According to BANA's records, Ms. Ruane's BANA account had a positive balance at the time of the September 2016 deposits.

116.   According to BANA's records, during the approximately 11 years that Ms. Ruane had her BANA checking account, she had "no prior returns." Upon information and belief, this means that she had never deposited a check that later bounced.

117.   In blaming Ms. Ruane for the fraud, BANA also ignored the possibility that whoever made the September 2016 deposits had taken advantage of any security vulnerabilities that might exist in BANA's mobile app, which BANA claims was used to make the deposits, or otherwise obtained Ms. Ruane's sensitive personal information without her knowledge or consent.

118.    Security vulnerabilities in mobile banking apps are a well-documented problem known to both regulators and the banking industry at large. (*See*, *e.g.*, FFIEC Guidelines at https://ithandbook.ffiec.gov/it-booklets/retail-payment-systems/appendix-e-mobile-financial-services.aspx.) Specifically, "remote check deposit" technology – *e.g.*, deposits of checks via a mobile app – has led to an industry-wide spike in fraudulent check deposits. (*See*, *e.g.*, https://www.cutimes.com/2017/06/09/as-remote-deposit-capture-soars-so-do-risks/?slreturn=20180525103853.)

119.    In fact, BANA explicitly excludes mobile check deposits from its "Online and Mobile Banking Security Guarantee" (available at https://www.bankofamerica.com/onlinebanking/online-banking-security-guarantee.go). Furthermore, BANA recently increased security for use of its online banking services to mitigate BANA's vulnerability to cybercrime. (*See*, *e.g.*, https://www.reuters.com/article/us-bank-of-america-cyber-intel/bofa-fortifies-online-banking-with-new-security-layer-idUSKBN1CS1Z0.) That BANA specifically does not guarantee the security of mobile check deposits through its own mobile app, and that BANA has felt the need to improve the security of its mobile app, suggests that BANA is aware that its mobile app has been, and could be, compromised by unknown fraudsters.

120.    BANA is also well aware that theft of bank customers' sensitive personal data is unfortunately a common phenomenon. One example is BANA's own experience in or around 2011, when it was reported that a BANA employee had stolen customer data including "names, addresses, Social Security numbers, phone numbers, bank account numbers, driver's license numbers, birth dates, e-mail addresses, family names, PINs and account balances" and leaked the information "to a ring of criminals." (*See*, *e.g.*, https://www.bankinfosecurity.com/bofa-breach-a-big-scary-story-a-3673; http://www.infosecisland.com/blogview/13982-Bank-of-Americas-10-

Million-Dollar-Breach-Loss.html; https://www.americanbanker.com/news/notable-data-breaches-of-2011.)

121.     The massive fraud revealed by government authorities in or around September 2016 to have been perpetrated at Wells Fargo, involving fraudulently opened accounts and unauthorized transactions on those accounts, is another example of blatant misuse of customer data that is clearly beyond an innocent customer's control. (*See*, *e.g.*, https://www.nytimes.com/2016/09/09/business/dealbook/wells-fargo-fined-for-years-of-harm-to-customers.html.)

122.     Theft of bank customer data also occurs through data breaches at businesses, including large retailers. The New York State Office of the Attorney General has reported that more than 900 businesses experienced data breaches of customer information in 2013. (*See* https://ag.ny.gov/press-release/ag-schneiderman-releases-report-showing-rise-data-breaches-provides-security-tips.) One of the most publicized examples, the computer security breach at Target in late 2013, reportedly compromised the sensitive personal and/or financial information of as many as 70 million people. (*See*, *e.g.*, https://www.forbes.com/sites/maggiemcgrath/2014/01/10/ target-data-breach-spilled-info-on-as-many-as-70-million-customers/#26b737a3e795.)

123.     In August 2017, Wells Fargo's Chief Executive Officer revealed that regulators were reviewing "actions [Wells Fargo] took to freeze, and in many cases close, consumer deposit accounts after detecting suspected fraudulent activity (by third parties or account holders) that affected those accounts." (*See*, *e.g.*, https://www.businesswire.com/news/home/20170804005632/en/Wells-Fargo-CEO-Shares-Updates-Company%E2%80%99s-Rebuilding.) In February 2018, *The New York Times* reported that Wells Fargo had been accused by a former Wells Fargo fraud investigator of closing its customers' accounts instead of investigating the

customers' fraud claims. (*See* https://www.nytimes.com/2018/02/28/business/wells-fargo-fraud-closing-accounts.html.)

124.    Upon information and belief, BANA routinely closes the accounts of customers with low account balances and reports those customers to ChexSystems and EWS as having committed fraud or engaged in unauthorized activity on their accounts, though BANA has not properly investigated those customers' disputes or fraud claims and when in fact BANA does not have a reasonable basis to conclude that those customers have committed fraud or engaged in unauthorized activity on their accounts.

125.    Upon information and belief, BANA routinely reports such customers as having committed fraud or engaged in unauthorized activity on their accounts even though those customers are in fact the victims, and not the perpetrators, of such fraud or unauthorized activity.

126.    Though BANA had no reasonable basis to hold Ms. Ruane responsible for the September 2016 deposits and report her to ChexSystems and EWS for fraud, and knew that it had no such basis, BANA nevertheless did so.

127.    When Ms. Ruane disputed the "suspected fraud activity" notation on her ChexSystems report as inaccurate, BANA verified to ChexSystems that it was in fact accurate, informing Chex that "the customer" – meaning Ms. Ruane – "deposited five checks for a total of $4,838.97 via mobile deposit."

128.    BANA verified this notation as accurate even though BANA knew that ChexSystems' standard for reporting someone for fraud is "alleged intentional or willful violation of financial institution checking account privileges or policies to obtain unauthorized benefits or rights."

129.     On January 9, 2018, BANA's counsel stated to the Court that in fact BANA does not know if the September 2016 deposits were made with Ms. Ruane's involvement or knowledge.

130.     BANA therefore had no good-faith or reasonable basis to conclude that Ms. Ruane had committed an "intentional or willful violation of [her BANA] checking account privileges or policies to obtain unauthorized benefits or rights."

131.     Moreover, BANA did not suffer any loss, and Ms. Ruane did not obtain any "unauthorized benefits or rights."

132.     BANA therefore knew that its reporting of Ms. Ruane to ChexSystems for "suspected fraud activity" was false, and that it had no factual basis for verifying the "suspected fraud activity" reporting as accurate.

133.     BANA is aware that virtually all banks and most credit unions will reject a person's application for a deposit account if the person's ChexSystems or EWS report indicates that the person is suspected of fraud or has transacted, or attempted to transact with an account in an unauthorized or prohibited manner.

134.     BANA knew that its reporting of Ms. Ruane to ChexSystems for fraud would severely impair, if not extinguish, her ability to open an account at another financial institution.

135.     BANA intended for its reporting to have such an effect.

136.     As a result of BANA's reporting, ChexSystems reported Ms. Ruane to at least three financial institutions for "suspected fraud activity" and all of those financial institutions rejected Ms. Ruane's application for an account.

137.   BANA also had no good-faith or reasonable basis to conclude that Ms. Ruane had transacted or attempted to transact with her BANA account in an unauthorized or prohibited manner, as BANA reported to EWS.

138.   BANA knew that reporting Ms. Ruane to EWS for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" would severely impair, if not extinguish, her ability to open an account at another financial institution.

139.   BANA intended for its reporting to have such an effect.

140.   As a result of BANA's reporting, EWS reported Ms. Ruane to at least one financial institution for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" and that financial institution rejected Ms. Ruane's application for an account.

141.   BANA's negative reporting of Ms. Ruane to ChexSystems and EWS was willful and malicious.

142.   The false "suspected fraud activity" notation on Ms. Ruane's ChexSystems report painted her as a criminal and caused her reputational harm.

143.   Likewise, the false "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" notation on Ms. Ruane's EWS report painted her as a criminal and caused her reputational harm.

144.   BANA subsequently agreed, as described above, to delete the negative information from both her ChexSystems and EWS reports during the pendency of this litigation, but "with full reservation of BANA's rights to re-report plaintiff as may be applicable at the conclusion of the litigation."

**VI.      *ChexSystems' FCRA, NY FCRA, and CCCRAA Violations***

145.     ChexSystems deliberately, willfully, intentionally, recklessly, and negligently failed to perform a reasonable reinvestigation of Ms. Ruane's dispute as required by the FCRA, and failed to maintain reasonable procedures designed to assure maximum possible accuracy of the information in the consumer reports it disseminated regarding Ms. Ruane.

146.     Instead, ChexSystems relied solely on information and documents it received from BANA and did not ask any non-ChexSystems entity other than BANA for information; failed to review, or did not adequately review, documents it received from BANA; and failed to conduct an independent evaluation of the accuracy of the disputed reporting.

147.     ChexSystems knew or should have known that the information BANA reported and certified to ChexSystems as accurate regarding Ms. Ruane was in fact inaccurate, incomplete, and could not be verified; and that the documents ChexSystems received from BANA did not support the information BANA reported and certified as accurate regarding Ms. Ruane.

148.     In its April 11, 2017 letter to Ms. Ruane, ChexSystems simply states that BANA "verified" the disputed information on Ms. Ruane's consumer report, providing no explanation as to how BANA reached this determination.

149.     ChexSystems' April 11, 2017 letter also states that "examples of the deposited checks as well as account statements" are enclosed. The enclosures include only two of the five fraudulent checks and contain nothing indicating that Ms. Ruane was responsible for the fraud.

150.     ChexSystems did not seek copies of the three missing counterfeit checks from BANA.

151.    ChexSystems either did not review the account statements that it received from BANA, or ignored the fact that the account statements contain no evidence that Ms. Ruane made the September 2016 deposits.

152.    ChexSystems did not contact Ms. Ruane seeking more documents or information.

153.    ChexSystems also ignored the fact that Ms. Ruane unequivocally denied in her dispute letter to ChexSystems that she had deposited the five fraudulent checks totaling $4,838.97 or that she was in any way responsible for the fraudulent deposits.

154.    Without any good-faith or reasonable basis to do so, ChexSystems took BANA's word that Ms. Ruane had committed the fraud over Ms. Ruane's word that she had not done so.

155.    Though ChexSystems knew that Ms. Ruane was disputing checks deposited into her BANA account, ChexSystems either did not conduct a comparison of the endorsement signature on the back of the disputed checks with Ms. Ruane's actual signature, a sample of which ChexSystems had from Ms. Ruane's dispute letter, or ignored the fact that Ms. Ruane's actual signature bears no resemblance whatsoever to the forged endorsement.

156.    ChexSystems is aware that virtually all banks and most credit unions will reject a person's application for a deposit account if the person's ChexSystems report indicates that the person is suspected of fraud.

157.    ChexSystems knew that its reporting of Ms. Ruane to financial institutions for "suspected fraud activity" would severely impair, if not extinguish, her ability to open an account at another financial institution.

158.    ChexSystems intended for its reporting to have such an effect.

159.    Ms. Ruane's dispute letter informed ChexSystems that her ChexSystems report had prevented her from opening a bank account; that without access to a bank account, she was

unable to receive her widow's pension and pay rent; and that as a result, she had been forced to quit her job in California and relocate with her daughter to New York City to live with her mother.

160.   Nevertheless, until at least April 2, 2018, ChexSystems continued to maintain its file on Ms. Ruane and to report to third parties the inaccurate, derogatory information provided by BANA to ChexSystems regarding Ms. Ruane.

161.   ChexSystems shared this inaccurate, derogatory information about Ms. Ruane with at least three financial institutions.

162.   As a result, Ms. Ruane was denied an account by all three of those financial institutions.

## VII.   *EWS's FCRA, NY FCRA, and CCCRAA violations*

163.   Like ChexSystems, EWS deliberately, willfully, intentionally, recklessly, and negligently failed to maintain reasonable procedures designed to assure maximum possible accuracy of the information in the consumer report(s) EWS disseminated regarding Ms. Ruane.

164.   Instead, EWS simply parroted the negative information that BANA reported to EWS about Ms. Ruane; failed to ask BANA for information and/or documents to support what BANA reported to EWS about Ms. Ruane; relied solely on information and documents it received from BANA and did not ask any non-EWS entity other than BANA for information; failed to review, or did not adequately review, documents it received from BANA, if any; and failed to conduct an independent evaluation of the accuracy of the disputed reporting.

165.   EWS knew or should have known that the information BANA reported and certified to EWS regarding Ms. Ruane was inaccurate, incomplete, and could not be verified; and

that whatever documents EWS may have received from BANA did not support the information BANA reported regarding Ms. Ruane.

166.   Upon information and belief, BANA did not send EWS any information or documents that showed that Ms. Ruane had transacted or attempted to transact with her BANA account "in an unauthorized or prohibited manner" or that Ms. Ruane herself had deposited the fraudulent checks.

167.   On or around October 4, 2018, EWS held a webinar titled "Protecting Accounts, High-Risk Transactions & Mobile Apps: Adapting to Evolving Authentication Needs," available at http://resources.earlywarning.com/protecting-accounts-transactions-and-mobile-apps/webinar-protecting-accounts-transactions-and-mobile-apps.

168.   During the October 4th webinar, an EWS executive – identified as its Vice President of Authentication Products – stated that theft of consumers' personally identifiable information (PII) is rampant, due to data breaches, malware, phishing, selling of PII on the "dark web," and other threats.

169.   The EWS executive further stated, "Out of wallet questions or user name passwords are unreliable at times because that information is readily available due to PII exposure, social media, and data breaches."

170.   The EWS executive further stated, "Over 9.7 billion records have been breached since 2013."

171.   The EWS executive further stated, in reference to such devices as mobile phones, that financial institutions are faced with "[t]he problem of knowing who or what is in control of the device."

172.    The EWS executive further stated, "We've already established that thieves have customer information from rampant data breaches, social engineering, malware and phishing, *so let's assume that they can log in as your customer*." (Emphasis added.)

173.    In a blog posting on EWS' website dated October 26, 2018, titled "How to mitigate account fraud on mobile devices," available at http://resources.earlywarning.com/blog/how-to-mitigate-account-fraud-on-mobile-devices, EWS' Senior Director of Authentication is quoted as stating, "Data breaches have made personally identifiable information (PII) readily available."

~~166.~~174.    EWS' Senior Director of Authentication is further quoted as stating, "As more consumers use mobile banking, yes, the risk of fraud naturally goes up."

175.    Upon information and belief, EWS was, at the time it disseminated the negative information about Ms. Ruane, aware that theft of consumers' personal identifying information (PII) is rampant, due to data breaches and other threats.

176.    Upon information and belief, EWS is – and was, at the time it disseminated the negative information about Ms. Ruane – aware that because theft of consumers' PII is rampant, much, if not most, of the fraud committed on consumers' accounts is committed by fraudsters, and not by the consumers who own the accounts.

177.    Upon information and belief, when EWS reports consumers for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner," EWS has not previously vetted the accuracy of the furnished information, and engages in a review, if it does at all, only at such future time that a consumer disputes the information as inaccurate.

178.    Upon information and belief, EWS reports consumers for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" virtually every time a financial institution reports a consumer for having engaged in such conduct.

179.    Upon information and belief, EWS reports consumers for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" without uniform standards defining what constitutes such conduct.

180.    EWS, as a consumer reporting agency, is required to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates" in the first instance – every time it prepares a report. 15 U.S.C. § 1681e(b). Had EWS actually followed such required procedures, Ms. Ruane would never have been flagged as a fraudster in the first place.

181.    Upon information and belief, EWS did not follow *any* procedures to assure the maximum possible accuracy of the information furnished by BANA about Ms. Ruane, but instead simply parroted said information.

182.    Upon information and belief, BANA did not provide, and EWS did not require, even minimal evidence that the information furnished by BANA about Ms. Ruane was accurate – for example, verification that BANA possessed any evidence that Ms. Ruane was indeed the perpetrator, and not the victim, of the fraud on her account.

183.    Upon information and belief, EWS previously offered financial institutions a product called "Internal Fraud Prevention[SM] Service" (IFPS) to help financial institutions identify and screen out job applicants who had supposedly committed fraud as an employee at a financial institution.

184.    At least two putative class action lawsuits – *Abbas v. Early Warning Services, LLC*, 2:15-cv-01976-BSB (D. Ariz.) and *Muir v. Early Warning Services, LLC et al.*, 2:16-cv-00521-SRC-CLW (D. N.J.) – were filed against EWS by individuals who had been denied employment at a bank as a result of EWS' IPFS, after their previous financial-institution employers had reported them to EWS as having committed "internal fraud."

185.    According to the complaint in each of the two aforementioned putative class actions, the plaintiff disputed the "internal fraud" report to EWS, and EWS responded that it had conducted a reinvestigation into the disputed information, stating, "The reinvestigation confirms that your file contains information which is incomplete, inaccurate, or the accuracy of which cannot be verified."

186.    Both putative class actions alleged that EWS had failed to follow reasonable procedures designed to assure maximum possible accuracy, in violation of 15 U.S.C. § 1681e(b).

187.    In each of the two aforementioned putative class actions, EWS entered into a class-wide settlement that included monetary relief.

167.188.    Upon information and belief, EWS has ceased offering the "Internal Fraud Prevention[SM] Service" product to financial institutions.

189.    EWS is aware that virtually all banks and most credit unions will reject a person's application for a deposit account if the person's EWS report indicates that the person has transacted, or attempted to transact with an account in an unauthorized or prohibited manner.

168.190.    By simply parroting a financial institution's report that a consumer engaged in fraud and/or "[t]ransact[ed] (or attempt[ed] to transact) with an account in an unauthorized or prohibited manner", without taking any steps to vet the accuracy of such

reporting, EWS acts in reckless disregard of the truth and of the reputation and personal interests of the consumers who are thereby labeled as fraudsters.

~~169.~~191.   EWS knew that its reporting of Ms. Ruane for "[t]ransacting (or attempting to transact) with an account in an unauthorized or prohibited manner" would severely impair, if not extinguish, her ability to open an account at another financial institution.

~~170.~~192.   EWS intended for its reporting to have such an effect.

~~171.~~193.   EWS shared inaccurate, derogatory information about Ms. Ruane with at least one financial institution, Citibank.

194.   As a result, Ms. Ruane was denied a bank account by Citibank.

~~172.~~195.   In addition, upon information and belief, EWS shared inaccurate, derogatory information about Ms. Ruane with one or more entities defined as a "reseller" under 15 U.S.C. 1681a(u) – "a consumer reporting agency that assembles and merges information contained in the database of another consumer reporting agency … concerning any consumer for purposes of furnishing such information to any third party …" – and such reseller(s) then furnished the negative information about Ms. Ruane to one or more financial institutions.

**FIRST CLAIM FOR RELIEF**
(Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*)
(Against Defendant BANA)

~~173.~~196.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

~~174.~~197.   This claim arises under the Electronic Fund Transfer Act (EFTA) and Regulation E because it relates to incorrect, fraudulent and/or unauthorized electronic fund transfers.

175.198.        The ways in which Defendant BANA violated the EFTA and Regulation E include but are not limited to the following:

    a.   Failing to limit Plaintiff's liability for the erroneous, fraudulent and/or unauthorized electronic fund transfers in accordance with the EFTA and Regulation E;

    b.   Failing to conduct a good-faith investigation after Plaintiff notified BANA of the erroneous or fraudulent deposits into her account;

    c.   Failing to provide Plaintiff, within three business days after the conclusion of BANA's investigation, with an explanation for BANA's findings;

    d.   Failing to notify Plaintiff of her right to request copies of all documentation that BANA relied on to conclude that no error or fraud occurred; and

    e.    Knowingly and willfully concluding that Plaintiff's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to BANA at the time of its investigation.

176.199.        These actions are in violation of 15 U.S.C. §§ 1693f and 1693g and 12 C.F.R. §§ 1005.6 and 1005.11.

177.200.        As a direct and proximate result of BANA's violations of the EFTA and Regulation E, Plaintiff has sustained actual damages, plus such other damages as may be determined by the court. Plaintiff is entitled to recover actual damages, plus an additional sum of between $100 to $1000, the costs of the action, and a reasonable attorney's fee. 15 U.S.C. § 1693m.

178.201.      As a direct and proximate result of BANA's violations of the EFTA and Regulation E, Plaintiff suffered compensable harm, including actual damages and emotional distress.

179.202.      Because BANA knowingly and willfully concluded that Plaintiff's account was not in error when such a conclusion could not reasonably have been drawn from the evidence available to BANA at the time of its investigation, Plaintiff is also entitled to recover treble damages under § 1693f(e).

## SECOND CLAIM FOR RELIEF
(N.Y. Gen. Bus. Law § 349)
(Against Defendant BANA)

180.203.      Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

181.204.      New York prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ."  N.Y. Gen. Bus. Law § 349(a).

182.205.      An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions." N.Y. Gen. Bus. Law § 349(h).

183.206.      Defendant BANA violated § 349 of the New York General Business Law by using deceptive acts and practices in the conduct of its business.

184.207.      BANA's violations include, but are not limited to, representing to Plaintiff that BANA had performed a good-faith investigation of her dispute, when in fact BANA did not

do so; and representing to Plaintiff that BANA's records showed that she made the deposits in question when in fact BANA had no such evidence to this effect.

185.208.    BANA's conduct has a broad impact on consumers at large.

186.209.    BANA's conduct is directed toward consumers at large.

187.210.    Upon information and belief, BANA routinely represents to its customers – especially those with low account balances – that BANA has conducted a good-faith investigation of their disputes of activity on their accounts, when in fact BANA has not.

188.211.    Upon information and belief, BANA routinely informs its customers – especially those with low account balances – that BANA has concluded that they committed fraud or engaged in unauthorized activity on their accounts, when in fact BANA does not have a reasonable basis to conclude that those customers in fact did so.

189.212.    As a direct and proximate result of BANA's violations of § 349 of the New York General Business Law, Plaintiff has sustained actual damages in an amount to be proved at trial and is also entitled to punitive damages, injunctive relief, costs and attorney's fees.

### THIRD CLAIM FOR RELIEF
(California Business and Professions Code § 17200 *et seq*.)
(Against Defendant BANA)

190.213.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

191.214.    California Business and Professions Code § 17200 *et seq*., the "Unfair Competition Law" ("UCL"), defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice. The UCL provides that a court may order injunctive relief and restitution to affected members of the general public as remedies for violations of the UCL.

192.215.    Defendant BANA has committed acts of unfair competition proscribed by the UCL, including the acts and practices alleged herein.

193.216.    More particularly, as alleged above, without any basis Defendant BANA closed Plaintiff's BANA account in retaliation for disputing erroneous, fraudulent, or unauthorized deposits on her account, and prevented Plaintiff from opening an account at another financial institution by reporting her to Defendants ChexSystems and EWS as having committed fraud or engaged in unauthorized activity.

194.217.    The results of Defendant BANA's acts, including Plaintiff's subsequent inability to receive her widow's pension from Ireland, are set forth at length above.

195.218.    Defendant BANA's business acts and practices, as alleged above, are unlawful in that they violate provision of the statutes alleged in the preceding and following causes of action.

196.219.    Defendant BANA's business acts and practices, as alleged above, are unfair in that they offend public policy, are substantially injurious to consumers, and have no utility that outweighs the substantial harm to consumers.

197.220.    Defendant BANA's business acts and practices, as alleged above, are fraudulent in that they are likely to deceive the public and affected consumers as to their legal rights and obligations, and, by use of such deception, may preclude consumers from exercising legal rights to which they are entitled.

198.221.    Defendant BANA's unlawful, unfair, and fraudulent business acts and practices present a continuing threat to members of the general public in that Defendant BANA is currently engaging in such acts and practices, and will persist and continue to do so unless and until this Court issues an injunction and awards declaratory and restitutionary relief.

199.222.        As a direct and proximate result of the acts and practices described herein,

Defendant BANA has caused Plaintiff injury as set forth above.

200.223.        Under California Business and Professions Code § 17203, Plaintiff seeks

an order enjoining Defendant BANA from engaging in such acts and practices as alleged, above,

and ordering that Defendant BANA provide appropriate restitution to Plaintiff.

201.224.        In addition, under California Code of Civil Procedure § 1021.5, Plaintiff

seeks recovery of attorneys' fees, costs and expenses incurred in the filing and prosecution of

this action.

**FOURTH CLAIM FOR RELIEF**
(Breach of Duty of Good Faith and Fair Dealing under New York Uniform Commercial Code §§
1-203 and 4-103 and California Commercial Code §§1304 and 4103)
(Against Defendant BANA)

202.225.        Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs with the same force and effect as though fully set forth herein.

203.226.        Section 1-203 of New York's Uniform Commercial Code and California

Commercial Code § 1304 imposes an obligation of good faith in the performance of any

contract.

204.227.        Section 4-103 of New York's Uniform Commercial Code further states

that no bank may disclaim responsibility for its own lack of good faith or failure to exercise

ordinary care in the performance of its obligations.

205.228.        Similarly, California Commercial Code § 4103 states that no bank may

disclaim responsibility for its lack of good faith or failure to exercise ordinary or limit the

measure of damages for such lack or failure.

206.229.        Furthermore, New York and California law provides that all contracts

contain an implied covenant of good faith and fair dealing in the course of performance.

207.230.    Defendant BANA breached this duty, and indeed acted in bad faith, by holding Plaintiff liable for the erroneous or unauthorized deposits into her account.

208.231.    As a result of Defendant BANA's breach of the duty of good faith and fair dealing, Plaintiff is entitled to damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
(Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*)
(Against Defendant BANA)

209.232.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

210.233.    Defendant BANA is liable to Plaintiff for engaging in willful and negligent conduct in violation of the FCRA.

211.234.    Defendant BANA's violations of the FCRA include, but are not limited to:

a. Failing to conduct a reasonable investigation of the information disputed by Plaintiff;

b. Failing to review all relevant information provided to Defendant BANA by Defendant ChexSystems concerning Plaintiff's account; and

c. Failing to find that the information disputed by Plaintiff was inaccurate and incomplete, to report such a finding to all nationwide consumer reporting agencies to which Defendant BANA furnished the information, and to delete or permanently block the reporting of the disputed information.

212.235.    As a direct and proximate result of Defendant BANA's willful and negligent conduct in violation of the FCRA, Plaintiff suffered compensable harm. Plaintiff is entitled to recover actual damages or damages of not less than $100 and not more than $1,000, punitive damages, the costs of the action, and reasonable attorney's fees.

**SIXTH CLAIM FOR RELIEF**
(Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*)
(Against Defendants ChexSystems and EWS)

~~213.~~236.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

~~214.~~237.   Defendants ChexSystems and EWS are liable to Plaintiff for engaging in willful and negligent conduct in violation of the FCRA.

~~215.~~238.   Defendant ChexSystems' violations of the FCRA include, but are not limited to:

    a.   Failing to conduct a reasonable reinvestigation of derogatory information on Plaintiff's consumer report after receiving notice that Plaintiff disputed said information;

    b.   Failing to conduct an independent reinvestigation of the underlying facts and instead relying solely and exclusively on the information furnished by BANA;

    c.   Failing to review and consider all relevant information submitted by Plaintiff concerning her dispute;

    d.   Failing to delete the disputed information from Plaintiff's consumer report and file after reinvestigation, even though a reasonable reinvestigation would have revealed the disputed information to be inaccurate and/or incomplete;

    e.   Failing to employ and follow reasonable procedures to assure maximum possible accuracy of the information contained in Plaintiff's consumer report; and

    f.   Continuing to report the disputed information despite having knowledge of its inaccuracy and/or inability to verify the same.

216.239.    Defendant EWS's violations of the FCRA include, but are not limited to, failing to employ and follow reasonable procedures to assure maximum possible accuracy of the information contained in Plaintiff's consumer report.

217.240.    As a direct and proximate result of Defendants ChexSystems' and EWS's willful and negligent conduct in violation of the FCRA, Plaintiff suffered compensable harm. Plaintiff is entitled to recover actual damages or damages of not less than $100 and not more than $1,000, punitive damages, the costs of the action, and reasonable attorney's fees.

### SEVENTH CLAIM FOR RELIEF
(New York Fair Credit Reporting Act, N.Y. Gen. Bus. Law §§ 380-j and 380-k)
(Against Defendants ChexSystems and EWS)

218.241.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

219.242.    Defendants ChexSystems and EWS are liable to Plaintiff for engaging in willful and negligent conduct in violation of the NY FCRA.

220.243.    Defendants ChexSystems' and EWS's violations of the NY FCRA include, but are not limited to:

    a.  Reporting and maintaining in their respective files on Plaintiff information that they had reason to know was inaccurate;

    b.  Failing to maintain reasonable procedures designed to assure maximum possible accuracy of the information concerning Plaintiff; and

    c.  Failing to maintain reasonable procedures designed to avoid the above violations.

221.244.    As a direct and proximate result of Defendants ChexSystems' and EWS's willful and negligent conduct in violation of the NY FCRA, Plaintiff suffered compensable

harm. Plaintiff is entitled to recover actual damages, punitive damages, injunctive relief, the costs of the action, and reasonable attorney's fees.

## EIGHTH CLAIM FOR RELIEF
(California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785 *et seq*. ("CCCRAA"))
(Against Defendants ChexSystems and EWS)

222.245.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

223.246.    Defendants ChexSystems and EWS are liable to Plaintiff for engaging in willful and negligent conduct in violation of the CCCRAA.

224.247.    Defendants ChexSystems' and EWS's violations of the CCCRAA include, but are not limited to:

   a.   Failing to maintain reasonable procedures designed to assure maximum possible accuracy of the information concerning Plaintiff; and

   b.   As to Defendant ChexSystems, failing to conduct a proper reinvestigation of information disputed by Plaintiff, including by failing to conduct a proper review of information submitted by Plaintiff.

225.248.    As a direct and proximate result of Defendants ChexSystems' and EWS's willful and negligent conduct in violation of the CCCRAA, Plaintiff suffered compensable harm. Plaintiff is entitled to recover a civil penalty up to $2,500, the costs of the action, and reasonable attorney's fees.

## NINTH CLAIM FOR RELIEF
(California Consumer Credit Reporting Agencies Act, Cal. Civ. Code § 1785 *et seq*. ("CCCRAA"))
(Against Defendant BANA)

226.249.        Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

227.250.        Defendant BANA is liable to Plaintiff for engaging in willful and negligent conduct in violation of the CCCRAA.

228.251.        Defendant BANA's violations of the CCCRAA include, but are not limited to:

    a.  Furnishing information on specific transactions to consumer reporting agencies ChexSystems and EWS though Defendant BANA knew or should have known that the information was incomplete or inaccurate; and

    b.  Failing to conduct a proper investigation with respect to the information disputed by Plaintiff and to review relevant information submitted to Defendant BANA by Plaintiff.

229.252.        Defendant did not maintain reasonable procedures to comply with the CCCRAA.

230.253.        As a direct and proximate result of Defendant BANA's willful and negligent conduct in violation of the CCCRAA, Plaintiff is entitled to punitive damages.

**TENTH CLAIM FOR RELIEF**
(Defamation under New York common law and Cal. Civ. Code §§ 44 and 45a)
(Against Defendants ChexSystems and EWS)

231.254.        Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as though fully set forth herein.

232.255.        Defendants ChexSystems and EWS published statements in writing to Citibank and to other banks and entities that the above-referenced false and negative information , respectively, that Plaintiff engaged in "suspected fraud activity" and "[t]ransact[ed] (or

attempt[ed] to transact) with an account in an unauthorized or prohibited manner" belongs to Plaintiff.

233.256.    ChexSystems and EWS published these statements in response to any bank's or other financial institution's request for a consumer report on Plaintiff.

234.257.    The statements made by ChexSystems and EWS are false in that they inaccurately reflect Plaintiff's banking information and history, and paint Plaintiff as criminally dishonest.

235.258.    ChexSystems and EWS published these statements to Citibank and to other financial institutions that have requested a consumer report on Plaintiff.

236.259.    ChexSystems and EWS knew or should have known that the statements were false when made and had no factual basis for making the statements because Plaintiff had notified ChexSystems and EWS, in writing, that the information was inaccurate for the reasons stated above.

237.260.    Nonetheless, ChexSystems and EWS continued to publish the false and negative statements concerning Plaintiff's banking history, until at least April 2, 2018.

238.261.    The publications constitute libel per se.

239.262.    In publishing these false statements of fact, ChexSystems and EWS acted with malice and with the intent to injure Plaintiff's name and reputation and to severely impair, if not extinguish, her ability to open an account at a financial institution.

240.263.    ChexSystems' and EWS's statements have a tendency to injure and have injured Plaintiff's name, reputation, and ability to open an account at a financial institution, which in turn caused other injury as described above, including injury to her livelihood.

241.264.     ChexSystems' and EWS's publications of these statements were not

privileged.

242.265.     As a direct and proximate result of ChexSystems' and EWS's unlawful

conduct, Plaintiff suffered compensable harm, including actual damages and emotional distress.

## ELEVENTH CLAIM FOR RELIEF
(Defamation under New York common law and Cal. Civ. Code §§44, 45a, and 46)
(Against Defendant BANA)

243.266.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs with the same force and effect as though fully set forth herein.

244.267.     At the times pertinent hereto, Defendant BANA published statements of

fact – both orally and in writing, to ChexSystems and EWS, and possibly to other persons or

entities – that are false, and communicated negative representations concerning Plaintiff's

banking information and history.

245.268.     The statements made by BANA are false as outlined above.

246.269.     BANA published these statements at least to Defendants ChexSystems

and EWS.

247.270.     Defendant BANA knew or should have known that the statements were

false when made and had no factual basis for making the statements, as Plaintiff had notified

BANA that the statements were false for the reasons stated above. However, BANA continued to

publish such statements until at least April 2, 2018.

248.271.     The written statements and their publication constitute libel per se.

249.272.     The oral statements and their publication constitute slander per se.

250.273.      In publishing these false statements of fact, BANA acted with malice and with the intent to injure Plaintiff's name and reputation and to severely impair, if not extinguish, her ability to open an account at another financial institution.

251.274.      BANA's statements have a tendency to injure and have injured Plaintiff's name, reputation, and ability to open an account at a financial institution, which in turn caused other injury as described above, including injury to her livelihood.

252.275.      BANA's publications of these statements were not privileged.

253.276.      As a direct and proximate result of BANA's unlawful conduct, Plaintiff suffered compensable harm, including actual damages and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.      Enter judgment for Plaintiff on all causes of action;

2.      Enter an injunction requiring Defendant BANA to comply with the Electronic Fund Transfer Act, Regulation E, the Fair Credit Reporting Act, and the California Consumer Credit Reporting Agencies Act, and to train its employees accordingly;

3.      Enter an injunction requiring Defendant BANA to cease and desist from pursuing, or to correct, negative action against Plaintiff, including its negative reporting to consumer reporting agencies, in relation to the facts alleged herein;

4.      Enter an injunction requiring Defendants ChexSystems and EWS to comply with the Fair Credit Reporting Act, the New York Fair Credit Reporting Act, and the California Consumer Credit Reporting Agencies Act, and to train their respective employees accordingly;

5.      Enter an injunction requiring Defendants ChexSystems and EWS to permanently delete, and to not reinsert, negative information relating to the facts alleged herein from their

respective files on Plaintiff, and to maintain reasonable procedures designed to assure maximum possible accuracy of the information in their respective files concerning Plaintiff;

6.     Award actual, statutory, consequential, and punitive damages to Plaintiff;

7.     Award reasonable attorney's fees and costs to Plaintiff; and

8.     Award such other and further relief as may be just, equitable, and proper.

**JURY TRIAL DEMANDED.**

Dated:  New York, New York
        ~~July~~ November ~~2~~___, 2018                    Respectfully submitted,

                                                __/s/ Susan Shin_____
                                                By: Susan Shin
                                                Eve Weissman
                                                New Economy Project
                                                121 W. 27th St., Suite 804
                                                New York, New York 10001
                                                212-680-5100

                                                Brian L. Bromberg
                                                Bromberg Law Office, P.C.
                                                Standard Oil Building
                                                26 Broadway, 21st Floor
                                                New York, New York 10004
                                                212-248-7906

                                                *Attorneys for Plaintiff*